UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**08 1418**

**WEXLER, J.**

----------------------------------------------------------------X

CITY OF ANN ARBOR EMPLOYEES' RETIREMENT :
SYSTEM, Individually and On Behalf of All Others
Similarly Situated,

**BOYLE, M.J.**

                               Plaintiff,       :

                    - against -          :

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   APR 07 2008

BROOKLYN OFFICE

CITIGROUP MORTGAGE LOAN TRUST INC.,   :
CITIGROUP MORTGAGE LOAN TRUST 2007-2,
CITIGROUP MORTGAGE LOAN TRUST 2007-6,  :
CITIGROUP MORTGAGE LOAN TRUST 2007-AHL1,
CITIGROUP MORTGAGE LOAN TRUST 2007-AHL2,:
CITIGROUP MORTGAGE LOAN TRUST 2007-AHL3,
CITIGROUP MORTGAGE LOAN TRUST 2007-
AMC1, CITIGROUP MORTGAGE LOAN TRUST  :
2007-AMC2, CITIGROUP MORTGAGE LOAN
TRUST 2007-AMC3, CITIGROUP MORTGAGE  :
LOAN TRUST 2007-AMC4, CITIGROUP
MORTGAGE LOAN TRUST 2007-AR1, CITIGROUP :
MORTGAGE LOAN TRUST 2007-AR4, CITIGROUP
MORTGAGE LOAN TRUST 2007-AR5, CITIGROUP :
MORTGAGE LOAN TRUST 2007-AR7, CITIGROUP
MORTGAGE LOAN TRUST 2007-OPX1, CITIGROUP :
MORTGAGE LOAN TRUST 2007-WFHE1,
CITIGROUP MORTGAGE LOAN TRUST 2007-  :
WFHE2, CITIGROUP MORTGAGE LOAN TRUST
2007-WFHE3, CITIGROUP MORTGAGE LOAN  :
TRUST 2007-WFHE4, CITIGROUP GLOBAL
MARKETS INC., RANDALL COSTA, SCOTT  :
FREIDENRICH, PETER PATRICOLA, MARK I.
TSESARSKY, JEFFREY PERLOWITZ and EVELYN :
ECHEVARRIA,

                      Defendants.   :

----------------------------------------------------------------X

## NOTICE OF REMOVAL

        Pursuant to 28 U.S.C. §§ 1334(b), 1446, and 1452(a), and, alternatively, pursuant

to 28 U.S.C. §§ 1332 and 1441, as amended in relevant part by the Class Action Fairness Act of

2005 ("CAFA"), and authorized by 28 U.S.C. § 1453, defendants Citigroup Mortgage Loan

Trust Inc. ("Citigroup Mortgage"), Citigroup Mortgage Loan Trust 2007-2, Citigroup Mortgage

Loan Trust 2007-6, Citigroup Mortgage Loan Trust 2007-AHL1, Citigroup Mortgage Loan Trust

2007-AHL2, Citigroup Mortgage Loan Trust 2007-AHL3, Citigroup Mortgage Loan Trust 2007–

AMC1, Citigroup Mortgage Loan Trust 2007-AMC2, Citigroup Mortgage Loan Trust 2007-

AMC3, Citigroup Mortgage Loan Trust 2007-AMC4, Citigroup Mortgage Loan Trust 2007-

AR1, Citigroup Mortgage Loan Trust 2007-AR4, Citigroup Mortgage Loan Trust 2007-AR5,

Citigroup Mortgage Loan Trust 2007-AR7, Citigroup Mortgage Loan Trust 2007-OPX1,

Citigroup Mortgage Loan Trust 2007-WFHE1, Citigroup Mortgage Loan Trust 2007-WFHE2,

Citigroup Mortgage Loan Trust 2007-WFHE3, Citigroup Mortgage Loan Trust 2007-WFHE4

(collectively, the "Trust Defendants"), Citigroup Global Markets Inc., Randall Costa, Scott

Freidenrich, Peter Patricola, Mark I. Tsesarsky, Jeffrey Perlowitz and Evelyn Echevarria

(collectively, "Defendants"), by their undersigned attorneys, Cleary Gottlieb Steen & Hamilton

LLP, hereby remove the above-captioned civil action, and all claims and causes of action therein,

from the Supreme Court of the State of New York, County of Nassau, to the United States

District Court for the Eastern District of New York.  Defendants appear for the purpose of

removal only and for no other purpose and reserve all defenses and rights available to them, and

state as follows:

      1.     On March 19, 2008, the City of Ann Arbor Employees' Retirement

System purported to initiate this putative class action by filing a complaint in the Supreme Court

of the State of New York, County of Nassau, under Index No. 08/005187, purportedly on behalf

of itself and all persons or entities (collectively, "Plaintiffs") who acquired mortgage pass-

through certificates and asset-backed pass-through certificates allegedly issued by the Trust

Defendants.  Pursuant to Rule 81.1(b) of the Local Civil Rules of the United States Courts for the Southern and Eastern Districts of New York and 28 U.S.C. Section 1446(a), a true and correct copy of the summons and complaint, which is the only pleading thus far served upon Defendants, is attached hereto as <u>Exhibit A</u>.

2.    No Defendant was served prior to March 19, 2008, and this notice is being filed within 30 days of service on Defendants and thus is timely filed under 28 U.S.C. § 1446(b).

3.    Plaintiffs' complaint alleges that they purchased certain mortgage pass-through certificates and asset-backed pass-through certificates (the "Certificates") issued by the Trust Defendants, which purportedly were established by Citigroup Mortgage to issue the Certificates, pursuant to a Registration Statement filed with the United States Securities and Exchange Commission on December 12, 2006, and Prospectus Supplements incorporated therein.  Plaintiffs further allege that these documents contained materially false and misleading representations regarding the mortgage loans underlying the Certificates.  Plaintiffs seek to recover damages from Defendants pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act").

4.    More specifically, the alleged misrepresentations in the Registration Statement and Prospectus Supplements relate to certain mortgage loans underlying the Certificates (the "Mortgage Loans") allegedly purchased by Citigroup Mortgage from loan originators and their agents that include American Home Mortgage Corporation ("AHM"). AHM is alleged to have originated the largest number of Mortgage Loans for two of the trusts on which Plaintiffs base their suit, and AHM is also alleged to have originated a significant number of Mortgage Loans in a third trust.

3

5.      On August 6, 2007, AHM filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, In re American Home Mortgage Holdings, Inc., Case No. 07-11047, et seq. (the "AHM Bankruptcy Proceedings"). The AHM Bankruptcy Proceedings are currently pending before U.S. Bankruptcy Judge Christopher Sontchi.

6.      Pursuant to agreements containing certain indemnification provisions for the benefit of Citigroup Mortgage and other Defendants, and pursuant to statutory and common law, AHM owes Citigroup Mortgage and other Defendants indemnification and/or contribution obligations for any claims arising out of the public offering of Certificates relating to the Mortgage Loans that AHM originated. Such claims include, without limitation, Plaintiffs' claims in this lawsuit arising out of such Mortgage Loans. Citigroup Mortgage and other Defendants, through their affiliates, have asserted and reserved their rights to indemnification and contribution in a Proof of Claim filed in the AHM Bankruptcy Proceedings.

