UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------------------X

CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM,
Individually and On Behalf of All Others Similarly Situated,

                                  Plaintiff,

                     - against -

CITIGROUP MORTGAGE LOAN TRUST INC., CITIGROUP
MORTGAGE LOAN TRUST 2007-2, CITIGROUP MORTGAGE
LOAN TRUST 2007-6, CITIGROUP MORTGAGE LOAN TRUST
2007-AHL1, CITIGROUP MORTGAGE LOAN TRUST 2007-AHL2,
CITIGROUP MORTGAGE LOAN TRUST 2007-AHL3, CITIGROUP
MORTGAGE LOAN TRUST 2007-AMC1, CITIGROUP MORTGAGE
LOAN TRUST 2007-AMC2, CITIGROUP MORTGAGE LOAN
TRUST 2007-AMC3, CITIGROUP MORTGAGE LOAN TRUST 2007-
AMC4, CITIGROUP MORTGAGE LOAN TRUST 2007-AR1,
CITIGROUP MORTGAGE LOAN TRUST 2007-AR4, CITIGROUP
MORTGAGE LOAN TRUST 2007-AR5, CITIGROUP MORTGAGE
LOAN TRUST 2007-AR7, CITIGROUP MORTGAGE LOAN TRUST
2007-OPX1, CITIGROUP MORTGAGE LOAN TRUST 2007-WFHE1,
CITIGROUP MORTGAGE LOAN TRUST 2007-WFHE2,
CITIGROUP MORTGAGE LOAN TRUST 2007-WFHE3,
CITIGROUP MORTGAGE LOAN TRUST 2007-WFHE4,
CITIGROUP GLOBAL MARKETS INC., RANDALL COSTA, SCOTT
FREIDENRICH, PETER PATRICOLA, MARK I. TSESARSKY,
JEFFREY PERLOWITZ and EVELYN ECHEVARRIA,

                                  Defendants.

      08 Civ. 1418 (LDW)

----------------------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR DISMISSAL MOTION

                    CLEARY GOTTLIEB STEEN & HAMILTON LLP
                    One Liberty Plaza
                    New York, New York 10006
                    (212) 225-2000

                    Attorneys for Defendants

Of Counsel:

  Lawrence B. Friedman
  Jennifer A. Kennedy
  Theodore S. Geiger

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

I.  PRELIMINARY STATEMENT ...................................................... 1

II.  BACKGROUND.................................................................. 2

    A.  The Certificates ........................................................ 2

    B.  The Offering Materials' Disclosures About The Mortgage Loans
        Underlying The Certificates.......................................... 4

    C.  Plaintiffs' Allegations ................................................ 4

III.  ARGUMENT .................................................................. 5

    A.  ANN ARBOR AND KANSAS CITY LACK STANDING TO ASSERT
        CLAIMS CONCERNING 16 OF THE 18 TRUSTS ...................................... 6

        1.  Ann Arbor And Kansas City Do Not Have Article III Standing
            To Assert Claims Against Trusts In Which They Did Not
            Purchase Certificates............................................ 6

        2.  Ann Arbor And Kansas City Do Not Have Statutory Standing
            To Bring Section 11 Claims Against Trusts In Which They Did
            Not Purchase Certificates........................................ 7

        3.  Ann Arbor's And Kansas City's Section 12(a)(2) Claims Fail
            Also Because They Do Not Allege That They Purchased
            Certificates In An Initial Offering................................. 10

    B.  DEFENDANTS DISCLOSED THE RISKS ABOUT WHICH PLAINTIFFS
        COMPLAIN.................................................................. 11

        1.  Defendants Disclosed The Risks Associated Generally With
            Purchasing Certificates Backed By Subprime Mortgages ............... 12

            a.  Underwriting Standards of Originators ................................. 13

            b.  Loan-To-Value Ratios................................................. 14

            c.  Appraisals .......................................................... 14

            d.  Debt-To-Income Ratio ................................................ 15

i

e.  Ratings ................................................................................   15

f.  Underwriting Standards of Citigroup Mortgage ....................   16

2.  Defendants Disclosed The Risks Associated With Purchasing
The Certificates That Ann Arbor And Kansas City Bought ............   17

C.  PLAINTIFFS' CLAIMS FAIL BECAUSE PLAINTIFFS HAVE NOT
ALLEGED THAT DEFENDANTS FAILED TO PERFORM AS
PROMISED ................................................................................................   23

D.  THE COURT SHOULD DISMISS PLAINTIFFS' SECTION 15 CLAIM
AGAINST THE INDIVIDUAL DEFENDANTS ...........................................   25

IV.  CONCLUSION...............................................................................................   25

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 77 ................................................................................................... passim

Fed. R. Civ. P. 8 ...............................................................................12, 16, 18, 21

Fed. R. Civ. P. 9(b) ................................................................................. 16

Fed. R. Civ. P. 11(b) ............................................................................... 21


**Cases**

In re Alliance Bernstein Mut. Fund Excessive Fee Litig.,
No. 04-CV-4885 (SWK), 2005 WL 2677753 (S.D.N.Y. October 19, 2005) ................... 7

Ashcroft v. Iqbal,
556 U.S. __ (2009) ................................................................................. 17

In re Authentidate Holding Corp.,
No. 05 Civ. 5323, 2006 WL 2034644 (S.D.N.Y. July 14, 2006) ...................... 9

Barnes v. Osofsky,
373 F.2d 269 (2d Cir. 1967) ................................................................. 7-8

Caiafa v. Sea Containers,
525 F. Supp. 2d 398 (S.D.N.Y. 2007) ..................................................... 12

Caiafa v. Sea Containers LTD.,
No. 08-3006-cv, 2009 WL 1383457 (2d Cir. May 19, 2009) ........................... 10

In re CIT Group, Inc. Sec. Litig.,
349 F. Supp. 2d 685 (S.D.N.Y. 2004) ..................................................... 17

In re Connetics Corp.,
542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................... 22

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991) ..................................................................... 4

In re Countrywide Fin. Corp. Sec. Litig.,
588 F. Supp. 2d 1152 (C.D. Cal. 2008) ................................................... 9

DeMaria v. Andersen,
318 F.3d 170 (2d Cir. 2003)................................................................................ 17

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009)................................................................................ 25

In re Friedman's, Inc. Sec. Litig.,
385 F. Supp. 2d 1345 (N.D. Ga. 2005)............................................................... 8-9

Geinko v. Padda,
No. 00-C-5070, 2002 WL 276236 (N.D. Ill. 2002) ........................................... 22

In re Global Crossing, Ltd. Sec. Litig.,
313 F. Supp. 2d 189 (S.D.N.Y. 2003).................................................................. 7

Gustafson v. Alloyd Co.,
513 U.S. 561 (1995)............................................................................................ 10

Hoffman v. UBS-AG,
591 F. Supp. 2d 522 (S.D.N.Y. 2008).................................................................. 6

Hunt v. Alliance N. Am. Gov. Income Trust, Inc.,
159 F.3d 723 (2d Cir. 1998)................................................................................ 4

Lewis v. Casey,
518 U.S. 343 (1996)............................................................................................ 7

Lone Star Fund (U.S.) v. Barclays Bank,
No. 3:08-cv-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008) ................ 24

Lujan v. Defenders of Wildlife,
504 U.S. 555 (1992)............................................................................................ 6

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
289 F. Supp. 2d 429 (S.D.N.Y. 2003).................................................................. 25

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
547 U.S. 71 (2006).............................................................................................. 8

Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.,
No. 99 Civ. 1944 (NRB), 2000 WL 709006 (S.D.N.Y. June 1, 2000).............. 4

Miller v. Lazard, Ltd.,
473 F. Supp. 2d 571 (S.D.N.Y. 2007).................................................................. 11

In re MobileMedia Sec. Litig.,
28 F. Supp. 2d 901 (D.N.J. 1998) ....................................................................... 10

iv

Olkey v. Hyperion 1999 Term Trust, Inc.,
98 F.3d 2 (2d Cir. 1996)................................................................................ 11

Ong ex rel. Ong IRA v. Sears, Roebuck & Co.,
388 F. Supp. 2d 871 (N.D. Ill. 2004) ............................................................ 9

In re PMA Capital Corp. Sec. Litig,
No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) .............................. 10

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)............................................................................ 16

In re Salomon Analyst Level 3 Litig.,
350 F. Supp. 2d 477 (S.D.N.Y. 2006).............................................................. 9

In re Salomon Smith Barney Mut. Fund Fees Litig.,
441 F. Supp. 2d 579 (S.D.N.Y. 2006).............................................................. 7

Steinberg v. PRT Group, Inc.,
88 F. Supp. 2d 294 (S.D.N.Y. 2000)................................................................ 4, 11

In re Sterling Foster & Co., Inc., Sec. Litig.,
222 F. Supp. 2d 216 (E.D.N.Y. 2002) ............................................................ 10

In re Transkaryotic Therapies, Inc. Sec. Litig.,
319 F. Supp. 2d 152 (D. Mass. 2004) .............................................................. 9

TSC Indus., Inc. v. Northway, Inc.,
426 U.S. 438 (1976)........................................................................................ 22

In re WorldCom, Inc. Sec. Litig.,
No. 02 Civ. 3288 (DLC) et al., 2004 WL 555697 (S.D.N.Y. Mar. 19, 2004).... 10

Yung v. Lee,
432 F.3d 142 (2d Cir. 2005)............................................................................ 10

Zirkin v. Quanta Capital Holdings Ltd.,
No. 07 Civ. 851(RPP), 2009 WL 185940 (S.D.N.Y. Jan. 23, 2009) ................ 16

## Other Authorities

17 C.F.R. § 230.430B(f)(2) (2009) ................................................................ 8-9

Ruth Simon and James R. Hagerty, More Borrowers with Risky Loans are Falling Behind
--- Subprime Mortgages Surged as Housing Market Soared; Now, Delinquencies Mount,
THE WALL STREET JOURNAL, Dec. 5, 2006 ...................................................... 1

Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 52056, Investment Company Act Release No. 26993, [2005 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 87,421 (July 19, 2005) .............................................................................. 8

Defendants respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for an order dismissing the Amended Complaint.[1]

## I.     PRELIMINARY STATEMENT

This case arises from Plaintiffs' decision to make speculative investments in high-risk mortgage-backed securities, which were dependent upon borrowers' payments on high-risk subprime loans, during a time of unprecedented and widely publicized volatility in the housing market.[2]  Plaintiffs purchased these securities with their eyes wide open, knowing full well of Defendants' express and extensive warnings that these securities involved "significant risks and uncertainties" because, among other things, the underlying subprime loans had unusually high loan-to-value ratios, were originated with compromised or non-existent borrower documentation or verification, were made to borrowers with severely limited credit histories and creditworthiness and frequently contemplated interest-only payments.  Having made these highly speculative investments in search of large returns, but now confronted with the unprecedented collapse of the housing market, Plaintiffs now seek to be relieved of the consequences of their

---

[1]     Defendants are Citigroup Mortgage Loan Trust Inc. ("Citigroup Mortgage"), Citigroup Mortgage Loan Trust 2007-2, Citigroup Mortgage Loan Trust 2007-6, Citigroup Mortgage Loan Trust 2007-AHL1, Citigroup Mortgage Loan Trust 2007-AHL2, Citigroup Mortgage Loan Trust 2007-AHL3, Citigroup Mortgage Loan Trust 2007-AMC1, Citigroup Mortgage Loan Trust 2007-AMC2, Citigroup Mortgage Loan Trust 2007-AMC3, Citigroup Mortgage Loan Trust 2007-AMC4, Citigroup Mortgage Loan Trust 2007-AR1, Citigroup Mortgage Loan Trust 2007-AR4, Citigroup Mortgage Loan Trust 2007-AR5, Citigroup Mortgage Loan Trust 2007-AR7, Citigroup Mortgage Loan Trust 2007-OPX1, Citigroup Mortgage Loan Trust 2007-WFHE1, Citigroup Mortgage Loan Trust 2007-WFHE2, Citigroup Mortgage Loan Trust 2007-WFHE3, Citigroup Mortgage Loan Trust 2007-WFHE4 (collectively, the "Citigroup Trusts" or "Trusts"), Citigroup Global Markets Inc. ("CGMI"), Randall Costa, Scott Freidenrich, Peter Patricola, Mark I. Tsesarsky, Jeffrey Perlowitz and Evelyn Echevarria (collectively, the "Citigroup Individuals") (together with Citigroup Mortgage, the Citigroup Trusts and CGMI, "Defendants").

[2]     The increased risks associated with the subprime housing market were increasingly evident by late 2006, before the securities at issue here were sold.  See Ruth Simon and James R. Hagerty, More Borrowers with Risky Loans are Falling Behind --- Subprime Mortgages Surged as Housing Market Soared; Now, Delinquencies Mount, THE WALL STREET JOURNAL, Dec. 5, 2006, at A1, attached hereto as Exhibit A to the Declaration of Jennifer A. Kennedy (the "Kennedy Declaration"), dated July 17, 2009.  All exhibits cited in this brief are attached to the Kennedy Declaration.  The cited portions of the exhibits have been highlighted for the Court's convenience.

own speculation by blaming Defendants, contending that their warnings were inadequate, and improperly invoking Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").  However, the securities laws do not permit Plaintiffs to recover merely because they purport to have sustained the very losses Defendants warned them could occur.  Further, at the threshold, the named plaintiffs do not even have standing to assert most of their claims. Accordingly, the Court should dismiss the Amended Complaint in full.

## II.   BACKGROUND

The City of Ann Arbor Employees' Retirement System ("Ann Arbor") and The Greater Kansas City Laborers Pension Fund ("Kansas City") and a putative class said to consist of all others similarly situated (collectively, "Plaintiffs") are suing Defendants for purported violations of Sections 11, 12(a)(2) and 15 of the Securities Act.  See Amended Complaint ("AC") ¶ 8.  Plaintiffs primarily allege that, in the disclosures filed with the Securities and Exchange Commission between December 13, 2006 and October 22, 2007 in connection with the securities Plaintiffs purchased, Defendants made material misstatements and/or are liable for material omissions concerning the loan origination practices and underwriting standards of the mortgage lenders that issued the loans underlying these securities.  See id. ¶ 5.