7.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), and this action may be removed to this Court by Defendants pursuant to 28 U.S.C. § 1452(a), because this lawsuit is "related to" a case under Chapter 11, namely the AHM Bankruptcy Proceedings. This lawsuit relates to AHM's bankruptcy rights in light of certain Defendants' rights to indemnification and contribution from AHM in the event a judgment is entered against them in this action and as a result of any costs and expenses incurred by these Defendants to defend against this action. Consequently, the outcome of this case will have a direct effect on the AHM bankruptcy estate.

8.      Alternatively, this action may be removed to this Court under 28 U.S.C. § 1332, as amended by CAFA, because it is a putative "class action" commenced after February

4

18, 2005 – i.e., the effective date of CAFA – in which the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a state different from any defendant. 28 U.S.C. § 1332(d)(2)(A).

9.     CAFA is applicable to this action because it was commenced on or about March 19, 2008 – i.e., after the effective date of CAFA. 28 U.S.C. §§ 1332, 1453.

10.     In addition, this action is a "class action" within the meaning of CAFA, because Plaintiffs seek to represent a class of persons in a civil action filed under CPLR § 901, et seq. – i.e., a "rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

11.     There is more than $5,000,000 in controversy in this action. Under 28 U.S.C. § 1332(d), as amended by CAFA, the amount in controversy in a putative class action is determined by aggregating the amount at issue in the claims of all members of the putative class. 28 U.S.C. § 1332(d)(6). Here, the complaint alleges that Defendants made false and misleading statements in connection with the issuance of billions of dollars worth of Certificates and that the value of the Certificates has declined substantially subsequent to and due to Defendants' alleged violations. Complaint ¶¶ 2, 60 and Prayer For Relief. While Defendants deny that Plaintiffs are entitled to recover any amount, and specifically deny that Plaintiffs are entitled to the relief in the various forms sought, these allegations plainly make the amount in controversy in this class action more than $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2).

12.     The requisite diversity of citizenship exists under 28 U.S.C. §§ 1132(d)(2) and (d)(7). To establish diversity jurisdiction under CAFA, it is sufficient that any one member of the putative class is a citizen of a state different from any one defendant, in contrast to the complete diversity requirement of typical diversity jurisdiction. 28 U.S.C. § 1332(d)(2)(A).

Among Defendants, there are citizens of Illinois, New York, New Jersey and North Carolina. Because a natural person can be a citizen of at most one state -- his or her state of domicile -- it follows a fortiori that at least one member of the proposed class is a citizen of a state different from at least one Defendant.

13.     Citigroup Mortgage is incorporated under the laws of the State of Delaware, with its principal place of business in New York, and was served on March 19, 2008; Citigroup Global Markets Inc. is incorporated under the laws of the State of New York, with its principal place of business in New York, and was served on March 19, 2008.  The Trust Defendants are trusts chartered under the laws of New York.  Randall Costa is a resident of the State of Illinois, with a business address of 131 South Dearborn Street, Chicago, Illinois, 60603, and was served on March 31, 2008; Scott Freidenrich is a resident of the State of New Jersey, with a business address of 388 Greenwich Street, New York, New York, 10013, and was served on March 31, 2008; Peter Patricola is a resident of the State of New Jersey, with a business address of 388 Greenwich Street, New York, New York, 10013, and was served on March 31, 2008; Mark Tsesarsky is a resident of the State of New York, with a business address of 388 Greenwich Street, New York, New York, 10013, and was served on March 31, 2008; Jeffrey Perlowitz is a resident of the State of New Jersey, with a business address of 388 Greenwich Street, New York, New York, 10013, and was served on March 31, 2008; and Evelyn Echevarria is a resident of the State of North Carolina, with a business address of 6525 Morrison Blvd., Suite 318, Charlotte, North Carolina, 28211, and was served on March 31, 2008.

14.     Although Defendants deny that it is their burden to show that CAFA's exceptions to jurisdiction in 28 U.S.C. §§ 1332(d)(4), (5) and (9) do not apply, none does.

a.     First, the exceptions in 28 U.S.C. §§ 1332(d)(4)(A) and (B) do not apply because they are limited to cases where, among other things, more than two-thirds of the putative class members are citizens of the state in which the action was originally filed.  28 U.S.C. §§ 1332(d)(4)(A) and (B).  There is no basis for concluding that two-thirds of the members of the proposed class are citizens of New York.

b.     Second, the exception in Section 1332(d)(5)(A) does not apply because Defendants are individuals and corporate and other private entities, not States, State officials or other governmental entities.  28 U.SC. § 1332(d)(5)(A).

c.     Third, the exception in Section 1332(d)(5)(B) does not apply because the number of putative class members is alleged to be in excess of 100.  28 U.S.C. § 1332(d)(5)(B).  Specifically, the complaint alleges that there are "hundreds" of members of the putative class. See Complaint ¶ 23.

d.     Finally, the exceptions in Section 1332(d)(9) do not apply because this case does not solely involve a claim: (1) concerning a "covered security" under Section 16(f)(3) of the 1933 Act; (2) relating to the internal affairs or governance of a corporation or other form of business enterprise and arising by virtue of the laws of the state in which such corporation or business enterprise is organized; or (3) relating to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security.  28 U.S.C. § 1332(d)(9).

15.     Defendants promptly will serve a copy of this Notice of Removal on counsel for Plaintiffs, and will file a copy of this Notice of Removal with the Clerk of the

Supreme Court of the State of New York, County of Nassau, pursuant to 28 U.S.C. Section

1446(d).

WHEREFORE, Defendants, under 28 U.S.C. §§ 1334(b), 1446, and 1452(a), and,

alternatively, under to 28 U.S.C. §§ 1332 and 1441, as amended in relevant part by CAFA, and

authorized by 28 U.S.C. § 1453, remove this action in its entirety from the Supreme Court of the

State of New York, County of Nassau, to this Court.


Dated:  New York, New York
        April 7, 2008

                                          CLEARY GOTTLIEB STEEN & HAMILTON LLP


                                          By: _____
                                              Lawrence B. Friedman,
                                              A Member of the Firm

                                          One Liberty Plaza
                                          New York, New York 10006
                                          (212) 225-2000

                                          Attorneys for Defendants



Of Counsel:

        Joseph Landau

EXHIBIT

A

#2008 03908

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

———————————————————— x
                                :

CITY OF ANN ARBOR EMPLOYEES'
RETIREMENT SYSTEM, Individually and On
Behalf of All Others Similarly Situated,

                            Plaintiff,

       vs.