## A.   The Certificates

The mortgage-backed securities at issue in this lawsuit were created and issued as follows.  Citigroup Mortgage, which engages in mortgage lending and other real estate finance-related businesses, acquired pools of mortgage loans and then transferred those loans to one of the 18 Citigroup Trusts.  On December 13, 2006, Citigroup Mortgage filed a shelf registration statement and base prospectus in connection with the Trusts' sale of certificates of various

2

classes, to be backed by borrowers' payments on the underlying loans (the "Certificates").[3]  The

Certificates were then sold to investors in 18 separate offerings by the 18 separate Trusts,

pursuant to 18 separate prospectus supplements, each of which was filed by the issuing Trust and

applied only to the single offering by that Trust (the "Prospectus Supplements," and collectively

with the shelf registration statement and the Base Prospectuses, the "Offering Materials").

CGMI underwrote all 18 offerings.  AC ¶ 14.  The Citigroup Individuals, in their capacities as

affiliates and control persons of Citigroup Mortgage, oversaw these transactions.  Id. ¶¶ 15-20.

Each of the 18 Trusts is a separate legal entity that owns a unique pool of loans

that underlies the Certificates issued by each Trust.  As the Prospectuses and Prospectus

Supplements state, "[t]he Certificates represent obligations of the issuing entity only and do not

represent an interest in [any other entity]."  See, e.g., 2007-WFHE2 Trust (Ex. C) at S-1; 2007-

AR5 Trust (Ex. D) at S-1.[4]  Each Trust owns different loans, each of which has different

characteristics.  See AC ¶ 239.  Critically, Ann Arbor and Kansas City purchased Certificates

issued by only two of the Trusts, 2007-AR5 and 2007-WHFE2, respectively.  Declaration of

David A. Rosenfeld, Docket No. 44, Exhibit A.

In sum, the Certificates therefore constitute 18 varieties of "pass-through

securities," backed by the pools of loans that Citigroup Mortgage transferred to the issuing

---

[3]      Citigroup Mortgage filed two additional base prospectuses on May 16, 2007 and July 30, 2007, respectively (together, with the December 13, 2006 prospectus, the "Base Prospectuses").  The portions of the Base Prospectus relevant to this motion are identical, and therefore all specific cites to a "Base Prospectus" refer to the December 13, 2006 Prospectus (Ex. B).

[4]      See also 2007-6 Trust (Ex. E) at S-1; 2007-AHL1 Trust (Ex. F) at S-1; 2007-AHL2 Trust (Ex. G) at S-1, 2007-AHL3 Trust (Ex. H) at S-1; 2007-AMC1 Trust (Ex. I) at S-1; 2007-AMC2 Trust (Ex. J) at S-1; 2007-AMC3 Trust (Ex. K) at S-1; 2007-AMC4 Trust (Ex. L) at S-1; 2007-AR1 Trust (Ex. M) at S-1; 2007-AR4 Trust (Ex. N) at S-1; 2007-AR7 Trust (Ex. O) at S-1; 2007-WFHE1 Trust (Ex. P) at S-1; 2007-WFHE3 Trust (Ex. Q) at S-1; 2007-WFHE4 Trust (Ex. R) at S-1; Base Prospectus (Ex. B) at 5.

Trusts.[5]  Many of the loans underlying the Certificates were, as Defendants fully disclosed to investors, "'subprime,' that is, characterized by a higher risk of repayment defaults than more conventional mortgages."[6]  As described in the Prospectus Supplements, they include negatively amortizing loans, buydown mortgage loans, balloon loans, multifamily loans, non-conforming loans, high loan-to-value loans and junior lien mortgage loans.  See, e.g., Base Prospectus (Ex. B) at 6-9.[7]

**B.**     **The Offering Materials' Disclosures About The Mortgage Loans Underlying The Certificates**

          The Offering Materials contain extensive disclosures describing the origination and underwriting practices and guidelines that led to the mortgage loans underlying the Certificates (the "Mortgage Loans").  The disclosures note in particular how these practices and guidelines deviated, in many ways, from those associated with prime lending, thereby increasing the default risks associated with the underlying loans.  See, e.g., 2007-2 Trust Prospectus Statement (Ex. S) at S-14, S-79.  Approximately 31 pages of these warnings are summarized in the Offering Materials' conclusion that these securities "are not suitable investments for all investors" and that "investment in these types of securities involves significant risks and uncertainties and should only be considered by sophisticated investors."  Base Prospectus (Ex. B) at 5, 19.

---

[5]     "A pass-through security is formed when mortgages are pooled together and the undivided interests in the pool or pools are sold . . . . The cash flow from the mortgages is passed through to the holders of the securities in the form of periodic payments of interest, principal, and prepayments (net of a service fee)."  Hunt v. Alliance N. Am. Gov. Income Trust, Inc., 159 F.3d 723, 731 (2d Cir. 1998) (citation omitted).

[6]     Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 99 Civ. 1944 (NRB), 2000 WL 709006, at *4 (S.D.N.Y. June 1, 2000).

[7]     In this securities litigation, "the Court may properly consider [on a dismissal motion] a document, such as the prospectuses here, which are incorporated by reference, even if it is not attached to the complaint."  Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 299 (S.D.N.Y. 2000) (citing I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991)); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).

C.      **Plaintiffs' Allegations**

Plaintiffs allegedly purchased the Certificates despite these warnings, and accepted the investment risks these warnings reflect.  See AC ¶ 4.  Now, after the adverse results Plaintiffs were warned about have occurred, Plaintiffs are asking the Court to relieve them of the consequences of their highly speculative investment decisions by claiming they were misled by the Offering Materials' disclosures regarding the quality and nature of the Mortgage Loans backing the Certificates.  AC ¶¶ 4-5, 62, 245, 253-55.

Ann Arbor and Kansas City divide the Amended Complaint into two sections.  First, they present generalized allegations regarding omissions and misstatements about the quality and nature of **all** subprime mortgage loans underwritten by **all** originators of those loans.  AC ¶¶ 54-82, 239.  Second, they present allegations regarding omissions or misstatements about the quality and nature of all loans underwritten by the seven originators that originated the Mortgage Loans backing the Certificates.[8]  AC ¶¶ 83-218.  Notably, none of these originators is named as a defendant, and Plaintiffs do not identify at all how any Mortgage Loan suffers from the alleged defects Plaintiffs contend were not disclosed.

## III.      ARGUMENT

The Court should dismiss the Amended Complaint for three reasons.  First, Ann Arbor and Kansas City lack standing to assert many of the claims in the Amended Complaint, because they purchased Certificates in only two of the 18 Trusts, and they did so in the secondary market.  Second, to an overwhelming degree, most of the information Plaintiffs allege Defendants omitted and/or misrepresented was disclosed, and any remaining alleged omissions

---

[8]      Those originators are American Home Mortgage Corp. ("AHM"), Accredited Home Lenders, Inc. ("Accredited"), Countrywide Home Loans, Inc. ("Countrywide"), Argent Mortgage Company ("Argent"), Opteum Financial Services, LLC ("Opteum"), Silver State Financial Services, Inc. ("Silver State") and Wells Fargo Bank, N.A. ("Wells Fargo").

or misrepresentations are immaterial in light of the total mix of information that was disclosed.

Third, Plaintiffs have not stated a claim because Defendants promised that they would repurchase or substitute Mortgage Loans that do not comply with the terms of the Offering Materials, and Plaintiffs fail to allege, because they cannot allege, that Defendants have not performed as promised.

## A.   ANN ARBOR AND KANSAS CITY LACK STANDING TO ASSERT CLAIMS CONCERNING 16 OF THE 18 TRUSTS

Named Plaintiffs Ann Arbor and Kansas City purport to sue on behalf of all purchasers of Certificates in the 18 different Trusts, but Ann Arbor and Kansas City collectively purchased Certificates issued in only two Trusts.  Thus, they lack standing to pursue claims with respect to Certificates issued by the other 16 Trusts.  Furthermore, they lack standing to assert any Section 12(a)(2) claims, because they did not purchase their Certificates in the initial public offering of any Trust.

### 1.   Ann Arbor And Kansas City Do Not Have Article III Standing To Assert Claims Against Trusts In Which They Did Not Purchase Certificates

Ann Arbor and Kansas City must, but cannot satisfy the constitutional standing requirements of Article III in order to invoke this Court's jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  They can meet this threshold requirement only if they can allege "(1) a personal injury, (2) that is fairly traceable to the defendant's allegedly unlawful conduct, and (3) that is likely to be redressed by the requested relief."  Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530 (S.D.N.Y. 2008) (citing Allen v. Wright, 468 U.S. 737, 751 (1984)).[9]  But Ann Arbor and Kansas City have not suffered any "personal injury" traceable to the 16 Trusts from which they did not purchase Certificates.  See, e.g., id. at 530-31 (plaintiffs lack standing to

---

[9]       Questions regarding the standing of named plaintiffs must be resolved *before* class certification. Hoffman, 591 F. Supp. 2d at 530-32; In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006).

bring claims relating to mutual funds they did not own); <u>In re Salomon Smith Barney Mut. Fund Fees Litig.</u>, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) (same); <u>In re Alliance Bernstein Mut. Fund Excessive Fee Litig.</u>, No. 04-CV-4885 (SWK), 2005 WL 2677753, at *9 (S.D.N.Y. October 19, 2005) (same).  Accordingly, this Court lacks subject matter jurisdiction over Plaintiffs' claims arising from these 16 Trusts, and it must dismiss these claims.

The fact that the Amended Complaint is styled as a purported class action does not alter this analysis — the named plaintiffs cannot seek relief with respect to any of the 18 species of Certificates they did not buy.  <u>See</u> <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (in order to maintain class action, at least one named plaintiff must have standing for <u>each</u> challenged offering); <u>see also</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (citations omitted).

**2.    Ann Arbor And Kansas City Do Not Have Statutory Standing To Bring Section 11 Claims Against Trusts In Which They Did Not Purchase Certificates**

Ann Arbor's and Kansas City's claims likewise fail for the separate and sufficient reason that they cannot meet the Securities Act's statutory standing requirements for the 16 Trusts from which they did not purchase Certificates.  Only those "who purchase securities that are the direct subject of the prospectus and registration statement" have standing to bring Section 11 claims.  <u>Barnes v. Osofsky</u>, 373 F.2d 269, 273 (2d Cir. 1967).  Section 11 states that "[i]n case any part of the registration statement, when such part became effective" contained material misstatements or omissions, "any person acquiring <u>such security</u>" may sue "every underwriter

with respect to <u>such security</u>."[10] 15 U.S.C. § 77k(a) (emphasis added).  Here, the named

plaintiffs acquired Certificates in only two Trusts, and no others.  Therefore, they lack statutory

standing as to Certificates in the remaining 16 Trusts.

   This analysis is not altered by the fact the Certificates in all 18 Trusts were issued

pursuant to a single shelf registration statement.  Section 11 liability cannot attach to a shelf

registration statement until securities are actually offered for sale by means of a full prospectus.

<u>See</u> 17 C.F.R. § 230.430B(f)(2) (2009).[11]  Accordingly, standing under Section 11 is limited to

those investors who purchase a security issued pursuant to the specific materials by which the

security was offered.  <u>See, e.g.</u>, <u>Barnes</u>, 373 F.2d at 273; <u>In re Friedman's, Inc. Sec. Litig.</u>, 385 F.

Supp. 2d 1345, 1371-72 (N.D. Ga. 2005) (holding that under "such security" language of Section

11, plaintiffs could not maintain claims for securities they did not own, even though they

originated from the same shelf registration as another offering in which plaintiffs had purchased

securities).

   Here, the offerings in each of the 18 Trusts were conducted not only pursuant to a

shelf registration statement and a base prospectus, but also pursuant to a <u>unique</u> prospectus

supplement that was issued <u>solely for that Trust</u>.  Accordingly, the term "such security" as used

---

[10] Section 11 indicates that the phrase "such security" refers to a security offered at a particular price in a particular offering.  For example, Section 11(e) calculates damages based on the disposition of "such security," and provides for a negative causation defense when a reduction in the value of "such security" was not a result of defects in its registration statement.  15 U.S.C. § 77k(e).  Under the principles of statutory construction, the phrase "such security" should be read in the same way throughout the section.  <u>See</u> <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit</u>, 547 U.S. 71, 86 (2006) ("[I]dentical words used in different parts of the same statute are . . . presumed to have the same meaning.").

[11] As the legislative history of this rule makes clear, it was enacted for the express purpose of ensuring that shelf registration offerings are, in the context of Section 11, treated similarly to non-shelf offerings.  <u>See</u> Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 52056, Investment Company Act Release No. 26993, [2005 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 87,421, at 82,433 (July 19, 2005) ("These provisions [e.g. Rule 430B] also will reconcile the effective date for shelf offerings for issuers and underwriters with a comparable date for non-shelf offerings.").

in Section 11 precludes Ann Arbor and Kansas City from asserting claims concerning Prospectus Supplements for Certificates they did not purchase.[12]

For these reasons, courts have consistently limited standing in this context to purchasers of "such security," i.e., the security issued in a particular offering, not in other distinct offerings, even if those offerings were made under the same shelf registration statement.[13]  See Oral Arg. Tr. at 62 in La. Mun. Police Employees Ret. Sys. v. Merrill Lynch & Co., No. 08 Civ. 9063 (JSR) (S.D.N.Y. Feb. 19, 2009) (Ex. T).  See also In re Friedman's, 385 F. Supp. 2d at 1371 (the "clear import" of Section 11's "such security" language is that plaintiff could only sue on the offering to which it could trace shares, and not another under the same shelf registration statement); Ong ex rel. Ong IRA v. Sears, Roebuck & Co., 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004) (no standing under Section 11 on two offerings where plaintiff only bought in a third offering, even though all three shared the same shelf registration statement); In re Transkaryotic Therapies, Inc. Sec. Litig., 319 F. Supp. 2d 152, 158-59 (D. Mass. 2004) (same).

Even where courts have allowed plaintiffs to assert claims relating to securities they did not purchase when those securities were issued under a shared shelf registration statement, they have done so when the claims rely on nearly identical alleged violations for both the purchased and non-purchased securities.  See In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1152, 1167 (C.D. Cal. 2008) (allowing claims based on offerings not owned by

---

[12]    SEC regulations confirm that Certificates in each Trust were issued under a unique registration statement with its own registration date.  As Rule 430B makes clear, the effective date of the registration statement with respect to each Trust is different because it is measured by the filing of each supplement.  See 17 C.F.R. § 230.430B(f)(2) (2009) (registration statement "deemed, for purposes of liability under section 11 of the [Securities] Act . . . to be a new effective date of the part of such registration statement relating to the securities to which such form of prospectus relates, such part of the registration statement consisting of all information included in the registration statement and any prospectus relating to the offering of such securities").