CITIGROUP MORTGAGE LOAN TRUST INC.,
CITIGROUP MORTGAGE LOAN TRUST 2007-
2, CITIGROUP MORTGAGE LOAN TRUST
2007-6, CITIGROUP MORTGAGE LOAN
TRUST 2007-AHL1, CITIGROUP MORTGAGE
LOAN TRUST 2007-AHL2, CITIGROUP
MORTGAGE LOAN TRUST 2007-AHL3,
CITIGROUP MORTGAGE LOAN TRUST 2007-
AMC1, CITIGROUP MORTGAGE LOAN
TRUST 2007-AMC2, CITIGROUP MORTGAGE
LOAN TRUST 2007-AMC3, CITIGROUP
MORTGAGE LOAN TRUST 2007-AMC4,
CITIGROUP MORTGAGE LOAN TRUST 2007-
AR1, CITIGROUP MORTGAGE LOAN TRUST
2007-AR4, CITIGROUP MORTGAGE LOAN
TRUST 2007-AR5, CITIGROUP MORTGAGE
LOAN TRUST 2007-AR7, CITIGROUP
MORTGAGE LOAN TRUST 2007-OPX1,
CITIGROUP MORTGAGE LOAN TRUST 2007-
WFHE1, CITIGROUP MORTGAGE LOAN
TRUST 2007-WFHE2, CITIGROUP MORTGAGE
LOAN TRUST 2007-WFHE3, CITIGROUP
MORTGAGE LOAN TRUST 2007-WFHE4,
CITIGROUP GLOBAL MARKETS INC.,
RANDALL COSTA, SCOTT FREIDENRICH,
PETER PATRICOLA, MARK I. TSESARSKY,
JEFFREY PERLOWITZ and EVELYN
ECHEVARRIA,

                           Defendants.

———————————————————— x

Index No.: 08- 005187

Date Purchased: 3/19/08

Plaintiff designates Nassau County
as the place of trial.

The basis of the venue is
CPLR 503(a)

**SUMMONS**

Plaintiff resides at
301 E. Liberty Street
Suite 680
Ann Arbor, MI 48104

2008 MAR 19 PM 2 12

To the above named Defendant:

      You are hereby summoned to answer the complaint in this action and to serve a copy of your
answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the
Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of

service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED:   Melville, New York          COUGHLIN STOIA GELLER
         March 19, 2008                RUDMAN & ROBBINS LLP


                                      By:   SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD

                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone:  631/367-7100
                                      631/367-1173 (fax)

                                      Attorneys for Plaintiff

Defendant's address:

Citigroup Mortgage Loan Trust Inc.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Citigroup Mortgage Loan Trust 2007-2
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-6
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AHL1
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AHL2
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AHL3
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AMC1
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AMC2
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AMC3
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AMC4
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AR1
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AR4
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AR5
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-AR7
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-OPX1
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-WFHE1
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-WFHE2
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-WFHE3
Citigroup Mortgage Loan Trust Inc.
390 Greenwich Street
NY, NY 10013

Citigroup Mortgage Loan Trust 2007-WFHE4
390 Greenwich Street
NY, NY 10013

Citigroup Global Markets Inc
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Randall D. Costa
105 Prospect Street
White Plains, NY 10606

Scott H. Freidenrich
1015 Seward Avenue
Westfield, NJ 07090

Peter Patricola
14 Heather Hill Way
Holmdel, NJ 07733

Mark I. Tsesarsky
115 Central Park West, Apt. 20
New York, NY 10023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

——————————————————— x

CITY OF ANN ARBOR EMPLOYEES'
RETIREMENT SYSTEM, Individually and On
Behalf of All Others Similarly Situated,

                      Plaintiff,

    vs.

CITIGROUP MORTGAGE LOAN TRUST
INC., CITIGROUP MORTGAGE LOAN
TRUST 2007-2, CITIGROUP MORTGAGE
LOAN TRUST 2007-6, CITIGROUP
MORTGAGE LOAN TRUST 2007-AHL1,
CITIGROUP MORTGAGE LOAN TRUST
2007-AHL2, CITIGROUP MORTGAGE
LOAN TRUST 2007-AHL3, CITIGROUP
MORTGAGE LOAN TRUST 2007-AMC1,
CITIGROUP MORTGAGE LOAN TRUST
2007-AMC2, CITIGROUP MORTGAGE
LOAN TRUST 2007-AMC3, CITIGROUP
MORTGAGE LOAN TRUST 2007-AMC4,
CITIGROUP MORTGAGE LOAN TRUST
2007-AR1, CITIGROUP MORTGAGE LOAN
TRUST 2007-AR4, CITIGROUP
MORTGAGE LOAN TRUST 2007-AR5,
CITIGROUP MORTGAGE LOAN TRUST
2007-AR7, CITIGROUP MORTGAGE LOAN
TRUST 2007-OPX1, CITIGROUP
MORTGAGE LOAN TRUST 2007-WFHE1,
CITIGROUP MORTGAGE LOAN TRUST
2007-WFHE2, CITIGROUP MORTGAGE
LOAN TRUST 2007-WFHE3,

——————————————————— x

Index No. 08 - 005187

CLASS ACTION    DOF 3/19/08

COMPLAINT FOR VIOLATION OF §§11
AND 15 OF THE SECURITIES ACT OF
1933

DEMAND FOR JURY TRIAL

[Caption continued on following page.]

- 1 -

------------------------------------------------------------ x
                                                             :
CITIGROUP MORTGAGE LOAN TRUST                                :
2007-WFHE4, CITIGROUP GLOBAL                                 :
MARKETS INC., RANDALL COSTA,                                 :
SCOTT FREIDENRICH, PETER                                     :
PATRICOLA, MARK I. TSESARSKY,                                :
JEFFREY PERLOWITZ and EVELYN                                 :
ECHEVARRIA,                                                  :
                                                             :
                         Defendants.                         :
                                                             :
------------------------------------------------------------ x

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates and Asset-Backed Pass-Through Certificates (collectively, the "Certificates") of Citigroup Mortgage Loan Trust Inc. ("Citigroup Mortgage" or the "Depositor") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements issued during 2007 (collectively, the "Registration Statement"). This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").

2.     Citigroup Mortgage is a Delaware corporation formed for the purpose of acquiring, owning and transferring mortgage loan assets and selling interests in them. Citigroup Mortgage is an affiliate of Citigroup Global Markets Inc. ("Citigroup Global"). The issuers of the various offerings (the "Defendant Issuers") are the Trusts identified in ¶12, established by Citigroup Mortgage to issue billions of dollars worth of Certificates in 2007.

3.     On December 12, 2006, Citigroup Mortgage and the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing billions of dollars of Certificates. The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement. The Certificates were supported by pools of mortgage loans. The Registration Statement represented that the mortgage pools would primarily consist of loans generally secured by liens on residential properties, including conventional and adjustable-rate mortgage loans.

4.     Investors purchased the Certificates based upon three primary factors: return (in the form of interest payments), timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets). The Registration Statement included false statements and/or

- 2 -

omissions about: (i) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (ii) the maximum loan-to-value ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; and (iv) the debt-to-income ratios permitted on the loans.

5.      The true facts which were omitted from the Registration Statement were:

•       The originators of the underlying mortgage loans to Citigroup Mortgage were issuing many of the mortgage loans to borrowers who: (i) were not in compliance with the prudent or maximum debt-to-income ratio purportedly required by the lenders; (ii) did not provide adequate documentation to support the income and assets required to issue the loans pursuant to the lenders' stated guidelines; (iii) were steered to stated income/asset and low documentation mortgage loans by lenders, lenders' correspondents or lenders' agents, such as mortgage brokers, because the borrowers could not qualify for mortgage loans that required full documentation; and (iv) did not have the income or assets required by the lenders' own guidelines to afford the required mortgage loan payments, which resulted in a mismatch between the needs and capacity of the borrowers.