[13]    While a plaintiff need not have purchased securities in every offering to qualify as a *lead* plaintiff under the PSLRA, this does not supersede the standing requirement that at least *one named* plaintiff have standing for each claim alleged.  See, e.g., In re Authentidate Holding Corp., No. 05 Civ. 5323, 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006); In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2006).

plaintiffs to proceed, but noting that "it is possible that later issuances could incorporate very different alleged violations and have in common a minor common misrepresentation or omission.  The differences could be significant enough to lead a Court to deny standing for class plaintiffs on a motion to dismiss."); In re PMA Capital Corp. Sec. Litig, No. 03-6121, 2005 WL 1806503, at *18 (E.D. Pa. July 27, 2005) (denying motion to dismiss because plaintiffs "allege the same incorrect statements and violations" for each offering); In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC) et al., 2004 WL 555697, at *7 (S.D.N.Y. Mar. 19, 2004) (allowing standing for second offering on same day as the one in which plaintiffs purchased); In re MobileMedia Sec. Litig., 28 F. Supp. 2d 901, 911 n.7, 915 (D.N.J. 1998) (same).  But here, as the Amended Complaint makes plain, the allegations regarding each of the Trusts are fundamentally different from one another, because each Trust is backed by unique Mortgage Loans, and each involves different originators about whom Plaintiffs make different allegations.

### 3. Ann Arbor's And Kansas City's Section 12(a)(2) Claims Fail Also Because They Do Not Allege That They Purchased Certificates In An Initial Offering

Ann Arbor and Kansas City lack standing to bring claims under Section 12(a)(2) because they did not purchase Certificates in an initial public offering.  Only purchasers in such a public offering have standing to bring a Section 12(a)(2) claim.  Secondary market purchasers lack such standing.  Gustafson v. Alloyd Co., 513 U.S. 561, 584 (1995); Yung v. Lee, 432 F.3d 142, 149 (2d Cir. 2005).  Moreover, Section 12(a)(2) standing exists only where plaintiffs affirmatively plead that they purchased in the initial offering.  See Caiafa v. Sea Containers LTD., No. 08-3006-cv, 2009 WL 1383457, at *2 (2d Cir. May 19, 2009).  Merely alleging that securities purchases are "pursuant and traceable" to a registration statement is insufficient.  See, e.g., In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 245-46 (E.D.N.Y. 2002).  But that is all Ann Arbor and Kansas City plead.  AC ¶¶ 10-11.  Hence, the Court must dismiss

their Section 12(a)(2) claims on this ground too, as well as because they lack Article III and

statutory standing with respect to claims concerning 16 of the 18 Trusts.

## B.    DEFENDANTS DISCLOSED THE RISKS ABOUT WHICH PLAINTIFFS COMPLAIN

The Court should also dismiss Plaintiffs' claims because Defendants disclosed, in

clear and prominent language, the precise information Plaintiffs allege Defendants omitted or

misrepresented.  To the extent any information was not disclosed, it is immaterial.

To state a claim under either Section 11 or 12(a)(2), Plaintiffs must allege that a

registration statement: (1) "contained an untrue statement of material fact;" (2) "omitted to state

a material fact required to be stated therein;" or (3) omitted to state a material fact "necessary to

make the statements therein not misleading."  15 U.S.C. § 77k; see also 15 U.S.C. § 77l(a)(2).

"[A]n omission is material if there is a substantial likelihood that the 'disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered the 'total

mix' of the information made available.'"  Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 578

(S.D.N.Y. 2007) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  In

assessing whether statements are materially misleading, a court must consider the offering

materials as a whole, not selectively.  Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d

Cir. 1996) ("[T]he central issue . . . is not whether the particular statements, taken separately,

were literally true, but whether defendants' representations, taken together and in context, would

have misled a reasonable investor about the nature of the securities") (citations and alterations

omitted).  Accordingly, when purported material misstatements or omissions conflict with the

plain language of the prospectus as a whole, a court need not accept those claims as true.

Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (citing Barnum v.

<u>Millbrook Care Ltd. P'ship</u>, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (citations omitted), <u>aff'd</u>, 43 F.3d 1458 (2d Cir. 1994)).

Here, the Offering Materials include voluminous disclosures regarding the exact risks about which Plaintiffs complain — that the subprime mortgages backing the Certificates were, in fact, subprime.  Further, they directly address both Plaintiffs' generalized allegations regarding all originators of all subprime mortgages, and Plaintiffs' allegations regarding the seven originators of loans backing the Trusts.

### 1.   Defendants Disclosed The Risks Associated Generally With Purchasing Certificates Backed By Subprime Mortgages

Plaintiffs cite to numerous newspaper articles and various complaints from other lawsuits to allege that <u>all</u> originators of <u>all</u> subprime mortgages did not comply with the underwriting standards described in the Offering Materials.[14]  From these entirely unspecific allegations, Plaintiffs allege by implication that the seven originators of the loans backing the Certificates are also culpable, resulting in the Offering Materials being incomplete with respect to disclosure of:  (a) the underwriting standards associated with the origination of the underlying mortgage loans; (b) the maximum loan-to-value (LTV) ratios used to qualify borrowers; (c) the appraisals of properties underlying the mortgage loans; (d) the debt-to-income ratios permitted on the loans; (e) the ratings of the Certificates; and (f) the underwriting standards used by Citigroup Mortgage.[15]  <u>See</u> AC ¶¶ 4, 54-59, 220-237.  The Court should dismiss those

---

[14]   Citation to another complaint fails to satisfy the pleading requirement of Rule 8.  <u>See</u> <u>Caiafa v. Sea Containers</u>, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007)  ("allegations . . . contained in pleadings from an unrelated lawsuit . . . are inadmissible.").

[15]   Plaintiffs have named the wrong party in these allegations.  To the extent due diligence was conducted, it was done by Citigroup Global Markets Realty Corp., which is not a named defendant in this case.  In any event, the Offering Materials disclosed that "[m]ortgage loans acquired by the sponsor are subject to varying levels of due diligence prior to purchase."  <u>See</u> 2007-WFHE2 Trust (Ex. C) at S-56.

allegations, because the Offering Materials contain disclosures speaking directly to each of these subjects.

           a.     <u>Underwriting Standards of Originators</u>

Defendants explicitly and repeatedly disclosed the high risk that the underlying loans would not be repaid because they were issued using non-traditional and less stringent underwriting standards, stating, among other things, as follows:

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure."  Base Prospectus at 6 (Ex. B) (emphasis in original).

- "**The mortgage loans were underwritten to standards which do not conform to the credit standards of Fannie Mae or Freddie Mac which may result in losses on the mortgage loans** . . . . The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae or Freddie Mac credit guidelines . . . . As a result of the originator's underwriting standards, the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner." <u>See</u> 2007-WFHE2 Trust (Ex. C) at S-11 (emphasis in original).

The risk factors explicitly state that mortgages were originated **<u>with minimal or no documentation</u>** from borrowers regarding assets, income or employment:

- "Substantially all of the mortgage loans consist of a type sometimes referred to in the mortgage loans origination industry as 'Alt-A' mortgage loans which may have been originated using underwriting standards that are less stringent than the underwriting standards applied by certain other first mortgage loan purchase programs, such as those of Fannie Mae and Freddie Mac.  <u>Alt-A mortgage loans, for example, may have been originated with little or no documentation of borrower income and/or assets.</u>  Applying less stringent underwriting standards creates additional risks that losses on the mortgage loans will be allocated to related certificateholders." 2007-AR5 Trust (Ex. D) at S-25 (emphasis added).

b.      Loan-To-Value Ratios

Defendants explicitly and repeatedly disclosed the high risk that the loans

underlying the Certificates would not be repaid because they were issued with high loan-to-value

ratios ("LTV"), including ratios in excess of 100 percent, including as follows:

- "*High LTV Loans*.  Mortgage loans with loan-to-value ratios in excess of 80% and as high as 125% and not insured by primary mortgage insurance policies are designated by the depositor as high LTV loans.  High LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property and are underwritten with an emphasis on the creditworthiness of the related borrower."  Base Prospectus (Ex. B) at 8.

- "**Mortgage loans with high fully combined loan-to-value ratios leave the related borrower with little to no equity in the related mortgage property, which may result in losses with respect to such mortgage loans.**"  See 2007-6 Trust (Ex. E) at S-22 (emphasis in original).

The risk factors in each prospectus supplement also disclose how many of the underlying

mortgages had loan-to-value ratios in excess of 80 percent, and stated that these loans carried

increased risk, for example, one such Prospectus Supplement disclosed the following:

- "Approximately 55.83% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) have a combined loan-to-value ratio in excess of 80% . . . . Mortgage loans with higher loan-to-value ratios may present a greater risk of loss."  See 2007-WFHE2 Trust (Ex. C) at S-12.[16]

c.      Appraisals

Defendants explicitly and repeatedly disclosed that the value of the mortgaged

properties might not remain at their appraised value as determined on the date of origination of

the related Mortgage Loan, thereby further adding to the risk of default.  See Base Prospectus

(Ex. B) at 6, 10, 25.  The offering materials further warned of risks due to the fact that "[r]ecent

---

[16]     Each Prospectus Supplement contains a similar disclosure.  See, e.g., 2007-AMC3 Trust (Ex. K) at S-14 ("Approximately 61.35% of the Group I Mortgage Loans and approximately 69.25% of the Group II Mortgage Loans (in each case, by aggregate principal balance of the related loan group as of the cut-off date) and approximately 65.42% of the mortgage loans (by aggregate principal balance of the mortgage loans as of the cut-off date) have an original fully combined loan-to-value ratio in excess of 80%.").

developments in the residential mortgage market" had led to an increase in delinquencies and foreclosures, increased "monthly payments on adjustable rate mortgage loans," and the fact that housing prices and appraisal values had flattened out or declined.  See 2007-AHL2 Trust (Ex. G) at S-14.

                    d.      Debt-To-Income Ratio

Defendants also noted the high risks associated with the Certificates because the originators' underwriting standards allowed higher debt-to-income ratios than Fannie Mae and Freddie Mac standards, "[which] may result in the adjustable-rate mortgage loans experiencing increased delinquency, foreclosure, bankruptcy and loss than other mortgage loans."  See, e.g., 2007-WFHE4 Trust (Ex. R) at S-15.

                    e.      Ratings

Defendants disclosed that any rating assigned to a Certificate was at the discretion of the ratings agency, and made no representations as to how that rating was derived.  To the contrary, they stated as follows:

- "A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time."  Base Prospectus (Ex. B) at 12.

- "No person is obligated to maintain the rating on any security, and accordingly, there can be no assurance to you that the ratings assigned to any security on the date on which the security is originally issued will not be lowered or withdrawn by a rating agency at any time thereafter."  Base Prospectus (Ex. B) at 12.

- "Each rating agency rating the offered certificates may change or withdraw its initial ratings at any time in the future . . . ."  2007-WFHE2 Trust (Ex. C) at S-21.

- "A rating on the offered certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the offered certificates as described in this section."  2007-AMC1 Trust (Ex. I) at S-94.

f.      Underwriting Standards of Citigroup Mortgage

Defendants also disclosed the loan characteristics allowed under "Citigroup Mortgage's underwriting standards,"[17] and the risks associated with those characteristics.[18]  See, e.g., Base Prospectus (Ex. B) at 6 ("The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure.").  Further, and most importantly, Defendants cautioned investors that "in some cases . . . [Citigroup Mortgage] may not be able to establish the underwriting standards used in the origination of the related mortgage loans . . . . To the extent the mortgage loans cannot be re-underwritten or the underwriting criteria cannot be verified, the mortgage loans might suffer losses greater than they would had they been directly underwritten by the depositor or an affiliate thereof."  Id. at 10.[19]

---

[17]        AC ¶ 56.  Presumably, these allegations relate to the underwriting standards of Sponsor Citigroup Global Markets Realty Corp.  See supra, n.15.

[18]        See supra, Section III(B)(1)(a).

[19]        The majority of the allegations regarding Citigroup Mortgage (AC ¶¶ 54-59) also must be dismissed because they sound in fraud, but lack the particularity required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  The "heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).  Although Plaintiffs purport to "expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct," (AC ¶¶ 240, 251) — thereby revealing their sensitivity to this defect in their pleading — such a disclaimer is unavailing where, as here, "the wording and imputations of the complaint are classically associated with fraud." Rombach , 355 F.3d at 172.  See, e.g., AC ¶ 54 ("Citigroup management repeatedly told underwriters to 'look at it again,' and to accept virtually any loan."); AC ¶ 57 ("Underwriters conducting the underwriting for Citigroup Mortgage knew the borrowers could not afford the loans, but the guidelines allowed approval of the loans, so they were approved nonetheless . . . team leaders would tell due diligence underwriters to look at problematic loans again meaning they should 'find a way to accept it.'"); AC ¶ 59 ("Citigroup Mortgage did what was necessary to compete for the opportunity to buy and resell these loans.").  Where, as here, "the Complaint implies an intentional scheme of misconduct" by Defendants, it must meet the heightened pleading requirements of Rule 9(b). Zirkin v. Quanta Capital Holdings Ltd., No. 07 Civ. 851(RPP), 2009 WL 185940, at *12 (S.D.N.Y. Jan. 23, 2009). When fraud is alleged, the complaint must:  (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. Rombach, 355 F.3d at 170 (citation omitted).  Plaintiffs provide none of this required particularity.  In fact, these allegations do not even satisfy the basic pleading standard of Rule 8 because Plaintiffs provide no facts

In sum, contrary to Plaintiffs' allegations, the Offering Materials explicitly and repeatedly warned investors in clear and distinct language that the Certificates inhered precisely the risks Plaintiffs now allege were not disclosed — that the underlying loans were characterized by higher risks of non-payment than conventional loans, and that this could lead to greater defaults, greater losses and ratings downgrades. These representations, "taken together, and in context, would not have misled a reasonable investor about the nature of the securities." DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (citation and alterations omitted). Accordingly, the Court should dismiss Plaintiffs' allegations in full.[20]

## 2. Defendants Disclosed The Risks Associated With Purchasing The Certificates That Ann Arbor And Kansas City Bought

As shown above, Ann Arbor and Kansas City have standing to assert Section 11 claims only with respect to the two offerings in which they bought Certificates. But their allegations about Wells Fargo, the sole originator[21] of loans underlying these two offerings, fail

---

connecting these alleged practices to the loans backing the Trusts, or to any representations contained in the Offering Materials. See infra, n.20.