•       The lenders or the lenders' agents knew that the borrowers either could not provide the required documentation or the borrowers refused to provide it.

•       The underwriting, quality control, and due diligence practices and policies utilized in connection with the approval and funding of the mortgage loans were so weak that borrowers were being extended loans based on stated income in the mortgage loan applications with purported income amounts that could not possibly be reconciled with the jobs claimed on the loan application or through a check of free "online" salary databases such as salary.com.

•       The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded.  In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating USPAP regulations.[1]

---

[1]      The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America. USPAP contains standards for all types of appraisal services.  Standards are included for real estate, personal property, business and mass appraisal.

6.     As a result, the Certificates sold to plaintiff and the Class were secured by assets that had a much greater risk profile than represented in the Registration Statement.  In this way, defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings.

7.     By the Fall of 2007, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public, increasing the risk of the Certificates receiving less absolute cash flow in the future and the likelihood that investors would not receive it on a timely basis.  The credit rating agencies also began to put negative watch labels on the Certificate tranches or classes, ultimately downgrading many.  As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiff and the Class and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

## JURISDICTION AND VENUE

8.     The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.  Section 22 of the 1933 Act explicitly states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States."  Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law.  This is an action asserting federal law claims.  Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and therefore is not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

- 4 -

9.     The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this County. Citigroup Mortgage and Citigroup Global conduct business in this County.

## PARTIES

10.     Plaintiff City of Ann Arbor Employees' Retirement System acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.

11.     Defendant Citigroup Mortgage is a Delaware corporation headquartered in New York, New York.  It is a special purpose corporation formed in 2002.  Defendant Citigroup Mortgage was the Depositor.

12.     The Defendant Issuers of the various Certificates are each New York common law trusts. Each of these Trusts issued hundreds of million of dollars worth of Certificates pursuant to a Prospectus Supplement which listed numerous classes of the Certificates.  The Defendant Issuers are:

| | |
|---|---|
| Citigroup Mortgage Loan Trust 2007-2 | Citigroup Mortgage Loan Trust 2007-WFHE4 |
| Citigroup Mortgage Loan Trust 2007-6 | Citigroup Mortgage Loan Trust 2007-AHL1 |
| Citigroup Mortgage Loan Trust 2007-AHL2 | Citigroup Mortgage Loan Trust 2007-AHL3 |
| Citigroup Mortgage Loan Trust 2007-AMC1 | Citigroup Mortgage Loan Trust 2007-AMC2 |
| Citigroup Mortgage Loan Trust 2007-AMC3 | Citigroup Mortgage Loan Trust 2007-AMC4 |
| Citigroup Mortgage Loan Trust 2007-AR1 | Citigroup Mortgage Loan Trust 2007-AR4 |
| Citigroup Mortgage Loan Trust 2007-AR5 | Citigroup Mortgage Loan Trust 2007-AR7 |
| Citigroup Mortgage Loan Trust 2007-OPX1 | Citigroup Mortgage Loan Trust 2007-WFHE1[2] |
| Citigroup Mortgage Loan Trust 2007-WFHE2 | Citigroup Mortgage Loan Trust 2007-WFHE3 |

13.     Defendant Citigroup Global Markets Inc. ("Citigroup Global") is a securities firm which provides a range of financial services, including engaging in the mortgage banking business.

---

[2]     The WFHE Certificates are Asset-Backed Pass-Through Certificates whereas the other Trust Series are Mortgage Pass-Through Certificates.

Citigroup Global is a corporation based in New York, New York. Citigroup Global acted as the underwriter in the sale of all the Citigroup Mortgage offerings, helping to draft and disseminate the offering documents. Citigroup Global was the underwriter for all of the Trusts.

14.     Defendant Randall Costa ("Costa") was Principal Executive Officer, President and director of Citigroup Mortgage during the relevant time period. Defendant Costa signed the December 12, 2006 Registration Statement.

15.     Defendant Scott Friedenrich ("Friedenrich") was Principal Financial Officer and Treasurer of Citigroup Mortgage during the relevant time period. Defendant Friedenrich signed the December 12, 2006 Registration Statement.

16.     Defendant Peter Patricola ("Patricola") was Controller of Citigroup Mortgage during the relevant time period. Defendant Patricola signed the December 12, 2006 Registration Statement.

17.     Defendant Mark I. Tsesarsky ("Tsesarsky") was a director of Citigroup Mortgage during the relevant time period. Defendant Tsesarsky signed the December 12, 2006 Registration Statement.

18.     Defendant Jeffrey Perlowitz ("Perlowitz") was a director of Citigroup Mortgage during the relevant time period. Defendant Perlowitz signed the December 12, 2006 Registration Statement.

19.     Defendant Evelyn Echevarria ("Echevarria") was a director of Citigroup Mortgage during the relevant time period. Defendant Echevarria signed the December 12, 2006 Registration Statement.

20.     The defendants identified in ¶¶14-19 are referred to herein as the "Individual Defendants." The Individual Defendants functioned as directors to the Trusts as they were directors to Citigroup Mortgage and signed the Registration Statement for the registration of the securities issued by the Trusts.

- 6 -

21. These defendants aided and abetted, and/or participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

22. Plaintiff brings this action as a class action pursuant to CPLR 901, *et seq.*, on behalf of a class consisting of all persons or entities who acquired the Certificates between January 2007 and October 2007 pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-138237) and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

23. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Citigroup Mortgage and Citigroup Global or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The Registration Statement issued billions of dollars worth of Certificates.

24. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

28.     Citigroup Mortgage is engaged in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting. Citigroup Mortgage was set up to acquire mortgage loan pools that were transferred to the Trusts, from which the Certificates of various classes were sold to investors pursuant to the Registration Statement and Prospectus Supplements. While these offering documents contained data about the mortgage loans, some of the most important information for plaintiff and the other members of the Class, which was omitted from the Registration Statement and



actually involved the underwriting, quality control, due diligence, approval . . . . . . Prospectus Supplements
policies for the mortgage loans and the likelihood and ability of borrowers . . . . . . . and funding practices an

to repay the mortgage loans according to the terms of the mortgage note and the mortgage or the

deed of trust. This depended on several factors, including creditworthiness of borrowers, debt-to-

income levels, loan-to-value ratios, assets of the borrower, occupancy of the property securing the

mortgage loan, and the accuracy of other data collected during the origination of the mortgage loans.

### THE FALSE AND MISLEADING REGISTRATION
### STATEMENT/PROSPECTUS SUPPLEMENTS

29.     Defendants caused the Registration Statement/Prospectus Supplements to be filed

with the SEC between January 2007 and October 2007 in connection with the issuance of billions of

dollars in Certificates.   The Registration Statement/Prospectus Supplements were false and

misleading. The Registration Statement incorporated by reference the subsequently filed Prospectus

Supplements. The December 12, 2006 Registration Statement represented that:

> This Registration Statement consists of (i) a basic prospectus for use in a
> residential or multifamily transaction and (ii) two forms of prospectus supplement
> (one form to be used in offering a Series of Senior/Subordinate Certificates and the
> second form to be used in offering Mortgage-Backed Notes). Each basic prospectus
> used (in either preliminary or final form) will be accompanied by the applicable
> prospectus supplement.