[20]     To the extent any of Plaintiffs' allegations are not addressed by these disclosures, they concern information that is immaterial in light of the total mix of information Defendants provided, which adequately and truthfully alerted Certificate holders to the nature and quality of what they were purchasing. See In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (dismissing complaint "on the ground that the alleged misstatements, taken in the context of the registration statement and prospectus as a whole, were so obviously unimportant . . . that reasonable minds could not differ on the question of [their] importance. . . .") (quoting I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir. 1991)).

        The allegations not addressed by these disclosures must also be dismissed because they fail to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937, 1940 (2009) (citation omitted). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949. Accordingly, "[f]acts that are merely consistent with a defendant's liability . . . stop[] short of the line between possibility and plausibility of entitlement to relief." Id. (quotations and citations omitted). Plaintiffs' generalized allegations regarding the underwriting practices of originators of subprime mortgages are merely consistent with and not demonstrative of Defendants' liability. The Amended Complaint fails to plead any facts plausibly suggesting that any of the Mortgage Loans were originated under these circumstances. Because the facts alleged "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 1950 (citing Fed. R. Civ. P. 8(a)(2)). These allegations must, therefore, be dismissed.

[21]     2007-WFHE2 Trust (Ex. C) at 4 and 2007-AR5 Trust (Ex. D) at II-11 ("Originators of the Group 1 Mortgage Loans") and II-49 ("Originators of the Group 2 Mortgage Loans").

entirely because the risks Ann Arbor and Kansas City complain about were fully disclosed.[22]
These allegations fall into five categories, each of which is premised on the complaint that the
Offering Materials did not fully disclose that the loans Wells Fargo originated or purchased were
high-risk loans made on the basis of little or no documentation.[23]  But as shown below, rather
than being omitted, this information was explicitly and repeatedly disclosed, in both the general
warnings described above, see supra, Section III(B)(1)(a), and in the Prospectus Supplements
specific to the two Trusts from which Ann Arbor and Kansas City purchased Certificates.

      First, Plaintiffs allege that the Offering Materials fail to disclose that Mortgage
Loans originated by Wells Fargo included Alt-A loans, sub-prime loans, adjustable rate
mortgages and low-payment loans, such as loans that were "interest-only" for a certain period of
time with payment escalation thereafter.[24]  AC ¶¶ 172, 176.  To the contrary, Defendants
expressly disclosed that Wells Fargo originated or acquired "Alt-A Prime Loans" "Alt-A Minus
Loans" and loans of similar character, including "Subprime Fixed Rate First Lien Loans,"
"Subprime Adjustable Rate First Lien Loans," "Subprime Second Lien Loans," "ARMs" and
"interest-only loans."  See 2007-AR5 Trust (Ex. D) at S-7 (ARMs and interest-only loans), S-37
(Alt-A loans); 2007-WFHE2 Trust (Ex. C) at S-6 (ARMs and interest-only loans), S-38
(subprime loans).  Moreover, Plaintiffs admit that "[t]he Registration Statement represented that

---

[22]    Because Ann Arbor and Kansas City lack standing as to 16 of the 18 Trusts, this section addresses disclosures relating only to those two Trusts from which Ann Arbor and Kansas City purchased Certificates.  The annex to this memorandum of law identifies Defendants' disclosures relating to the remaining 16 Trusts.  These disclosures equally defeat Plaintiffs' claims against the 16 Trusts, for the reasons stated here.

[23]    Again, Plaintiffs improperly infer from newspaper articles about Wells Fargo's general practices that every single loan originated or purchased by Wells Fargo and at issue here was made in a manner that contravened Wells Fargo's underwriting standards.  From this, Plaintiffs argue that any Wells Fargo loans in the Trusts are noncompliant with the terms of the Offering Materials.  Such pleading by inference does not pass muster under Rule 8. See supra, n.20.

[24]    Plaintiffs allege that the Wells Fargo "Alt-A group" originated loans that were not Alt-A.  But which division underwrote the loans is entirely immaterial.

the mortgage pools would . . . consist of loans . . . including . . . adjustable-rate mortgage loans."
AC ¶ 3.

Second, Plaintiffs allege that the Offering Materials omit that Wells Fargo
"viewed verification of its borrowers' income as unnecessary."  AC ¶¶ 170, 175, 178.  To the
contrary, Defendants disclosed no fewer than five times that many of the loans underlying the
Certificates had been originated with little or no documentation regarding the borrowers' income
or employment.  See, e.g., 2007-WFHE2 Trust (Ex. C) at S-51 ("Wells Fargo's 'subprime
mortgage loan programs include . . . a 'lite' documentation program and a 'stated income, stated
asset' program."); 2007-AR5 Trust (Ex. D) at S-50 ("Borrowers . . . may have been approved
under . . . a 'No Documentation' program."); id. at S-51 ("In the case of No Documentation
Loans, borrowers may not have been required to provide any information . . . regarding their
employment and in that instance employment would not have been verified.  Also . . . borrowers
would not have been required to provide any information . . . regarding their income or assets.");
id. at S-40 ("[B]orrowers may . . . be eligible for a reduced documentation program."); 2007-
WFHE2 Trust (Ex. C) at S-41 ("Verifications of income, assets or mortgages may be waived.");
2007-AR5 Trust (Ex. D) at S-41 (same); 2007-WFHE2 Trust (Ex. C) at S-41 ("[T]he loan
applicant may be eligible for a loan approval process permitting reduced documentation . . .
[R]educed documentation options and waivers limit the amount of documentation required for an
underwriting decision."); 2007-AR5 Trust (Ex. D) at S-41 (same); 2007-WFHE2 Trust (Ex. C) at
S-41 ("Wells Fargo Bank accepts alternative methods of verification, in those instances where
verifications are part of the underwriting decision.").[25]

---

[25]     This disclosure also moots Plaintiffs' allegation that Defendants did not disclose that "alternative measures
of credit were accepted" by Wells Fargo in some instances.  AC ¶ 175.

Third, Plaintiffs allege that the Offering Materials fail to disclose that Wells Fargo's "underwriting guidelines did not include performing a thorough examination of whether credit scores matched borrower's profiles."  AC ¶ 175.  To the contrary, Defendants expressly cautioned investors that "[t]here can be no assurance that the Credit Scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans." 2007-WFHE2 Trust (Ex. C) at S-15; 2007-AR5 Trust (Ex. D) at S-36.  In light of this warning, whether borrowers' credit scores were verified is immaterial, because investors were expressly told not to rely on the credit scores at all.

Fourth, Plaintiffs allege that the Offering Materials fail to disclose that Wells Fargo did not attempt to confirm the underwriting standards used by the "mortgage brokers, correspondents and other third parties from which Wells Fargo acquired mortgages," and as a result, "[t]hese third parties were able to engage in serious underwriting deficiencies without review or correction by Wells Fargo."  AC ¶¶ 171, 180.  To the contrary, the Offering Materials disclose this exact information and the risks associated with Wells Fargo having acquired loans from third parties, including the use of less exacting underwriting standards.  See 2007-WFHE2 Trust (Ex. C) at S-41 ("The underwriting of mortgage loans acquired by Wells Fargo Bank . . . may not be reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file.") (emphasis added); 2007-AR5 Trust (Ex. D) at S-41 (same); 2007-WFHE2 Trust (Ex. C) at S-40 (Wells Fargo would  "delegate[e] . . . all underwriting functions to such Correspondents . . . which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations.") (emphasis added); 2007-AR5 Trust (Ex. D) at S-39 (same); 2007-WFHE2

Trust (Ex. C) at S-40 ("Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's general or modified underwriting standards."); 2007-AR5 Trust (Ex. D) at S-39-40 (same); 2007-WFHE2 Trust (Ex. C) at S-53 ("As with all underwriting criteria, the foregoing [underwriting standards] are guidelines for the loan underwriter and variations from the guidelines may occur at the discretion of the loan underwriter based on the existence of sufficient compensating factors to warrant the variance.").[26]

      Fifth, Plaintiffs allege that Defendants did not disclose that Wells Fargo was a "production-based shop" where underwriters were pressured to approve loans that did not meet the required standards, or to simply ignore such standards.  AC ¶¶ 170, 177, 178.[27]  To the

---

[26]     These disclosures also moot Plaintiffs' allegation that Wells Fargo did not disclose that it "made some mistakes" in permitting loan-to-value ratios that were "too high," and "should not have offered such lenient loan terms," AC ¶ 179 (citation omitted), because the quotations upon which the Amended Complaint relies are actually about Wells Fargo's acquisition of loans from third parties and not Wells Fargo's own underwriting practices.  See Wells Fargo 2007 Annual Report, at 6 (2008), https://www.wellsfargo.com/downloads/pdf/invest_relations/wf2007annualreport.pdf (language omitted by plaintiffs in bold) ("We made some mistakes.  **We took on too much risk—and did not price sufficiently for it—in the home equity loans we purchased through indirect channels such as mortgage brokers, bankers and other mortgage companies.**  Too many of our home equity loans had "loan-to-value" ratios that were too high . . . .  Sometimes we did not require full documentation for these home equity loans we purchased from brokers because these were prime borrowers who had high credit scores with lower expected risk of default . . . We should not have offered such lenient loan terms **through indirect channels**, and we made the mistake of taking on too much risk.  We should have known better.  **In third quarter 2007, we stopped purchasing home equity loans from third-party correspondents.  In fourth quarter, we stopped purchasing loans through wholesalers when the borrowers were not Wells Fargo mortgage customers.  We've also exited the nonprime wholesale and correspondent channels for first mortgages.**").  Even if these statements had been about Wells Fargo's underwriting practices, and not third-party loans acquired by Wells Fargo, Plaintiffs were warned that the Trusts contained loans with high loan-to-value ratios, which ratios were disclosed.  See, e.g., 2007-AR5 Trust (Ex. D) at II-3 (Combined Loan-to-Value Ratios of the Group 1 Mortgage Loans at Origination); id. at S-43 (Wells Fargo "originates mortgage loans with Loan-to-Value Ratios in excess of 80%."); id. at S-45 ("mortgage loans may be originated with Loan-to-Value Ratios between 95.01% and 97%").

[27]     These allegations are premised, in part, on citation to a complaint in another lawsuit, which, as previously noted, does not satisfy Plaintiffs' Rule 8 obligation to plead "facts."  See supra, n.14.  If such reliance were permissible, Rule 8 could be circumvented by two plaintiffs filing simultaneous complaints, each relying on allegations made by the other.  Such a practice would make a mockery of the pleading rules.

      Furthermore, Plaintiffs' attorneys cannot shirk their obligation under Fed. R. Civ. P. 11(b) "to conduct an appropriate investigation into the facts that is reasonable under the circumstances by merely stating that '[someone

contrary, Defendants expressly informed investors that when the loans backing the Trusts were

originated, Wells Fargo had "initiated a program designed to encourage its mortgage loan

underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already

granted to them . . . ."  2007-AR5 Trust (Ex. D) at S-51-52 (emphasis added).  Investors were

warned directly and specifically that "[t]here can be no assurance that . . . this initiative will not

result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses,

among mortgage loans underwritten in accordance with the updated philosophy."  Id. at S-52.

Defendants even informed investors that, while Wells Fargo had recently become more

conservative in its underwriting standards, its prior, more aggressive, approach should lead

investors to "expect[] that a significant number of the mortgage loans in the Mortgage Pool may

not have been originated . . . if the revised underwriting guidelines were in effect at the date of

the loan application."  2007-WFHE2 Trust (Ex. C) at S-52.

      In sum, the Offering Materials disclosed all of the risks associated with investing

in Certificates backed by loans originated by Wells Fargo, the sole originator underlying the two

Trusts in which Ann Arbor and Kansas City purchased Certificates.[28]

---

else] alleges' certain additional facts."  Geinko v. Padda, No. 00-C-5070, 2002 WL 276236, at *6 (N.D. Ill. 2002).
See In re Connetics Corp., 542 F. Supp. 2d 996, 1005-1006 (N.D. Cal. 2008).  Here it is obvious that in some cases
Plaintiffs' attorneys have not even read the complaint whose allegations they purport to be adopting.  For instance,
Plaintiffs rely on supposed allegations by Wells Fargo in the case of Wells Fargo Bank, N.A. v. Quicken Loans,
Inc.: "[A]s alleged in a lawsuit styled Wells Fargo Bank, N.A. v. Quicken Loans Inc., 2:08-cv-12408 (E.D. Mich.
2008), Wells Fargo expected that their borrowers would overstate their income on 'stated income' loan applications
and that these borrowers would not have the ability to make their monthly mortgage loan payments."  AC ¶ 178.
The complaint in that case makes no such allegation.  See Compl. in Wells Fargo Bank, N.A. v. Quicken Loans,
Inc., 2:08-cv-12408 (E.D. Mich. 2008) (Ex. U).

[28]     Any additional allegedly omitted information not addressed above regarding Wells Fargo is immaterial in
light of the total mix of information, including the substantial and direct warnings quoted above, that Defendants
provided in the Offering Materials.  TSC Indus., Inc., 426 U.S. at 449.  This is equally true of allegations regarding
other originators that are not addressed by the disclosures set forth in the annex attached hereto.

**C.**    **PLAINTIFFS' CLAIMS FAIL BECAUSE PLAINTIFFS HAVE NOT ALLEGED THAT DEFENDANTS FAILED TO PERFORM AS PROMISED**

Plaintiffs have not alleged that Defendants failed to meet their obligations, as described in the Offering Materials, to cure any problems arising from non-compliant loans. Therefore, Plaintiffs cannot sustain any claim based on an alleged misrepresentation regarding the quality or nature of these loans.

The Trusts are backed by thousands of loans originated by third parties.  Because Defendants were one step removed from the origination process, and because of the sheer volume of loans, Defendants were careful to represent only that all of the loans backing the Trusts *either* would be compliant or as described, _or_ would be made to satisfy the representations and warranties regarding the quality and nature of the loans as outlined in the Offering Materials. Ignoring this either/or disclosure, Plaintiffs allege only that the loans did not satisfy this first condition, and fail to make <u>any</u> allegations with regard to the second.  Accordingly, because Plaintiffs have not alleged that Defendants failed to meet their obligations as defined in the Offering Materials, Plaintiffs cannot sustain their claims.