30.     The Trusts and Citigroup Mortgage were the "Issuers" that caused the Registration

Statement, dated December 12, 2006, to be filed with the SEC, which Registration Statement

discussed the mortgage loans contained in the mortgage pools held by the Defendant Issuers.

Defendants represented that the loans underlying the Certificates were loans made to borrowers

whose income documentation was not subject to quite as rigorous a set of standards as for other

borrowers, but that the loans were made based on the value of the underlying properties, as

confirmed by the appraisals of the properties.

**Omitted Verification Data**

31.     The Registration Statement/Prospectus Supplements emphasized the underwriting

standards utilized to generate the underlying mortgage loans held by the Defendant Issuers, but

omitted material facts related thereto. The Registration Statement stated that with respect to each mortgage loan, underwriting standards were applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. The Registration Statement further stated that in many cases an employment verification was obtained from an independent source, typically the borrower's employer. The verification purportedly confirmed, among other things, the length of employment with an organization, the borrower's actual salary and whether it is expected that the borrower would continue employment in the future. Where a prospective borrower was self-employed, the Registration Statement/Prospectus Supplements stated that the borrower was required to submit other verification materials.

32.     These representations were materially false and misleading because they omitted the fact that the lenders (and the lenders' agents, such as mortgage brokers) that transferred loans to Citigroup Mortgage, which were then placed into the Defendant Issuers, had become so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation. Similarly, those self-employed borrowers who were actually required to submit stated income applications would include income levels which were routinely inflated to extreme levels and objectively unreasonable relative to the stated job titles. These practices had the effect of both dramatically increasing the risk profile of the Certificates and substantially diminishing their actual value.

**Defective Appraisals**

33.     The Registration Statement and Prospectus Supplements also represented that in determining the adequacy of the property to be used as collateral, an appraisal was made of each property considered for financing. In instances where appraisals were conducted, the appraisers



construction had been completed. The Registration Statement asserted that appraisals were purportedly based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home, and adhered to USPAP regulations and requirements.

34.     These representations were materially false and misleading in that they omitted to state that the appraisals were inaccurate due to: (i) a complete lack of controls at the originators and the Depositor; and (ii) the lenders and/or their agents, such as mortgage brokers, exerted pressure on appraisers to come back with pre-determined, preconceived – and false – appraisal values. Appraisers were secretly pressured to appraise properties at artificial levels or they would not be hired again, resulting in appraisals being done on a "drive-by" basis where appraisers issued their appraisals without reasonable bases for doing so.

**The Prospectus Supplements Contained False Statements**
**About the Originators' Underwriting Practices**

35.     The Prospectus Supplements omitted material facts about the underwriting practices of American Home Mortgage Corp. ("AHM"), which was a key originator in the following Trusts:

> 2007-AR1
> 2007-6
> 2007-AR7

36.     For example, the Prospectus Supplement dated January 30, 2007, for Series 2007-AR1, stated:

> (a)     American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations. Exceptions to the underwriting standards may be permitted where compensating factors are present. In the case of investment properties and two-to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes. Because each loan is different, American Home expects and

encourages underwriters to use professional judgment based on their experience in making a lending decision.

*Omitted Information*: The standards applied in connection with the underwriting of loans generated by AHM were not in compliance with applicable federal and state laws and regulations. In fact, in order to continue to avoid a decline in loan volume, AHM regularly granted exceptions even where "compensating factors" were not present. A third of its mortgages were pay-option adjustable rate mortgages ("ARMs") which allowed borrowers to make payments of less than even the interest accruing on the loan, which had the effect of not just never reducing the principal, but actually added the deferred interest payments to the principal balance. In fact, AHM encouraged underwriters to generate loans regardless of the applicable risk factors without regard to reasonable professional judgment in order to generate loan production, because it reported few, if any, of the loans on its balance sheet and its business relied on volume. Thus, AHM was granting exceptions as a matter of course.

(b)     American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

*Omitted Information*: AHM was granting loans to applicants whose creditworthiness was impaired in order to generate loan volume regardless of the applicants' ability or willingness to repay the debt they were incurring. In fact, AHM was, as a matter of course, awarding loans to speculators who were not occupying the homes without properly verifying income. AHM knew the high proportion of non-owner occupied loans would decrease the borrowers' "willingness" to continue to pay loan payments if home prices stagnated or dropped. AHM subsequently suffered massive losses due to the failure of loans made to *"borrowers whose income [AHM] hadn't verified."* Smartmoney.com, July 31, 2007.

(c)     Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the

- 12 -

information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. *Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements*.

*Omitted Information*: Granting loans under stated income applications enhanced the importance of accurate property appraisals and credit score data. However, prior to 2007 the appraisal process had been substantially eroded such that many of the real estate properties underlying the Alt-A loans were not the subject of legitimate appraisals done in compliance with USPAP standards, including many of the appraisals done in Texas and Illinois. Moreover, the credit scores of many AHM borrowers, which was the purported reason for permitting loans with less verification, were manipulated by borrowers who either became an approved user on another person's credit card who had better credit or by complaining without basis to the credit score companies.

      (d)     In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

- 13 -

*Omitted Information*: Contrary to the representations in the Registration Statement about the strict qualifications and standards used to underwrite conforming loans, loans were being regularly granted where the borrowers' income did not support the total housing expense on an ongoing basis. In fact, many of the loans granted did not comply with the requirements of the underwriting systems used and/or were granted notwithstanding their failure to meet the existing processing standards. In fact, AHM was not nearly as meticulous with evaluating borrowers as the statement above implies. Borrowers were extended loans despite documentation, ability to pay and appraisal problems as well as abusive bait and switch tactics. During 2007 there were repeated complaints due to AHM's efforts in 2006-2007 to inflate its loan volume. In fact, during 2007 borrowers lodged repeated complaints that loans were switched on them by AHM, leaving them with mortgages they could not pay.

(e)      Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by American Home's vendor management company or an underwriter of American Home or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction, loans on second homes or loans on investment properties. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher

- 14 -

coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

*Omitted Information*: In fact, appraisals were not done with vigorous onsite inspections of each property and in compliance with USPAP standards, but rather were regularly inflated in order to generate a preordained value to justify loan approval. Moreover, the appraisals were subject to only a cursory review and/or no review at all for accuracy and consistency by AHM and/or its representatives. Loans were regularly being extended with high loan-to-value ratios without requiring higher coverage levels and/or being approved via the use of inflated appraisals. AHM's loan-to-value ratios assumed valid appraisals were performed. This was not the case, as appraisers felt pressured to appraise to predetermined values and artificially inflated appraisals were common.

(f)     American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

*Omitted Information*: AHM was using anything but "common sense" in granting mortgages to customers with little or no money down. Exceptions were not made for "quality" loans, but rather were granted as a matter of course. In fact, one third of the mortgages held in the pools were pay-option ARMs, many of which were made to speculators.

37.     Similar representations about AHM's underwriting practices were made in the Prospectus Supplements of other Trusts in which AHM was a key originator.