Specifically, Defendants' representations regarding the quality and nature of the underlying Mortgage Loans must be read together with Defendants' representations regarding repurchase and/or substitution of non-conforming loans.  The Offering Materials state that if any representation concerning the quality and nature of the mortgage loans is breached, Citigroup Mortgage will be obligated "either to cure the breach, . . . repurchase the mortgage loan, . . . or substitute for that mortgage loan."  <u>See</u> Base Prospectus (Ex. B) at 53.  <u>Further, the Offering Materials make clear that this cure, repurchase or substitution obligation is the "sole" remedy available to Certificate holders for any breach of representation</u>.  <u>Id.</u> at 48, 53, 55 and 56; <u>see also</u>

Registration Statement (Ex. V), at 48, 53, 55 and 56.[29]  Thus, read as a whole, as they must be,

the Offering Materials represent that the loans in the mortgage pools either are or will be made

compliant with the terms described therein.  The Court will search in vain in the Amended

Complaint for any allegation that Defendants failed to meet this obligation.  The Court should

therefore dismiss Plaintiffs' claims.

       In the only reported decision to directly address this point, Lone Star Fund (U.S.)

v. Barclays Bank, No. 3:08-cv-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008), the court

addressed similar claims of misrepresentation predicated on offering documents providing that

the sole remedy for any breach of representations they contained was for purchasers to seek to

have the issuer cure, replace or repurchase the affected mortgage loan.  Id. at *10-11.  The Lone

Star court dismissed the complaint, finding that, "given the structure of the Prospectus

Supplements, which set out certain representations and warranties for the mortgage loans that

will be pooled, and then contain language that makes clear that specific actions will be taken if

there are delinquent loans," defendants had "only represented that the loans are — or will be

made — compliant."  Id. at *10.  Because the plaintiffs in Lone Star did not allege that the

defendants had failed to repurchase or substitute loans, the court ruled that the defendants had

made no misstatements, let alone a materially misleading statement.  Id. at *11.

       So too here.  Defendants represented only that the Mortgage Loans were — or

would be made — compliant.  Plaintiffs have not alleged that Defendants refused to cure, replace

---

[29]     This language is consistent with 15 U.S.C. § 77n, which provides that "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."  Plaintiffs waived no rights under the securities laws. Rather, the Offering Materials clearly disclosed the remedy for any breach of representation regarding a mortgage loan, and Plaintiffs do not allege that those disclosures were false or misleading.  See Lone Star Fund (U.S.) v. Barclays Bank, No. 3:08-cv-0261-L, 2008 WL 4449508 at *11 (N.D. Tex. Sept. 30, 2008).  ("Because the court considers the 'repurchase or substitute' language to be part of the representations made by Defendants, it determines that they have not offended the anti-waiver statutes of federal or state law because they have not made any misrepresentation.").

or repurchase any non-compliant loans.  Plaintiffs, therefore, have failed to plead <u>any</u>

misrepresentations by Defendants, and their claims should be dismissed.

## D.     THE COURT SHOULD DISMISS PLAINTIFFS' SECTION 15 CLAIM AGAINST THE INDIVIDUAL DEFENDANTS

        Because Plaintiffs fail to state a claim under Section 11, their claim under Section

15 against the Individual Defendants for control person liability should be dismissed as well.

<u>See</u> <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d

187, 207 (2d Cir. 2009) ("having found that Plaintiffs failed to state a claim under . . . section 11

of the Securities Act, their control person liability claim pursuant to section 15 of the Securities

Act . . . must also fail for want of a primary violation."); <u>In re Merrill Lynch & Co., Inc.</u>

<u>Research Reports Sec. Litig.</u>, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003) ("[B]ecause Plaintiffs

have failed to state a claim against the Defendants for a primary violation of the federal securities

law, their claims for control person liability must necessarily fail.").

## IV.     CONCLUSION

        For the foregoing reasons, the Court should dismiss the Amended Complaint.

Dated:   New York, New York
       July 17, 2009

                           Respectfully submitted,

                           CLEARY GOTTLIEB STEEN & HAMILTON LLP

                           By:_____/s/ Lawrence B. Friedman_____
                              Lawrence B. Friedman,
                              A Member of the Firm

                              One Liberty Plaza
                              New York, New York 10006
                              (212) 225-2000

                              Attorneys for Defendants

25

**ANNEX**

**Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning
Originators of Mortgage Loans That Do Not Underlie
The Certificates Purchased by Ann Arbor and Kansas City**

A.   **Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning Accredited
Home Lenders and Aames Funding**

Allegedly Undisclosed Risk No. 1:  Loans were of greater risk because Accredited extended loans without regard to the creditworthiness of borrowers.  AC ¶¶ 197, 203.

Defendants' Disclosures Addressing Risk No. 1:

- "Accredited focuses on originating mortgage loans which do not conform to credit and other criteria established by Fannie Mae and Freddie Mac, commonly referred to as 'nonconforming' and 'subprime' mortgage loans."  2007-AHL1 Trust (Ex. F) at S-30; 2007-AHL2 Trust (Ex. G) at S-35; 2007-AHL3 Trust (Ex. H) at S-34.

- "There can be no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans."  2007-AHL1 Trust (Ex. F) at S-18; 2007-AHL2 Trust (Ex. G) at S-20; 2007-AHL3 Trust (Ex. H) at S-20.

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure."  Base Prospectus (Ex. B) at 6 (emphasis in original).

Allegedly Undisclosed Risk No. 2:  Loans were of greater risk because Accredited allowed exceptions to and overriding of underwriting guidelines.  AC ¶¶ 199-202, 204-209, 211-214.

Defendants' Disclosures Addressing Risk No. 2:

- "Accredited may allow exceptions to its underwriting guidelines in accordance with Accredited's established exception policy.  Exceptions may be allowed based upon the presence of compensating factors such as a low LTV, demonstrated pride of ownership and stability of employment."  2007-AHL1 Trust (Ex. F) at S-32; 2007-AHL2 Trust (Ex. G) at S-37; 2007-AHL3 Trust (Ex. H) at S-37.

- "[U]nderwriting standards may be varied in appropriate cases."  Base Prospectus (Ex. B) at 44.

Allegedly Undisclosed Risk No. 3:  Loans were of greater risk because Accredited did not verify income and/or employment.  AC ¶¶ 200, 210.

Defendants' Disclosures Addressing Risk No. 3:

- "Under the Stated Income program, applicants are evaluated based upon income as stated in the mortgage loan application."  2007-AHL1 Trust (Ex. F) at S-31; 2007-AHL2 Trust (Ex. G) at S-36; 2007-AHL3 Trust (Ex. H) at S-36.

- Annexes disclosed the exact number of loans originated with little or no documentation. See, e.g., 2007-AHL1 Trust (Ex. F) at II-18 (33.64% of Group I Mortgage Loans originated with Stated or Alt documentation); id. at II-31 (45.85% of Group II Mortgage Loans originated with Stated, Alt, or No documentations).

Allegedly Undisclosed Risk No. 4:  Loans were of greater risk because Accredited allowed borrowers with prior bankruptcies to receive loans.  AC ¶ 203.

Defendants' Disclosures Addressing Risk No. 4:

- "Accredited has a sixth, generally inactive credit classification, called 'C-' which may be assigned to a borrower with a current or recent foreclosure or bankruptcy and can still be used on an exception basis with approval from executive management."  2007-AHL1 Trust (Ex. F) at S-31; 2007-AHL2 Trust (Ex. G) at S-36; 2007-AHL3 Trust (Ex. H) at S-36.

Allegedly Undisclosed Risk No. 5:  Loans were of greater risk because Accredited allowed high loan-to-value ratios.  AC ¶ 203.

Defendants' Disclosures Addressing Risk No. 5:

- "Accredited offers a variety of specialty programs that provide higher LTV's and CLTV's . . . ."  2007-AHL1 Trust (Ex. F) at S-32; 2007-AHL2 Trust (Ex. G) at S-37; 2007-AHL3 Trust (Ex. H) at S-36.

- 100% LTV available for credit score of 620 or above on Full Documentation Plus loans. 2007-AHL1 Trust (Ex. F) at S-38 (Credit Grade Chart).

- "Mortgage loans with loan-to-value ratios in excess of 80% and as high as 125% . . . are designated by the depositor as high LTV loans.  High LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of

A-2

recovering any amounts from the foreclosure of the related mortgaged property . . . ."  Base Prospectus (Ex. B) at 8.

- Annexes provided substantial disclosure regarding the loan-to-value ratios of the loans. 2007-AHL1 Trust (Ex. F) at II-4. (table showing that the "Weighted Average Fully Combined LTV" of the loans was 85.42%).

Allegedly Undisclosed Risk No. 6:  Loans were of greater risk because Accredited accepted problematic appraisals.  AC ¶¶ 215-216.

Defendants' Disclosures Addressing Risk No. 6:

- "No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans."  2007-AHL1 Trust (Ex. F) at S-13; 2007-AHL2 Trust (Ex. G) at S-14; 2007-AHL3 Trust (Ex. H) at S-14.

- "The depositor cannot assure you that the values of the mortgaged properties . . . have remained or will remain at the appraised values . . . . Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios, that the market value of the . . . home may be lower than the principal amount outstanding . . . ."  Base Prospectus (Ex. B) at 6.

- "The depositor cannot assure you that values of the mortgaged properties . . . have remained or will remain at the appraised values . . . ."  Base Prospectus (Ex. B) at 10.

- "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels . . . ."  Base Prospectus (Ex. B) at 25.

Allegedly Undisclosed Risk No. 7:  Loans were of greater risk because Aames specialized in sub-prime loans and did not assess credit risk.  AC ¶ 197-98, 217.

Defendants' Disclosures Addressing Risk No. 7:

- "As a lender that generally specializes in loans made to credit impaired borrowers, Aames Funding made mortgage loans to borrowers with credit histories or other factors that might disqualify them from consideration for a loan from traditional financial institutions. Aames Funding's underwriting guidelines for such credit-impaired borrowers may, in certain instances, allow for higher combined loan-to-value ratios than would typically be the case if the borrower could qualify for a loan from a traditional financial institution." 2007-AHL1 Trust (Ex. F) at S-37 (emphasis added).

A-3

<u>Allegedly Undisclosed Risk No. 8</u>:  Loans were of greater risk because Aames allowed exceptions to underwriting guidelines.  AC ¶ 217.

<u>Defendants' Disclosures Addressing Risk No. 8</u>:

- "If an individual loan application did not meet Aames Funding's formal written underwriting guidelines, its underwriters could make underwriting exceptions up to certain limits within its formal exception policies and approval authorities.  From time to time, Aames Funding may have applied underwriting criteria that were either more stringent or more flexible depending upon the economic conditions of a particular geographic market."  2007-AHL1 Trust (Ex. F) at S-36.

- "Set forth below is a general description of the underwriting guidelines designed to provide an overview of the general credit considerations utilized by Aames Funding and is not intended to be a detailed explanation of all credit considerations analyzed by Aames Funding in underwriting loans."  2007-AHL1 Trust (Ex. F) at S-37.

- "This summary does not purport to be a complete description of the underwriting standards of Aames Funding.  All mortgage loans were underwritten generally in accordance with underwriting guidelines developed by Aames Funding . . . subject to certain exceptions with respect to individual mortgage loans."  2007-AHL1 Trust (Ex. F) at S-36.

<u>Allegedly Undisclosed Risk No. 9</u>:  Loans were of greater risk because there was little or no review of the underwriting process by Aames.  AC ¶ 218.[1]

<u>Defendants' Disclosures Addressing Risk No. 9</u>:

- "**Varying Underwriting Standards of Unaffiliated Mortgage Loan Sellers May Present a Greater Risk of Loss** . . . .[I]n some cases . . . the depositor may not be able to establish the underwriting standards used in the origination of the related mortgage loans. . . . To the extent the mortgage loans cannot be re-underwritten or the underwriting criteria cannot be verified, the mortgage loans might suffer losses greater than they would had they been directly underwritten by the depositor or an affiliate thereof."  Base Prospectus (Ex. B) at 10 (emphasis in original).

---

[1]     This allegation also fails to satisfy the Rule 8 requirement that a plaintiff must plead sufficient factual matter to state a facially plausible claim to relief.  <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.20.

**B.      Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning American Home Mortgage ("AHM")**

<u>Allegedly Undisclosed Risk No. 1</u>:  Loans were of greater risk because AHM issued pay-option ARMs.  AC ¶¶ 182, 192.

<u>Defendants' Disclosures Addressing Risk No. 1</u>:

- Defendants disclosed that the Certificates contained "Negatively Amortizing Loans," and stated that "[i]n the case of mortgage loans that are subject to negative amortization, the principal balances of these mortgage loans could be increased to an amount equal to or in excess of the value of the underlying mortgaged properties, <u>thereby increasing the likelihood of default</u>."  Base Prospectus (Ex. B) at 6 (emphasis added).

- Defendants disclosed that the Certificates would be backed by, *inter alia*, "ARM Loans that provide for negative amortization or accelerated amortization."  Base Prospectus (Ex. B) at 21.

- "[M]ortgage loans may provide for escalating or variable payments by the borrower."  Base Prospectus (Ex. B) at 45.

<u>Allegedly Undisclosed Risk No. 2</u>:  Loans were of greater risk because AHM gave loans to borrowers whose creditworthiness was impaired.  AC ¶¶ 183, 185, 186, 188.

<u>Defendants' Disclosures Addressing Risk No. 2</u>:

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure."  Base Prospectus (Ex. B) at 6 (emphasis in original).

- "Because the mortgage loans in the trust fund may include a substantial proportion of loans as to which the borrowers have blemished credit histories . . . or loans whose future performance is difficult to predict, such as adjustable payment mortgage loans, interest-only loans . . . . An investment in these types of securities involves significant risks and uncertainties and should only be considered by sophisticated investors who . . . have carefully analyzed the mortgage loans and the securities and understand the risks."  Base Prospectus (Ex. B) at 19.

- "**Recent developments in the residential mortgage market may adversely affect the performance and market value of your certificates.**"  2007-6 Trust (Ex. E) at S-31; 2007-AR7 Trust (Ex. O) at S-24 (emphasis in original).

A-5

- "Certain of the types of loans that may be included in the mortgage pools are recently developed and may involve additional uncertainties not present in traditional types of loans."  Base Prospectus (Ex. B) at 45.

- Annexes provided detailed information about borrower credit scores.  See 2007-AR7 Trust (Ex. O) at II-7 (table entitled "Credit Scores of the Mortgage Loans").

Allegedly Undisclosed Risk No. 3:  Loans were of greater risk because AHM's underwriting standards were lax and documentation was not required.  AC ¶¶ 183, 185, 186, 188, 190.