38.     The Prospectus Supplements made false statements about the underwriting practices of Accredited Home Lenders, Inc. ("Accredited") which, on its own and through its acquisition of

- 15 -

Aames Capital Corporation ("ACC") and its subsidiary Aames Funding, was a key originator in the

following Trusts:

> 2007-AHL1
> 2007-AHL2
> 2007-AHL3

    39.    For example, the Prospectus Supplement dated February 27, 2007, for Series 2007-

AHL1, stated:

> (a)    All mortgage loans were underwritten generally in accordance with underwriting guidelines developed by Aames Funding, as described below, subject to certain exceptions with respect to individual mortgage loans.
>
>     Aames Funding's underwriting guidelines were designed to assess the borrower's creditworthiness and the adequacy of the real property as collateral for the loan. The borrower's creditworthiness was assessed by examination of a number of factors, including calculation of debt-to-income ratios, which is the sum of the borrower's monthly debt payments divided by the borrower's monthly income before taxes and other payroll deductions, an examination of the borrower's credit history and credit score through standard credit reporting bureaus, and by evaluating the borrower's payment history with respect to existing mortgages, if any, on the property.
>
>     Aames Funding's underwriting policy was to analyze the overall situation of the borrower and to take into account compensating factors that may be used to offset certain areas of weakness. These compensating factors include the borrower's history of payments on his prior mortgage, credit scores, proposed reductions in the borrower's debt service expense, employment stability, number of years in residence and net disposable income.

***Omitted Information***: In fact, Aames Funding was regularly extending loans without regard to the

borrowers' creditworthiness or the adequacy of the underlying real property, which served as

collateral for the loan. Instead of taking into account the potential borrower's debt-to-income ratios

and credit history, credit score and appraisals, ACC and Aames Funding were granting loans without

regard to creditworthiness. Loans generated by mortgage brokers were accepted even though they

had little or no internal controls over underwriting practices. In fact, Aames Funding was making

loans to low-income elderly borrowers without regard to their ability to continue to fund the ongoing

- 16 -

mortgage payment as long as the potential borrower purportedly had substantial equity in the

property. Indicative of its aggressiveness was a mailer sent to elderly low-income borrowers:

> Even if you have credit problems, we can probably still help you out. That's because
> it's your equity, not your income or credit that matters most.

Aames Funding's emphasis on subprime borrowers resulted in it increasing the percentage of its

loans to such borrowers by over 80% between 2004 and 2005, reaching 90% of all loans made by

2005.

     (b)    An assessment of the adequacy of the real property as collateral for
the loan is primarily based upon an appraisal of the property and a calculation of the
loan-to-value ratios of the loan applied for and of all mortgages existing on the
property, including the loan applied for the combined loan-to-value ratio, to the
appraised value of the property at the time of origination. Appraisers determine a
property's value by reference to the sales prices of comparable properties recently
sold, adjusted to reflect the condition of the property as determined through
inspection.

*Omitted Information*: Aames Funding was not exercising reasonable control over brokers to prevent

them from pressuring appraisers to appraise to certain values, causing larger numbers of inflated

(and hence worthless) appraisals. Because of the credit problems of many of the borrowers, the

appraisals were extremely important and the omission of the information about weakness in the

appraisal process was significant.

     (c)    A critical function of Aames Funding's underwriting process was to
identify the level of credit risk associated with each applicant for a mortgage loan.
Aames Funding established six principal classifications, with respect to the credit
profile of potential borrowers, and assigned a rating to each loan based upon these
classifications. Aames Funding assigned credit grades by analyzing mortgage
payment history, consumer credit history, credit score, bankruptcy history and debt-
to-income ratio. If an individual loan application did not meet Aames Funding's
formal written underwriting guidelines, its underwriters could make underwriting
exceptions up to certain limits within its formal exception policies and approval
authorities. From time to time, Aames Funding may have applied underwriting
criteria that were either more stringent or more flexible depending upon the
economic conditions of a particular geographic market.

*Omitted Information*: Aames Funding was not assessing credit risk as represented. As a "predatory

lender" Aames Funding granted exceptions to its underwriting guidelines, as a matter of course, in

- 17 -

order to achieve volume goals. And for this reason, Aames Funding later experienced a large number of foreclosures.

> (d)     The underwriting of a mortgage loan to be originated or purchased by Aames Funding generally included a review of the completed loan package, which included the loan application, a current appraisal, a preliminary title report and a credit report. All loan applications and all closed loans offered to Aames Funding for purchase were required to be approved by Aames Funding in accordance with its underwriting criteria. Aames Funding regularly reviewed its underwriting guidelines and made changes when appropriate to respond to market conditions, the performance of loans representing a particular loan product or changes in laws or regulations.

*Omitted Information*:   Aames Funding's review of purportedly completed loan packages was cursory and in some cases non-existent. Thus, there was no reasonable basis to state and it was not true that all of the loan applications and loans closed were approved in accordance with Aames Funding's underwriting criteria. In fact, due to Aames Funding's lack of controls over its brokers, there was often little, if any, review of the underwriting process. In fact, the opposite was true, since the loans were being sold off via securitizations (not held on Aames Funding's balance sheet), brokers were compensated only for getting loans approved – not disapproved – and there were no material adverse consequences to the broker if the loan subsequently went bad.

40.     The Prospectus Supplements also omitted material facts about the underwriting practices of Countrywide Home Loans, Inc., which was the key originator in the following Trusts:

> 2007-AR1
> 2007-AR4
> 2007-6
> 2007-AR7

41.     For example, the Prospectus Supplement for Series 2007-6, dated April 30, 2007, stated,

> (a)     The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

***Omitted Information***: In fact, lending officers were regularly satisfied about adverse information in a borrower's credit report by ignoring such adverse information. Lending officers and originators also knew that borrowers frequently complained to credit rating agencies about adverse information that was in fact true, knowing that the rating agencies, if they could not confirm the adverse information within a specified time period, would remove the adverse information from the report.

> (b) Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program, whose values were confirmed with a Fannie Mae proprietary automated valuation model, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

***Omitted Information***: In fact, Countrywide's home loan appraisals were not obtained from truly independent appraisers or appraisal services, but rather were obtained from appraisers who understood that unless appraisals were generated at predetermined amounts that would enable a loan to be approved, they would no longer continue to get business from Countrywide home loans or brokers working with Countrywide. The effect was that purportedly independent appraisals generated in connection with Countrywide home loans were not prepared in conformance of Fannie Mae or Freddie Mac appraisal standards. Countrywide failed to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Prospectus Supplements/Registration Statement. This was particularly true in 2006-2007 when real estate values in many of the locations where the mortgage pools were located had stopped increasing at the rapid pace of 2004-2005. Thus, the aggressive lending practices

- 19 -

introduced during those years (where borrowers were granted large mortgages in excess of their

ability to pay with the assurance that refinancing would be possible in a short time) were extremely

risky and likely to lead to significant defaults in years when real estate prices did not increase or

even decreased.

> (c)     Under its Standard Underwriting Guidelines, Countrywide Home
> Loans generally permits a debt-to-income ratio based on the borrower's monthly
> housing expenses of up to 33% and a debt-to-income ratio based on the borrower's
> total monthly debt of up to 38%.

*Omitted Information*:  Countrywide's debt-to-income ratios were misstated (understated) by the

manipulation of reported income levels on loan applications, many times with the knowledge of the

mortgage broker.   The broker would get paid if the loan went through – even with false

information – but would not get paid if they questioned obviously distorted income levels.