Defendants' Disclosures Addressing Risk No. 3:

- "Substantially all of the mortgage loans . . . may have been originated using underwriting standards that are less stringent. . . . [F]or example, [loans] may have been originated with little or no documentation of borrower income and/or assets.  Applying less stringent underwriting standards creates additional risks that losses on the mortgage loans will be allocated to related certificateholders."  2007-6 Trust (Ex. E) at S-31; 2007-AR1 Trust (Ex. M) at S-18; 2007-AR7 Trust (Ex. O) at S-24.

- "Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require.  Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require.  For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both."  See 2007-AR1 Trust (Ex. M) at S-36; 2007-AR7 Trust (Ex. O) at S-36.

- Annexes provided detailed information about the documentation, or lack thereof, at origination.  See 2007-6 Trust (Ex. E) at II-5 and II-59 (only 13.63% of Group 1 and 10.92% of Group 2 loans had verified income and assets); see also 2007-AR1 Trust (Ex. M) at II-6 (only 20.10% of loans had verified income and assets); 2007-AR7 Trust (Ex. O) at II-5 (only 12.39% of loans verified income and assets).

Allegedly Undisclosed Risk No. 4:  Loans were of greater risk because AHM awarded loans to investors.  AC ¶¶ 188, 192.

Defendants' Disclosures Addressing Risk No. 4:

- "In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources."  See 2007-AR1 Trust (Ex. M) at S-36; 2007-AR7 Trust (Ex. O) at S-35.

A-6

- Annexes provided the exact number of mortgages issued to investors.  See 2007-6 (Ex. E) at II-4 (13.29% of mortgages issued to investors); 2007-AR1 Trust (Ex. M) at II-5 (12.76% of mortgages issued to investors); 2007-AR7 Trust (Ex. O) at II-4 (14.22% of mortgages issued to investors).

Allegedly Undisclosed Risk No. 5:  Loans were of greater risk because AHM allowed borrowers to make small or no down payments, resulting in high loan-to-value ratios.  AC ¶¶ 191-192.

Defendants' Disclosures Addressing Risk No. 5:

- "**Mortgage loans with high loan-to-value ratios leave the related borrower with little or no equity in the related mortgaged property which may result in losses with respect to such  mortgage loans** . . . . Mortgage loans with higher loan-to-value ratios may present a greater risk of loss."  2007-6 Trust (Ex. E) at S-22; 2007-AR1 Trust (Ex. M) at S-13; 2007-AR7 Trust (Ex. O) at S-17, S-18 (emphasis in original).

- 34.31% of loans in the 2007-AR1 Trust had Combined LTV Ratios at Origination of 95% or more.  2007-AR1 Trust (Ex. M) at II-5.

- "Mortgage loans with loan-to-value ratios in excess of 80% and as high as 125% . . . are designated by the depositor as high LTV loans.  High LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property . . . ."  Base Prospectus (Ex. B) at 8.

Allegedly Undisclosed Risk No. 6:  Loans were of greater risk because AHM permitted exceptions to its underwriting standards.  AC ¶¶ 182, 190, 192.

Defendants' Disclosures Addressing Risk No. 6:

- "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception."  2007-AR1 Trust (Ex. M) at S-38; 2007-AR7 Trust (Ex. O) at S-37.

- "[U]nderwriting standards may be varied in appropriate cases."  Base Prospectus (Ex. B) at 44.

<u>Allegedly Undisclosed Risk No. 7</u>:  Loans were of greater risk because the credit scores AHM used were unreliable.  AC ¶ 189.[2]

<u>Defendants' Disclosures Addressing Risk No. 7</u>:

- "There can be no assurance that the Credit Scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans."  2007-6 Trust (Ex. E) at S-42; 2007-AR1 Trust (Ex. M) at S-27; 2007-AR7 Trust (Ex. O) at S-34.

<u>Allegedly Undisclosed Risk No. 8</u>:  Loans were of greater risk because AHM relied on problematic appraisals.  AC ¶¶ 189-191.[3]

<u>Defendants' Disclosures Addressing Risk No. 8</u>:

- "There can be no assurance that the value of a mortgaged property used in the calculation of the loan-to-value ratio accurately reflected the actual value of the related mortgaged property at origination.  There can be no assurance that the loan-to-value ratio of any mortgage loan determined at any time after origination will be less than or equal to its original loan-to-value ratio."  2007-6 Trust (Ex. E) at S-22; 2007-AR1 Trust (Ex. M) at S-13; 2007-AR7 Trust (Ex. O) at S-18.

- "The depositor cannot assure you that the values of the mortgaged properties . . . have remained or will remain at the appraised values . . . . Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios, that the market value of the . . . home may be lower than the principal amount outstanding . . . ."  Base Prospectus (Ex. B) at 6.

- "The depositor cannot assure you that values of the mortgaged properties . . . have remained or will remain at the appraised values . . . ."  Base Prospectus (Ex. B) at 10.

- "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels . . . ."  Base Prospectus (Ex. B) at 25.

<u>Allegedly Undisclosed Risk No. 9</u>:  Loans were of greater risk because AHM violated state and federal regulations.  AC ¶ 182.[4]

<u>Defendants' Disclosures Addressing Risk No. 9</u>:

---

[2]      This allegation also sounds in fraud but fails to satisfy the pleading standard of Rule 9(b).  <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.19.

[3]      These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b).  <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.19.

[4]      This allegation also fails to satisfy the Rule 8 requirement that a plaintiff must plead sufficient factual matter to state a facially plausible claim to relief.  <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.20.

- "**Violations of Consumer Protection Laws May Result in Losses on the Mortgage Loans and the Securities Backed by Those Mortgage Loans**."  Base Prospectus (Ex. B) at 16 (emphasis in original).

- "**Originators and Servicers May be Subject to Litigation or Governmental Proceedings** . . . Lenders and servicers may be subject from time to time to various types of claims, legal actions (including class action lawsuits), investigations, subpoenas and inquiries in the course of their business."  Base Prospectus (Ex. B) at 19 (emphasis in original).

**C.    Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning Argent Mortgage Company ("Argent")**

Allegedly Undisclosed Risk No. 1:  Loans were of greater risk because Argent permitted high loan-to-value ratios.  AC ¶ 166.

Defendants' Disclosures Addressing Risk No. 1:

- The offering materials repeatedly disclosed that loans were granted with high LTV ratios. See 2007-AMC1 Trust (Ex. I) at S-7 (LTV ratios ranged up to 100% and weighted average fully combined LTV ratio of loans in trust was 87.48%); id. at S-33 (table indicating that 100% LTV loans were granted); 2007-AMC2 Trust (Ex. J) at S-7 (LTV ratios ranged up to 100% and weighted average fully combined LTV ratio of loans in trust was 87.17%).

- The high percentage of loans with loan-to-value ratios above 80% was disclosed.  See, e.g., 2007-AMC4 Trust (Ex. L) at S-18 ("approximately 55.03% of the mortgage loans . . . have an original loan-to-value ratio in excess of 80%).

- "Mortgage loans with loan-to-value ratios in excess of 80% and as high as 125% . . . are designated by the depositor as high LTV loans.  High LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property . . . ."  Base Prospectus (Ex. B) at 8.

Allegedly Undisclosed Risk No. 2:  Loans were of greater risk because Argent did not evaluate borrowers' credit histories, credit standings or repayment abilities.  AC ¶ 162.

Defendants' Disclosures Addressing Risk No. 2:

- "There can be no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans." 2007-AMC1 Trust (Ex. I) at S-18; 2007-AMC2 Trust (Ex. J) at S-19; 2007-AMC3 Trust (Ex. K) at S-19; 2007-AMC4 Trust (Ex. L) at S-24.

A-9

- "The Ameriquest[5] Underwriting Guidelines are less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to . . . the applicant's credit standing and repayment ability . . . ." 2007-AMC1 Trust (Ex. I) at S-30; 2007-AMC2 Trust (Ex. J) at S-32; 2007-AMC3 Trust (Ex. K) at S-32; 2007-AMC4 Trust (Ex. L) at S-42.

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure." Base Prospectus (Ex. B) at 6 (emphasis in original).

Allegedly Undisclosed Risk No. 3:  Loans were of greater risk because Argent did not verify borrowers' income.  AC ¶¶ 162-164.[6]

Defendants' Disclosures Addressing Risk No. 3:

- "During the underwriting process, each Ameriquest Loan Seller reviews and verifies the loan applicant's sources of income (except under the Stated Income and Limited Documentation types, under which programs such information may not be independently verified) . . . ." 2007-AMC1 Trust (Ex. I) at S-31; 2007-AMC2 Trust (Ex. J) at S-33; 2007-AMC3 Trust (Ex. K) at S-32; 2007-AMC4 Trust (Ex. L) at S-42 (emphasis added).

- Under Stated Income program "the applicant's income as stated on the application is not independently verified."  2007-AMC1 Trust (Ex. I) at S-31; 2007-AMC2 Trust (Ex. J) at S-33; 2007-AMC3 Trust (Ex. K) at S-33; 2007-AMC4 Trust (Ex. L) at S-43.

Allegedly Undisclosed Risk No. 4:  Loans were of greater risk because Argent departed from its underwriting standards.  AC ¶ 162.

Defendants' Disclosures Addressing Risk No. 4:

- "On a case-by-case basis, the Ameriquest Loan Sellers may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the risk categories described below, warrants an exception to the requirements set forth in the

---

[5]     The Prospectus Supplement referred to Argent Mortgage Company, L.L.C. ("Argent"), Ameriquest or the affiliates of Argent or Ameriquest collectively as the "Ameriquest Loan Sellers."  2007-AMC1 Trust (Ex. I) at S-30.

[6]     These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b).  See Mem. of Law submitted herewith, supra, n.19.

Ameriquest Underwriting Guidelines . . . . It is expected that a substantial number of the mortgage loans to be included in the mortgage pool will represent such underwriting exceptions."  2007-AMC1 Trust (Ex. I) at S-30; 2007-AMC2 Trust (Ex. J) at S-32; 2007-AMC3 Trust (Ex. K) at S-31, S-32; 2007-AMC4 Trust (Ex. L) at S-42.

- "[U]nderwriting standards may be varied in appropriate cases."  Base Prospectus (Ex. B) at 44.

Allegedly Undisclosed Risk No. 5:  Loans were of greater risk because Argent relied on problematic appraisals.  AC ¶ 167.[7]

Defendants' Disclosures Addressing Risk No. 5:

- "No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans."  2007-AMC1 Trust (Ex. I) at S-13; 2007-AMC2 Trust (Ex. J) at S-14; 2007-AMC3 Trust (Ex. K) at S-13; 2007-AMC4 Trust (Ex. L) at S-17.

- "[T]here can be no assurance that recourse will be available beyond the specific mortgaged property pledged as security for repayment or that the value of the mortgaged property will be sufficient to cover the amount due on the mortgage loan."  2007-AMC1 Trust (Ex. I) at S-41; 2007-AMC2 Trust (Ex. J) at S-50; 2007-AMC3 Trust (Ex. K) at S-44; 2007-AMC4 Trust (Ex. L) at S-62.

- "The depositor cannot assure you that the values of the mortgaged properties . . . have remained or will remain at the appraised values . . ..  Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios, that the market value of the . . . home may be lower than the principal amount outstanding . . . ."  Base Prospectus (Ex. B) at 6.

- "The depositor cannot assure you that values of the mortgaged properties . . . have remained or will remain at the appraised values . . . ."  Base Prospectus (Ex. B) at 10.

- "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels . . . ."  Base Prospectus (Ex. B) at 25.

**D.    Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning Countrywide Home Loans**

---

[7]    These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b).  See Mem. of Law submitted herewith, supra, n.19.

<u>Allegedly Undisclosed Risk No. 1</u>:  Loans were of greater risk because borrowers were not required to provide documentation or verification of income and assets.  AC ¶¶ 89, 109, 110, 113, 116, 125, 127.[8]

<u>Defendants' Disclosures Addressing Risk No. 1</u>:

- "Substantially all of the mortgage loans . . . may have been originated with little or no documentation of borrower income and/or assets."  2007-6 Trust (Ex. E) at S-31; 2007-AR1 Trust (Ex. M) at S-18; 2007-AR4 Trust (Ex. N) at S-39; 2007-AR7 Trust (Ex. O) at S-24.

- "Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required . . . ."  2007-6 Trust (Ex. E) at S-49; 2007-AR1 Trust (Ex. M) at S-34; 2007-AR4 Trust (Ex. N) at S-39; 2007-AR7 Trust (Ex. O) at S-44.

- "A prospective borrower may be eligible for a loan approval process that limits or eliminates Countrywide Home Loans' standard disclosure or verification requirements or both."  2007-6 Trust (Ex. E) at S-45; 2007-AR1 Trust (Ex. M) at S-30; 2007-AR4 Trust (Ex. N) at S-36; 2007-AR7 Trust (Ex. O) at S-40.

- "Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements . . . [and] also permit higher debt-to-income ratios . . . ."  2007-6 Trust (Ex. E) at S-48; 2007-AR1 Trust (Ex. M) at S-33; 2007-AR4 Trust (Ex. N) at S-38; 2007-AR7 Trust (Ex. O) at S-42.

- Only a small percentage of mortgages have verification of both income and assets.  <u>See</u> 2007-6 Trust (Ex. E) at II-5 and II-59 (only 13.63% of Group 1 mortgages, and 10.92% of Group 2 mortgage loans had both verified income and verified assets); <u>see also</u> 2007-AR1 Trust (Ex. M) at II-6 (20.10% of loans had both verified income and verified assets); 2007-AR4 Trust (Ex. N) at II-4 and II-14 (35.4% of Group I and 42.24% of Group 2 loans had verified income and verified assets); 2007-AR7 Trust (Ex. O) at II-5 (12.39% of loans had verified income and verified assets).

- "Applying less stringent underwriting standards creates additional risks that losses on the mortgage loans will be allocated to related certificateholders."  2007-6 Trust (Ex. E) at S-31; 2007-AR1 Trust (Ex. M) at S-18; 2007-AR7 Trust (Ex. O) at S-24.

<u>Allegedly Undisclosed Risk No. 2</u>:  Loans were of greater risk because Countrywide understated debt-to-income ratios because it did not verify borrowers' income.  AC ¶¶ 90-91, 143.

---

[8]     To the extent these allegations are adopted from complaints in unrelated proceedings they are improper. <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.14, n.27.