Countrywide took no meaningful steps to prevent these practices as Countrywide was highly

motivated to close and securitize loans – regardless of the underlying risk profile.  In fact, during the

summer of 2007, when there was increasing publicity about suspect lending practices, Countrywide

did an audit of lending practices by certain mortgage brokers and found many inconsistencies in loan

applications, but did nothing about it.

> (d)     Under the Stated Income/Stated Asset Documentation Program, the
> mortgage loan application is reviewed to determine that the stated income is
> reasonable for the borrower's employment and that the stated assets are consistent
> with the  borrower's income. The Stated Income/Stated Asset Documentation
> Program  permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans
> originated under the Stated Income/Stated Asset Documentation Program are
> generally eligible for sale to Fannie Mae or Freddie Mac.

*Omitted Information*: In fact, stated income amounts far in excess of those reasonable for the

borrowers' employment were regularly ignored in order to approve loans under the stated income

and stated asset documentation programs.  Countrywide was offering stated income loans up to

100% loan-to-value until March 2007.  In fact, in March 2007, Countrywide assured borrowers that

100% financing was still available:

"We want to assure homeowners that there is still an extensive selection of mortgage loans to suit a multitude of personal and financial circumstances," said Tom Hunt, managing director of Countrywide Home Loans. "We recognize it's been widely reported that some major lenders, like Countrywide, no longer offer 100% financing. In fact, we have made changes to certain subprime and other special mortgage programs, but we have not eliminated 100% financing. We still offer one of the widest selections of low- and no-downpayment options to qualified customers, including those with less-than-perfect credit."

42.     The Prospectus Supplements included false statements about the underwriting

practices of Argent Mortgage Company, LLC ("Argent"), now a division of Citigroup and a key

originator for the following Trusts:

> 2007-AMC1
> 2007-AMC2
> 2007-AMC3
> 2007-AMC4

43.     For example, the Prospectus Supplement for Trust Series 2007-AMC2, dated

February 15, 2007, stated:

(a)     Unless otherwise specified in the related prospectus supplement, the underwriting standards are applied by the originators to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. Initially, a prospective borrower is required to fill out a detailed application regarding pertinent credit information. As part of the description of the borrower's financial condition, the borrower is required to provide a current balance sheet describing assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In addition, an employment verification is obtained that reports the borrower's current salary and may contain information regarding length of employment and whether it is expected that the borrower will continue such employment in the future.

*Omitted Information*: Argent, referred to in late 2007 by The New York Times as a "troubled

subprime mortgage" entity, had been granting stated income loans at high loan-to-value ratios and

was failing to monitor brokers and correspondents and failing to perform due diligence of brokers

and correspondents, including reconciling adverse information found in database searches during the

broker approval process. In fact, Argent's due diligence and underwriting practices were so poor

that it was forced to agree to a cease-and-desist order in Georgia which required it to implement "Common Sense Underwriting" procedures to ensure that terms and conditions of loan programs matched the status of the borrowers (*e.g.*, a salaried, large firm employee should apply for a full document program rather than a stated income loan). Thus, Argent had engaged in practices contrary to those represented as to employment verification and evaluation of borrowers' repayment ability.

> (b)     In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing, except in the case of new manufactured homes, as described under "The Trust Funds." Each appraiser is selected in accordance with predetermined guidelines established for appraisers. The appraiser is required to inspect the property and verify that it is in good condition and that construction, if new, has been completed.

***Omitted Information***: Appraisers were, in fact, selected according to their willingness to appraise to specified values and not based upon objective appraisal standards.

44.     The Prospectus Supplements included false statements about the loan underwriting practices of Opteum Financial Services, LLC ("Opteum" or "OFS") which was a key originator for the following Trusts:

> 2007-OPX1
> 2007-6
> 2007-AR7

45.     For example, the Prospectus Supplement for Trust Series 2007-OPX1, dated February 15, 2007, stated:

> (a)     Exceptions. The following program parameters that are used by OFS are guidelines only.  OFS, on a case-by-case basis, may determine that the prospective mortgagor warrants an exception outside the standard program guidelines.  Exceptions may be granted if the loan application reflects certain compensating factors, including instances where the prospective mortgagor has demonstrated an ability to save and devote a greater portion of income to basic housing needs.  Other compensating factors may include a low loan-to-value; an excellent mortgage pay history; the primary borrower possesses a higher credit score than required; a substantial net worth to suggest that the repayment of the loan is within the prospective mortgagor's ability and/or the borrower has demonstrated an

- 22 -

ability to maintain a debt-free position and the value of the mortgaged property as collateral for the loan is adequate.

*    *    *

OFS allows the following variances from its underwriting guidelines with respect to mortgage loans originated by national builders: 1) verifying documentation relating to completion of work; 2) appraisal review requirements for owner occupied loan amounts less than $1 million are not required; 3) real estate commissions are allowed up to a maximum of 10%; and 4) exceptions for debt to income ratios allowed. Also, national builders originate loans under the "Skip It" program which allows borrowers who owner occupy the property to have no payments for the first (6) six months on their fist mortgage lien. The total dollar amount of the payments required for the first six months are paid by the builder to OFS at the time of purchasing of the loan.

**Omitted Information**: Exceptions to guidelines were granted as a matter of course – not just where compensating factors existed. The exceptions were granted so that loans would be issued to borrowers even when compensating factors were not present. Opteum, partially owned by Citigroup, was a lender that provided funding for homebuilders, who were some of the most aggressive in pushing borrowers into loans. Opteum served as a middleman between Wall Street and builders. Opteum provided developers with financing for their mortgage operations, then resold the loans to investment banks, which packaged them as securities and sold them to investors. The whole process made it easier for developers to build and sell homes when demand was otherwise declining. It also made it possible for Opteum to continue to generate fee income.

> (b)    OFS generally includes in its origination process by performing a pre-funding audit on each mortgage loan originated by OFS's retail and wholesale origination platforms including a review for compliance with the related program parameters and accuracy of the legal documents. OFS generally performs verbal audits of the borrower's income or employment and a verification of social security numbers of each borrower, and reviews the property ownership history that is provided by outside services prior to the disbursement of the loan.

**Omitted Information**: OFS did not in fact verify borrower information obtained via its origination process prior to disbursement, resulting in excessive early payment defaults and delinquencies. Ultimately, OFS had to completely correct its underwriting practices which were not as represented and were much looser than suggested by the Registration Statement.

46. The Prospectus Supplements made false statements about the loans originated by Wells Fargo Bank, N.A. ("Wells Fargo") which was a key originator for the following Trusts:

| | |
|---|---|
| 2007-2 | 2007-WFHE1 |
| 2007-AR1 | 2007-WFHE2 |
| 2007-AR4 | 2007-WFHE3 |
| 2007-AR5 | 2007-6 |
| 2007-WFHE4 | 2007-AR7 |

47. The Prospectus Supplement dated March 29, 2007, for Series 2007-AR5 stated in part:

> With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells Fargo Bank's underwriting of a mortgage loan may be based on data obtained by parties other than Wells Fargo Bank that are involved at various stages in the mortgage origination or acquisition process. This typically occurs under circumstances in which loans are subject to an alternative approval process, as when Correspondents, certain mortgage brokers or similar entities that have been approved by Wells Fargo Bank to process loans on its behalf, or independent contractors hired by Wells Fargo Bank to perform underwriting services on its behalf ("contract underwriters") make initial determinations as to the consistency of loans with Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may also permit these third parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank may also permit these third parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a Delegated Underwriting arrangement with a Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file. In addition, in order to be eligible to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated Underwriting arrangement, the originator must meet certain requirements including, among other things, certain quality, operational and financial guidelines.