<u>Defendants' Disclosures Addressing Risk No. 2</u>:

- "Since information relating to a prospective borrower's income and employment is not verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application."  2007-6 Trust (Ex. E) at S-47; 2007-AR1 Trust (Ex. M) at S-32; 2007-AR4 Trust (Ex. N) at S-38; 2007-AR7 Trust (Ex. O) at S-42.

- "Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis."  <u>See</u> 2007-6 Trust (Ex. E) at S-49; 2007-AR1 Trust (Ex. M) at S-34; 2007-AR4 Trust (Ex. N) at S-39, S-40; 2007-AR7 Trust (Ex. O) at S-44.


<u>Allegedly Undisclosed Risk No. 3</u>:  Loans were of greater risk because Countrywide permitted high loan-to-value ratios.  AC ¶ 144.

<u>Defendants' Disclosures Addressing Risk No. 3</u>:

- The Annexes provided detailed disclosures regarding the loan-to-value ratios of the mortgage loans.  <u>See, e.g.</u>, 2007-AR1 Trust (Ex. M) at II-5 ("Combined Loan-to-Value Ratios of the Mortgage Loans at Origination.") (stating that weighted average combined loan-to-value ratio was 86.75%).

- Loan-to-value ratios may be "close to or greater than" actual property values due to subordinate liens, declines in market value, or appraisals that do not reflect actual value.  2007-6 Trust (Ex. E) at S-32; 2007-AR4 Trust (Ex. N) at S-24; 2007-AR7 Trust (Ex. O) at S-24.

- "Under certain circumstances . . . Countrywide . . . allow[s] for Loan-to-Value Ratios of up to 100% . . . ."  <u>See</u> 2007-6 Trust (Ex. E) at S-48; 2007-AR1 Trust (Ex. M) at S-33; 2007-AR4 Trust (Ex. N) at S-38; 2007-AR7 Trust (Ex. O) at S-42-43. <u>See also</u> 2007-6 Trust (Ex. E) at S-48; 2007-AR1 Trust (Ex. M) at S-33; 2007-AR4 Trust (Ex. N) at S-39; 2007-AR7 Trust (Ex. O) at S-43 (Countrywide's "Expanded Underwriting Guidelines . . . generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% . . . .").

- Countrywide's "Stated Income/Stated Asset" program and "No Income/No Asset Documentation" program allowed maximum loan-to-value ratios that ranged as high as 90% and 95%, respectively.  <u>See</u> 2007-6 Trust (Ex. E) at S-49; 2007-AR1 Trust (Ex. M) at S-34; 2007-AR4 Trust (Ex. N) at S-40; 2007-AR7 Trust (Ex. O) at S-44.

- "Mortgage loans with loan-to-value ratios in excess of 80% and as high as 125% . . . are designated by the depositor as high LTV loans.  High LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property . . . ."  Base Prospectus (Ex. B) at 8.

Allegedly Undisclosed Risk No. 4:  Loans were of greater risk because Countrywide allowed exceptions to underwriting guidelines.  AC ¶¶ 99, 105, 123-124.[9]

Defendants' Disclosures Addressing Risk No. 4:

- "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  2007-6 Trust (Ex. E) at S-45; 2007-AR1 Trust (Ex. M) at S-30; 2007-AR4 Trust (Ex. N) at S-35; 2007-AR7 Trust (Ex. O) at S-39.

- "[U]nderwriting standards may be varied in appropriate cases."  Base Prospectus (Ex. B) at 44.

Allegedly Undisclosed Risk No. 5:  Loans were of greater risk because Countrywide approved loans based on the borrower's ability to pay a teaser rate.  AC ¶¶ 92-96, 101.

Defendants' Disclosures Addressing Risk No. 5:

- "[S]ome revolving credit loans may be teaser loans with an introductory rate that is lower than the rate that would be in effect if the applicable index and gross margin were used to determine the loan rate."  Base Prospectus (Ex. B) at 26.

- "Generally, the mortgagor under each buydown mortgage loan will be qualified at the applicable lower monthly payment.  Accordingly, the repayment of a buydown mortgage loan is dependent on the ability of the mortgagor to make larger level monthly payments after the buydown funds have been depleted and, for certain buydown mortgage loans, during the initial buydown period.  The inability of a mortgagor to make larger monthly payments could lead to losses on these mortgage loans . . . ."  Base Prospectus (Ex. B) at 7.

- "Another factor that may have contributed to, and may in the future result in, higher delinquency rates is the increase in monthly payments on adjustable rate mortgage loans."  2007-6 Trust (Ex. E) at S-32; 2007-AR4 Trust (Ex. N) at S-24; 2007-AR7 Trust (Ex. O) at S-25.

---

[9]    To the extent these allegations are adopted from complaints in unrelated proceedings they are improper.  See Mem. of Law submitted herewith, supra, n.14, n.27.

Allegedly Undisclosed Risk No. 6:  Loans were of greater risk because Countrywide did not use independent appraisals and/or relied on inaccurate appraisals.  AC ¶¶ 109, 130-140.[10]

Defendants' Disclosures Addressing Risk No. 6:

- "Except with respect to the mortgage loans originated pursuant to its Streamlined Documentation Program . . . Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans." 2007-6 Trust (Ex. E) at S-46 (emphasis added); 2007-AR1 Trust (Ex. M) at S-31; 2007-AR4 Trust (Ex. N) at S-36; 2007-AR7 Trust (Ex. O) at S-40.

- "There can be no assurance that the value of a mortgaged property used in the calculation of the loan-to-value ratio accurately reflected the actual value of the related mortgaged property at origination." 2007-6 Trust (Ex. E) at S-22; 2007-AR1 Trust (Ex. M) at S-13; 2007-AR4 Trust (Ex. N) at S-17; 2007-AR7 Trust (Ex. O) at S-17.

- "No assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date." 2007-6 Trust (Ex. E) at S-44; 2007-AR1 Trust (Ex. M) at S-28; 2007-AR4 Trust (Ex. N) at S-34; 2007-AR7 Trust (Ex. O) at S-38.

- "The depositor cannot assure you that the values of the mortgaged properties . . . have remained or will remain at the appraised values . . . . Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios, that the market value of the . . . home may be lower than the principal amount outstanding . . . ." Base Prospectus (Ex. B) at 6.

- "The depositor cannot assure you that values of the mortgaged properties . . . have remained or will remain at the appraised values . . . ." Base Prospectus (Ex. B) at 10.

- "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels . . . ." Base Prospectus (Ex. B) at 25.

Allegedly Undisclosed Risk No. 7:  Loans were of greater risk because Countrywide ignored adverse information in credit reports.  AC ¶ 129.

Defendants' Disclosures Addressing Risk No. 7:

- The Annexes provided detailed disclosures regarding the specific credit scores of borrowers. See, e.g., 2007-AR1 Trust (Ex. M) at II-8 ("Credit Scores of the Mortgage Loans").

---

[10]      This allegation also fails to satisfy the Rule 8 requirement that a plaintiff must plead sufficient factual matter to state a facially plausible claim to relief. See Mem. of Law submitted herewith, supra, n.20.

Allegedly Undisclosed Risk No. 8:  Countrywide was investigated by various state and federal agencies.  AC ¶¶ 103, 107-108.[11]

Defendants' Disclosures Addressing Risk No. 8:

- "**Originators and Servicers May be Subject to Litigation or Governmental Proceedings** . . . Lenders and servicers may be subject from time to time to various types of claims, legal actions (including class action lawsuits), investigations, subpoenas and inquiries in the course of their business."  Base Prospectus (Ex. B) at 19 (emphasis in original).

E. **Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning Opteum Financial Services ("Opteum")**

Allegedly Undisclosed Risk No. 1:  Loans were of greater risk because Opteum did not verify information provided by borrowers.  AC ¶¶ 194, 195.[12]

Defendants' Disclosures Addressing Risk No. 1:

- Opteum's programs included: Stated Income/Verified Assets, Stated Employment/Verified Assets, Stated Income/Stated Assets, No Income/No Assets, and No Income/No Employment/Verified Assets programs.  2007-6 Trust (Ex. E) at S-54; 2007-OPX1 Trust (Ex. W) at S-38.

- "Stated Income/Stated Assets (SISA).  Under this documentation type, the borrower states their employment, income and assets on the mortgage loan application, none of which are verified."  2007-6 Trust (Ex. E) at S-55; 2007-OPX1 Trust (Ex. W) at S-38.

- "No Income/No Assets (NINA).  Under this documentation type, the borrower provides no income, employment or asset information on the mortgage loan application."  2007-6 Trust (Ex. E) at S-55; 2007-OPX1 Trust (Ex. W) at S-38.

- Only 11.04% of loans in OPX-1 contained fully verified borrower information.  2007-OPX1 Trust (Ex. W) at S-30.

---

[11]     These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b).  See Mem. of Law submitted herewith, supra, n.19.  Additionally, these allegations refer to events that occurred after the Certificates were issued and therefore cannot constitute a material misstatement or omission in connection with the Certificates' sale.

[12]     To the extent these allegations are adopted from complaints in unrelated proceedings they are improper.  See Mem. of Law submitted herewith, supra, n.14, n.27.  These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b).  See Mem. of Law submitted herewith, supra, n.19.

- "As a result of the originator's underwriting standards, the mortgage loans in the mortgage pool are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner." 2007-OPX1 Trust (Ex. W) at S-12.

Allegedly Undisclosed Risk No. 2: Loans were of greater risk because Opteum granted exceptions to its lending guidelines. AC ¶ 194.[13]

Defendants' Disclosures Addressing Risk No. 2:

- "[Opteum], on a case-by-case basis, may determine that the prospective mortgagor warrants an exception outside the standard program guidelines." 2007-6 Trust (Ex. E) at S-51; 2007-OPX1 Trust (Ex. W) at S-35.

- "[U]nderwriting standards may be varied in appropriate cases." Base Prospectus (Ex. B) at 44.

Allegedly Undisclosed Risk No. 3: Loans were of greater risk because Opteum provided funding to homebuilders. AC ¶ 194.[14]

Defendants' Disclosures Addressing Risk No. 3:

- "[Opteum] allows the following variances from its underwriting guidelines with respect to mortgage loans originated by national builders. . . . [B]uilders originate loans under the "Skip It" program which allows borrowers who owner occupy the property to have no payments for the first (6) six months on their first mortgage lien. The total dollar amount of the payments required for the first six months are paid by the builder to [Opteum] at the time of purchasing of the loan." 2007-6 Trust (Ex. E) at S-51; 2007-OPX1 Trust (Ex. W) at S-34-35.

## F. Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning Silver State Mortgage ("Silver State")[15]

---

[13] To the extent these allegations are adopted from complaints in unrelated proceedings they are improper. See Mem. of Law submitted herewith, supra, n.14, n.27. These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b). See Mem. of Law submitted herewith, supra, n.19.

[14] This allegation also fails to satisfy the Rule 8 requirement that a plaintiff must plead sufficient factual matter to state a facially plausible claim to relief. See Mem. of Law submitted herewith, supra, n.20.

[15] Over the course of its business, Silver State only originated a very small number of loans, an even smaller amount of which underlie the Certificates.

Allegedly Undisclosed Risk No. 1:  Loans were of greater risk because Silver State's underwriting guidelines were not stringent and the mortgage loans were of "low quality."  AC ¶¶ 146-150, 152, 156.[16]

Defendants' Disclosures Addressing Risk No. 1:

- "Substantially all of the mortgage loans consist of a type sometimes referred to in the mortgage loans origination industry as 'Alt-A' mortgage loans which may have been originated using underwriting standards that are less stringent than the underwriting standards applied by certain other first mortgage loan purchase programs, such as those of Fannie Mae and Freddie Mac.  Alt-A mortgage loans, for example, may have been originated with little or no documentation of borrower income and/or assets.  Applying less stringent underwriting standards creates additional risks that losses on the mortgage loans will be allocated to related certificateholders."  2007-6 Trust (Ex. E) at S-31; 2007-AR1 Trust (Ex. M) at S-18; 2007-AR7 Trust (Ex. O) at S-24.

- Annexes provided detailed disclosures regarding the loan-to-value ratios of loans, the documentation type required and the credits scores of borrowers.  See, e.g., 2007-6 Trust (Ex. E) at II-4 ("Combined Loan-to-Value Ratios of the Group 1 Mortgage Loans at Origination"); id. at II-5 ("Documentation Types of the Group 1 Mortgage Loans"); id. at II-7 ("Credit Scores of the Group 1 Mortgage Loans").

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure."  Base Prospectus (Ex. B) at 6 (emphasis in original).

- "Certain of the types of loans that may be included in the mortgage pools are recently developed and may involve additional uncertainties not present in traditional types of loans."  Base Prospectus (Ex. B) at 45.

Allegedly Undisclosed Risk No. 2:  Loans were of greater risk because Silver State did not verify borrower information.  AC ¶ 146, 148, 151-154, 157-158.[17]  In addition, Silver State did not always verify the debt-to-income ratios.  AC ¶ 152.

Defendants' Disclosures Addressing Risk No. 2:

---

[16]     To the extent these allegations are adopted from complaints in unrelated proceedings they are improper.  See Mem. of Law submitted herewith, supra, n.14, n.27.

[17]     To the extent these allegations are adopted from complaints in unrelated proceedings they are improper.  See Mem. of Law submitted herewith, supra, n.14, n.27.  These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b).  See Mem. of Law submitted herewith, supra, n.19.

- Loans "may have been originated with little or no documentation of borrower income and/or assets."  2007-6 Trust (Ex. E) at S-31; 2007-AR1 Trust (Ex. M) at S-18; 2007-AR7 Trust (Ex. O) at S-24.

- Annexes provided the exact amount of documentation required at origination.  See 2007-6 (Ex. E) at II-5 and II-59 (only 13.63% of Group 1 mortgages, and 10.92% of Group 2 mortgage loans had both verified income and verified assets); see also 2007-AR1 Trust (Ex. M) at II-6 (only 20.10% of loans had both verified income and verified assets); 2007-AR7 Trust (Ex. O) at II-5 (only 12.39% of loans had verified income and verified assets).

Allegedly Undisclosed Risk No. 3:  Silver State's loans were of greater risk because they suffered from first payment and early payment defaults.  AC ¶ 146, 149-150.[18]

Defendants' Disclosures Addressing Risk No. 3:

- "[A] certain number of mortgage loans included in the trust fund may be delinquent as of the applicable cut-off date or may have been delinquent in payment in the last twelve months on one or more due dates . . . . [F]irst or early payment defaults, may be an indication of underwriting errors in assessing the financial means and/or credit history of the borrower or of an adverse change in the financial status of the borrower."  Base Prospectus (Ex. B) at 14.