*Omitted Information*: In fact, Wells Fargo did not attempt to confirm the standards actually used by mortgage brokers, correspondents and other third parties from which Wells Fargo acquired mortgages. These third parties were able to engage in serious underwriting deficiencies without review or correction by Wells Fargo. Wells Fargo has subsequently attributed much of its $1.3 billion mortgage-related write-down to loans it held which were originated by third parties.

## DISCLOSURES EMERGE ABOUT PROBLEMS WITH
## LOANS UNDERLYING THE CERTIFICATES

48.     On January 11, 2008, Moody's Investors Service announced it had taken negative action on many of the Certificates.

49.     On January 30, 2008, Standard & Poor's also announced it was considering slashing its rating on more than $500 billion of investments tied to bad mortgage loans, including those at issue here.

50.     These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates. The delinquency rates on the underlying mortgage loans have skyrocketed, with some mortgage pool 60-day delinquency rates (including foreclosures, 60+ day delinquencies and real estate owned) totaling more than 30% of the underlying mortgage pools. The massive foreclosure rate and extraordinary delinquencies have further confirmed defendants' misrepresentations concerning the lending practices detailed above.

### FIRST CAUSE OF ACTION

#### Violations of §11 of the 1933 Act Against
#### All Defendants Except Citigroup Mortgage

51.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Cause of Action, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Cause of Action is based solely on claims of strict liability and/or negligence under the 1933 Act. This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Citigroup Mortgage.

52.     The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to

make the statements made not misleading, and omitted to state material facts required to be stated therein.

53.     Each of the Defendant Issuers listed in ¶12 are strictly liable to plaintiff and the Class for the misstatements and omissions complained of herein.

54.     The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

55.     Defendant Citigroup Global was an underwriter of the Certificates and sold and marketed these investments to members of the Class.

56.     None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were not false and misleading or did not omit material facts that rendered statements made therein not false and misleading.

57.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

58.     Citigroup Global was the underwriter for the following issuances:

| | |
|---|---|
| Citigroup Mortgage Loan Trust 2007-2 | Citigroup Mortgage Loan Trust 2007-AHL1 |
| Citigroup Mortgage Loan Trust 2007-6 | Citigroup Mortgage Loan Trust 2007-AHL3 |
| Citigroup Mortgage Loan Trust 2007-AHL2 | Citigroup Mortgage Loan Trust 2007-AMC2 |
| Citigroup Mortgage Loan Trust 2007-AMC1 | Citigroup Mortgage Loan Trust 2007-AMC4 |
| Citigroup Mortgage Loan Trust 2007-AMC3 | Citigroup Mortgage Loan Trust 2007-AR4 |
| Citigroup Mortgage Loan Trust 2007-AR1 | Citigroup Mortgage Loan Trust 2007-AR7 |
| Citigroup Mortgage Loan Trust 2007-AR5 | Citigroup Mortgage Loan Trust 2007-WFHE1 |
| Citigroup Mortgage Loan Trust 2007-OPX1 | Citigroup Mortgage Loan Trust 2007-WFHE2 |
| Citigroup Mortgage Loan Trust-2007-WFHE3 | Citigroup Mortgage Loan Trust 2007-WFHE4 |

59.     Plaintiff acquired the Certificates pursuant and/or traceable to the Registration Statement.

60.     Plaintiff and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

61.     At the time of their purchases of the Certificates, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to early January 2008. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## SECOND CAUSE OF ACTION

### Violations of §15 of the 1933 Act
### Against the Individual Defendants and Citigroup Mortgage

62.     Plaintiff repeats and realleges each and every allegation contained above.

63.     This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Citigroup Mortgage.

64.     Each of the Individual Defendants was a control person of Citigroup Mortgage and of the Trusts by virtue of his or her position as a director and/or senior officer of Citigroup Mortgage. The Individual Defendants were responsible for the preparation of the contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

65.     Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

66.     Citigroup Mortgage was the Depositor for the offerings. The defendants named herein were responsible for overseeing the formation of the Defendant Issuers as well as the operations of the Defendant Issuers, including routing payments from the borrowers to investors.

67.     Citigroup Mortgage and the Individual Defendant prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as Class representative;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  March 19, 2008                COUGHLIN STOIA GELLER
                                        RUDMAN & ROBBINS LLP
                                      SAMUEL H. RUDMAN
                                      DAVID A. ROSENFELD


                                      SAMUEL H. RUDMAN

                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone: 631/367-7100
                                      631/367-1173 (fax)

- 28 -

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

Index Number _____     Year _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

_____

CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others
Similarly Situated,

                                                                                        Plaintiffs,

-against-

CITIGROUP MORTGAGE LOAN TRUST INC., CITIGROUP MORTGAGE LOAN TRUST 2007-2,
CITIGROUP MORTGAGE LOAN TRUST 2007-6, CITIGROUP MORTGAGE LOAN TRUST 2007-AHL1,
CITIGROUP MORTGAGE LOAN TRUST
2007-AHL2, CITIGROUP MORTGAGE LOAN TRUST 2007-AHL3, CITIGROUP MORTGAGE LOAN
TRUST 2007-AMC1, CITIGROUP MORTGAGE LOAN TRUST 2007-AMC2, CITIGROUP MORTGAGE
LOAN TRUST 2007-AMC3, CITIGROUP MORTGAGE LOAN TRUST 2007-AMC4, CITIGROUP
MORTGAGE LOAN TRUST 2007-AR1, CITIGROUP MORTGAGE LOAN TRUST 2007-AR4,
CITIGROUP MORTGAGE LOAN TRUST 2007-AR5, CITIGROUP MORTGAGE LOAN TRUST 2007-
AR7, CITIGROUP MORTGAGE LOAN TRUST 2007-OPX1, CITIGROUP MORTGAGE LOAN TRUST
2007-WFHE1, CITIGROUP MORTGAGE LOAN TRUST 2007-WFHE2, CITIGROUP MORTGAGE
LOAN TRUST 2007-WFHE3, CITIGROUP MORTGAGE LOAN TRUST 2007-WFHE4, CITIGROUP
GLOBAL MARKETS INC., RANDALL COSTA, SCOTT FREIDENRICH, PETER PATRICOLA, MARK
I. TSESARSKY, JEFFREY PERLOWITZ and EVELYN ECHEVARRIA,

                                                                                        Defendants.

_____

## COMPLAINT FOR VIOLATION OF
## §§11 AND 15 OF THE SECURITIES ACT OF 1933

_____

Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

_____

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the court of
New York State, certifies that, upon information and belief and reasonable inquiry, the
contentions contained in the annexed document are not frivolous.*

Dated: <u>March 19, 2008</u>                        Signature _____

                                                       Print Signer's Name <u>Samuel H. Rudman</u>