- "Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector."  2007-6 Trust (Ex. E) at S-31; 2007-AR7 Trust (Ex. O) at S-24.

- Annexes provided detailed disclosure regarding the historical delinquency of rates of the loans included in each Trust.  See, e.g., 2007-AR1 Trust (Ex. M) at II-13 ("Historical Delinquency of the Mortgage Loans").

Allegedly Undisclosed Risk No. 4:  Loans were of greater risk because Silver State used less stringent underwriting standards and allowed exceptions to underwriting standards.  AC ¶ 158.

Defendants' Disclosures Addressing Risk No. 4:

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater

---

[18]     To the extent these allegations are adopted from complaints in unrelated proceedings they are improper.  See Mem. of Law submitted herewith, supra, n.14, n.27.

likelihood of loss in the event of delinquency and foreclosure."  Base Prospectus (Ex. B) at 6 (emphasis in original).

- "[U]nderwriting standards may be varied in appropriate cases."  Base Prospectus (Ex. B) at 44.

Allegedly Undisclosed Risk No. 5:  Loans were of greater risk because Silver State made 100% loan-to-value loans, some of which were for investment properties. AC ¶ 158.

Defendants' Disclosures Addressing Risk No. 5:

- "**Mortgage loans with high loan-to-value ratios leave the related borrower with little or no equity in the related mortgaged property which may result in losses with respect to such  mortgage loans** . . . . Mortgage loans with higher loan-to-value ratios may present a greater risk of loss."  2007-6 Trust (Ex. E) at S-22; 2007-AR1 Trust (Ex. M) at S-13; 2007-AR7 Trust (Ex. O) at S-17, S-18 (emphasis in original).

- "Mortgage loans with loan-to-value ratios in excess of 80% and as high as 125% . . . are designated by the depositor as high LTV loans.  High LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property . . . ."  Base Prospectus (Ex. B) at 8.

Allegedly Undisclosed Risk No. 6:  Silver State was sued and/or investigated by government agencies.  AC ¶¶ 147, 159.[19]

Defendants' Disclosures Addressing Risk No. 6:

- "**Originators and Servicers May be Subject to Litigation or Governmental Proceedings** . . . . Lenders and servicers may be subject from time to time to various types of claims, legal actions (including class action lawsuits), investigations, subpoenas and inquiries in the course of their business."  Base Prospectus (Ex. B) at 19.

- "**Violations of Consumer Protection Laws May Result in Losses on the Mortgage Loans and the Securities Backed by Those Mortgage Loans**."  Base Prospectus (Ex. B) at 16 (emphasis in original).

Allegedly Undisclosed Risk No. 7:  Loans were of greater risk because Silver State relied on inaccurate appraisals.  AC ¶ 148, 155.[20]

---

[19]	To the extent these allegations are adopted from complaints in unrelated proceedings they are improper. See Mem. of Law submitted herewith, supra, n.14, n.27.

A-20

<u>Defendants' Disclosures Addressing Risk No. 7</u>:

- "There can be no assurance that the value of a mortgaged property used in the calculation of the loan-to-value ratio accurately reflected the actual value of the related mortgaged property at origination. There can be no assurance that the loan-to-value ratio of any mortgage loan determined at any time after origination will be less than or equal to its original loan-to-value ratio." 2007-6 Trust (Ex. E) at S-22; 2007-AR1 Trust (Ex. M) at S-13; 2007-AR7 Trust (Ex. O) at S-18.

- "The depositor cannot assure you that the values of the mortgaged properties . . . have remained or will remain at the appraised values . . . . Consequently, at any time after origination it is possible, especially in the case of contracts with high loan-to-value ratios, that the market value of the . . . home may be lower than the principal amount outstanding . . . ." Base Prospectus (Ex. B) at 6.

- "The depositor cannot assure you that values of the mortgaged properties . . . have remained or will remain at the appraised values . . . ." Base Prospectus (Ex. B) at 10.

- "No assurance can be given that values of the mortgaged properties have remained or will remain at their levels . . . ." Base Prospectus (Ex. B) at 25.


<u>Allegedly Undisclosed Risk No. 8</u>:  Citigroup Mortgage did little to verify the underwriting standards Silver State used to generate its loans.  AC ¶ 157.

<u>Defendants' Disclosures Addressing Risk No. 8</u>:

- "**Varying Underwriting Standards of Unaffiliated Mortgage Loan Sellers May Present a Greater Risk of Loss** . . . [I]n some cases . . . the depositor may not be able to establish the underwriting standards used in the origination of the related mortgage loans. . . . To the extent the mortgage loans cannot be re-underwritten or the underwriting criteria cannot be verified, the mortgage loans might suffer losses greater than they would had they been directly underwritten by the depositor or an affiliate thereof." Base Prospectus (Ex. B) at 10 (emphasis in original).

---

[20]     To the extent these allegations are adopted from complaints in unrelated proceedings they are improper. <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.14, n.27.  These allegations also sound in fraud but fail to satisfy the pleading standard of Rule 9(b). <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, n.19.

**G.     Defendants' Disclosures That Moot Plaintiffs' Allegations Concerning Wells Fargo Bank[21]**

<u>Allegedly Undisclosed Risk No. 1</u>:  Loans were of greater risk because they included Alt-A loans, sub-prime loans, adjustable rate mortgages and interest-only loans.  AC ¶¶ 172, 176.

<u>Defendants' Disclosures Addressing Risk No. 1</u>:

- Defendants disclosed that Wells Fargo originated a wide variety of alternative and subprime loans.  <u>See</u> 2007-WFHE1 Trust (Ex. P) at S-37 ("Fixed Rate First Lien Subprime Loans," "Adjustable Rate First Lien Subprime Loans," and "Second Lien Subprime Loans"); 2007-WFHE3 Trust (Ex. Q) at S-42 ("Subprime First Lien Loans," "Subprime Mortgage Loans," and "Alt-A Minus Mortgage Loans"); 2007-WFHE4 Trust (Ex. R) at S-76, S-77 (same); 2007-2 Trust (Ex. S) at S-79 ("Alt-A Fixed-Rate Loans," Alt-A Adjustable Rate Loans," "Alt-B Fixed-Rate Loans," and "Alt-B Adjustable-Rate Loans").

- Defendants disclosed the exact percentages of the loans that were adjustable rate or had interest-only periods.  <u>See</u>, <u>e.g.</u>, 2007-WFHE1 Trust (Ex. P) at S-6 (81.12% of loans were ARM loans, 10.36% of loans were interest only); 2007-WFHE3 Trust (Ex. Q) at S-6 (68.94% of loans were ARM loans, 7.80% of loans were interest only).

- "**The Types of Loans Included in the Trust Fund Related to Your Securities May Be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** . . . . The types of mortgage loans or contracts included in a trust fund may include loans made to borrowers who do not qualify for loans conforming to underwriting standards of more traditional lenders and as a result of the credit quality of such borrowers, such mortgage loans may have a greater likelihood of delinquency and foreclosure, and a greater likelihood of loss in the event of delinquency and foreclosure."  Base Prospectus (Ex. B) at 6 (emphasis in original).

<u>Allegedly Undisclosed Risk No. 2</u>:  Loans were of greater risk because Wells Fargo did not verify information provided by borrowers.  AC ¶¶ 170, 175, 178.

<u>Defendants' Disclosures Addressing Risk No. 2</u>:

- Under Wells Fargo's "stated income, stated asset" program "income is not independently verified.  Similarly, the applicant's assets . . . are not independently verified."  2007-WFHE1 Trust (Ex. P) at S-46; 2007-WFHE3 Trust (Ex. Q) at S-57; 2007-WFHE4 Trust (Ex. R) at S-91.

---

[21]     This section relates only to allegations against the Trusts backed by Wells Fargo loans in which Ann Arbor and Kansas City did not purchase Certificates.  Disclosures relating to the Trusts that were purchased by Ann Arbor and Kansas City and were backed by Wells Fargo loans, i.e. 2007-WFHE2 and 2007-AR5 Trusts, are addressed in the body of Defendants' Memorandum of Law.  <u>See</u> Mem. of Law submitted herewith, <u>supra</u>, Section III(B)(2).

- "In the case of the no documentation program, borrowers may not have been required to provide any information in their loan application regarding their employment and in that instance employment would not have been verified.  Also, in the case of the no documentation program, borrowers would not have been required to provide any information in their loan application regarding their income or assets . . . ."  2007-WFHE3 Trust (Ex. Q) at S-64; 2007-WFHE4 Trust (Ex. R) at S-99.

- "In the case of the 'stated' documentation program . . . the borrower's income would not have been verified . . . ."  2007-WFHE3 Trust (Ex. Q) at S-64; 2007-WFHE4 Trust (Ex. R) at S-100.  See also 2007-2 Trust (Ex. S) at S-92 (In the case of the 'Stated' program . . . the borrower's income would not have been verified.)

- "In the case of the stated reduced documentation program, the borrower's income would not have been verified . . . ."  2007-WFHE3 Trust (Ex. Q) at S-65; 2007-WFHE4 Trust (Ex. R) at S-100.

- "Verifications of income, assets or mortgages may be waived . . . ."  2007-2 Trust (Ex. S) at S-83; 2007-WFHE3 Trust (Ex. Q) at S-45; 2007-WFHE4 Trust (Ex. R) at S-80.

- "[T]he loan applicant may be eligible for a loan approval process permitting reduced documentation . . . . [R]educed documentation options and waivers limit the amount of documentation required for an underwriting decision . . . ."  2007-WFHE3 Trust (Ex. Q) at S-46.  See also 2007-2 Trust (Ex. S) at S-83 ("[B]orrowers may also be eligible for a reduced documentation program . . . .").

- "The Alt-A program . . . includes No Ratio documentation program, No Documentation program, Stated documentation program and Stated Reduced documentation program."  2007-WFHE4 Trust (Ex. R) at S-96.  See also 2007-2 Trust (Ex. S) at S-89 ("The Alt-B program includes No Ratio Loans, No Documentation Loans, Stated Loans and Stated Reduced Loans.").

- "Wells Fargo Bank accepts alternative methods of verification, in those instances where verifications are part of the underwriting decision."  2007-2 Trust (Ex. S) at S-84; 2007-WFHE3 Trust (Ex. Q) at S-46; 2007-WFHE4 Trust (Ex. R) at S-80.

- "Borrowers . . . may have been approved under a 'No Ratio' program . . . or under a 'No Documentation' program . . . . In the case of No Ratio Loans, the borrowers would not have been required to provide any information in their loan application regarding their income . . . . In the case of No Documentation Loans, borrowers may not have been required to provide any information in their loan application regarding their employment and in that instance employment would not have been verified.  Also, in the case of No Documentation Loans, borrowers would not have been required to provide any information in their loan application regarding their income or assets."  2007-2 Trust (Ex. S) at S-92.

A-23

Allegedly Undisclosed Risk No. 3:  Loans were of greater risk because Wells Fargo did not ascertain whether credit scores matched borrower's profiles.  AC ¶ 175.

Defendants' Disclosures Addressing Risk No. 3:

- "There can be no assurance that the Credit Scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans."  2007-2 Trust (Ex. S) at S-16; 2007-WFHE1 Trust (Ex. P) at S-15; 2007-WFH3 Trust (Ex. Q) at S-18; 2007-WFHE4 Trust (Ex. R) at S-19.

Allegedly Undisclosed Risk No. 4:  Loans were of greater risk because Wells Fargo did not confirm the underwriting standards used by the third parties.  AC ¶¶ 171, 180.

Defendants' Disclosures Addressing Risk No. 4:

- "Wells Fargo Bank may also acquire mortgage loans in negotiated transactions under which the mortgage loans may have been originated by the seller or another third party according to underwriting standards that may have varied materially from Wells Fargo Bank's general or modified underwriting standards."  2007-2 Trust (Ex. S) at S-82; 2007-WFHE1 Trust (Ex. P) at S-39; 2007-WFHE3 Trust (Ex. Q) at S-44; 2007-WFHE4 Trust (Ex. R) at S-79.

- "The underwriting of mortgage loans acquired by Wells Fargo Bank . . . may not be reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file."  2007-WFHE3 Trust (Ex. Q) at S-45; 2007-WFHE4 Trust (Ex. R) at S-80 (emphasis added).  See also 2007-2 Trust (Ex. S) at S-83 ("The underwriting of mortgage loans acquired by Wells Fargo Bank . . . is not be reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file.") (emphasis added).

- Wells Fargo would  "delegate[e] . . . all underwriting functions to such Correspondents . . . which will result in Wells Fargo Bank not performing any underwriting functions prior to acquisition of the loan but instead relying on such Correspondents' representations . . . ."  2007-2 Trust (Ex. S) at S-81; 2007-WFHE3 Trust (Ex. Q) at S-44; 2007-WFHE4 Trust (Ex. R) at S-79 (emphasis added)

Allegedly Undisclosed Risk No. 5:  Loans were of greater risk because Wells Fargo made or allowed exceptions to underwriting guidelines.  AC ¶¶ 170, 177, 178. [22]

---

[22]    To the extent these allegations are adopted from complaints in unrelated proceedings they are improper. See Mem. of Law submitted herewith, supra, n.14, n.27.

Defendants' Disclosures Addressing Risk No. 5:

- "*Underwriter Discretion*.  During the second calendar quarter of 2005, Wells Fargo Bank initiated a program designed to encourage its mortgage loan underwriting staff to prudently, but more aggressively, utilize the underwriting discretion already granted to them under Wells Fargo Bank's underwriting guidelines and policies.  This initiative was viewed by management as necessary and desirable to make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors as permitted by the underwriting guidelines.  There can be no assurance that the successful implementation of this initiative will not result in an increase in the incidence of delinquencies and foreclosures, or the severity of losses, among mortgage loans underwritten in accordance with the updated philosophy . . . ."  2007-2 Trust (Ex. S) at S-93 (emphasis in original).

- "[U]nderwriting standards may be varied in appropriate cases."  Base Prospectus (Ex. B) at 44.

- Defendants disclosed that, while Wells Fargo had recently become more conservative in its underwriting standards, its prior, more aggressive, approach should lead investors to "expect[] that a significant number of the mortgage loans in the Mortgage Pool may not have been originated . . . if the revised underwriting guidelines were in effect at the date of the loan application."  2007-WFHE4 Trust (Ex. __) at S-101.

A-25