UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————— x
CITY OF ANN ARBOR EMPLOYEES'          :   Civil Action No. 08-CV-01418
RETIREMENT SYSTEM, Individually and On :
Behalf of All Others Similarly Situated, :   CLASS ACTION
                                      :
                      Plaintiff,       :   LEAD PLAINTIFFS' OPPOSITION TO
                                      :   DEFENDANTS' MOTION TO DISMISS
        vs.                           :
                                      :
CITIGROUP MORTGAGE LOAN TRUST          :
INC., et al.                          :
                                      :
                      Defendants.      :
                                      :
——————————————————— x

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...........................................................................................1

II.     FACTUAL BACKGROUND .......................................................................3

III.    ARGUMENT .................................................................................................5

    A.    Legal Standard ....................................................................................5

    B.    Lead Plaintiffs Have Adequately Alleged Standing to Assert the Claims Set Forth in the Complaint .........................................................6

        1.    Lead Plaintiffs Have Adequately Alleged Standing to Pursue §11 Claims on Behalf of the Entire Class ..........................................................7

        2.    Lead Plaintiffs Have Adequately Alleged Standing to Pursue §12(a)(2) Claims on Behalf of the Entire Class............................................9

        3.    Lead Plaintiffs Have Adequately Alleged Article III Standing ................10

    C.    The Complaint Alleges Actionable False Statements and Omissions ...................12

        1.    The 1933 Act Provides Strict Liability for Material Misstatements..........12

        2.    Defendants' Misstatements and Omissions Were Material ......................13

        3.    The Various Disclosures Did Not Cure Defendants' Material Misstatements and Omissions .....................................14

            a.    Defendants' Material Misstatements and Omissions Regarding Its Underwriting Standards Were Not Cured by Any Alleged "Risk Disclosures" ....................................14

            b.    The Offering Documents Misrepresented the Property Appraisals in Connection with the Underlying Loans ..................16

            c.    The Offering Documents Misstated the Loan-to-Value Ratios of the Underlying Loans ....................................17

            d.    The Offering Documents Misstated the DTI Ratios of Borrowers for the Underlying Loans ..............................18

            e.    The Offering Documents Misrepresented the Ratings of the Certificates ..................................20

**Page**

f.   The Offering Documents Misrepresented Citigroup
Mortgage's Underwriting Standards ............................................20

g.   The Offering Documents Misrepresented Wells Fargo's
Underwriting Standards ...............................................................21

D.   The Complaint Adequately Alleges a Violation of §15 .........................................23

E.   Defendants Cannot Escape Liability by Pointing to Purported "Cure"
Provisions in the Offering Documents.....................................................................24

F.   Leave to Amend Should Be Granted .......................................................................25

IV.   CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen v. Wright*,
    468 U.S. 737 (1984)............................................................................................11

*AllianceBernstein Mut. Fund Excessive Fee Litig.*,
    No. 04 Civ. 4885 (SWK), 2005 U.S. Dist. LEXIS 24263
    (S.D.N.Y. Oct. 19, 2005) ..................................................................................12

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (U.S. 2009)................................................................................5

*Authentidate Holding Corp. Sec. Litig.*,
    No. 05 Civ. 5323 (LTS) 2006, U.S. Dist. LEXIS 47971
    (S.D.N.Y. July 14, 2006) ....................................................................................7

*Barnes v. Osofsky*,
    373 F.2d 269 (2d Cir. 1967)................................................................................9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1998)...........................................................................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................5

*Ca. Pub. Emples. Ret. Sys. v. Caboto-Gruppo Intesa BCI*,
    496 F.3d 245 (2d Cir. 2007)..............................................................................12

*Caiafa v. Sea Containers, Ltd.*,
    No. 08-3006-cv, 2009 U.S. App. LEXIS 10569
    (2d Cir. May 19, 2009) ......................................................................................10

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. N.Y. 2002).....................................................................13

*Conley v. Gibson*,
    355 U.S. 41 (1957).............................................................................................25

*Credit Suisse First Boston Corp. v. Arm Fin. Group*,
    No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332
    (S.D.N.Y. Mar. 28, 2001) ...........................................................................21, 23

*Erickson v. Pardus*,
    551 U.S. 89 (2007).............................................................................................5

**Page**

*Financial Inst. Ret. Fund v. Office of Thrift Supervision*,
    964 F.2d 142 (2d Cir. 1992)........................................................................11

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................13

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001)..........................................................................5

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995).....................................................................................9

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008)...................................................17, 18

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)................................................................................2, 12

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)...........................................................................7

*Hunt v. Alliance North Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)........................................................................14

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................................8, 9, 11

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469
    (S.D.N.Y. Sept. 20, 2000)............................................................................7

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    No. H-01-3624, 2004 U.S. Dist. LEXIS 8158
    (S.D. Tex. Feb. 25, 2004)............................................................................7

*In re Evci Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)...........................................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009)..........................................................21

*In re Friedman's, Inc. Sec. Litig.*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) ....................................................9, 10

Page

*In re Fuwei Films Sec. Litig.*,
247 F.R.D. 432 (S.D.N.Y. 2008) ...................................................................7

*In re Fuwei Films Sec. Litig.*,
No. 07 Civ. 9416 (RJS), 2009 U.S. Dist. LEXIS 59658
(S.D.N.Y. July 10, 2009) .........................................................................2, 12

*In re Giant Interactive Group, Inc. Sec. Litig.*,
No. 07 Civ. 10588 (RWS), 2009 U.S. Dist. LEXIS 69414
(S.D.N.Y. Aug. 7, 2009) ...............................................................................20

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003)............................................................6

*In re Globalstar Sec. Litig.*,
No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496
(S.D.N.Y. Dec. 15, 2003)..............................................................................19

*In re Grand Theft Auto Video Game Consumer Litig.*,
No. 06 MD 1739 (SWK) (MHD), 2006 U.S. Dist. LEXIS 78064
(S.D.N.Y. Oct. 25, 2006) ...............................................................................11

*In re Initial Pub. Offering Sec. Litig.*,
358 F. Supp. 2d 189 (S.D.N.Y. 2004).................................................5, 7, 21

*In re Lilco Sec. Litig.*,
625 F. Supp. 1500 (E.D.N.Y. 1986) ......................................................2, 6, 12

*In re Marsh & McLennan Cos. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)............................................................8

*In re Novagold Res. Inc. Secs. Litig.*,
No. 08 Civ. 7041 (DLC), 2009 U.S. Dist. LEXIS 47561
(S.D.N.Y. June 5, 2009)...............................................................................2, 5

*In re Pfizer Inc. Sec. Litig.*,
584 F. Supp. 2d 621 (S.D.N.Y. 2008)..........................................................13

*In re Prudential Sec. Ltd. P'shps. Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ..........................................................16, 18

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007).............................................................6

**Page**

*In re Regeneron Pharms., Inc. Sec. Litig.,*
    No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
    (S.D.N.Y. Feb. 3, 2005) ................................................................16

*In re Salomon Analyst Level 3 Litig.,*
    350 F. Supp. 2d 477 (S.D.N.Y. 2006) ...........................................7

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) .........................................12

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) .............................................................6

*In re Suprema Specialties, Inc. Sec. Litig.,*
    438 F.3d 256 (3d. Cir. 2006) .......................................................10

*In re Tower Auto Sec. Litig.,*
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ...........................................6

*In re Transkaryotic Therapies, Inc. Sec. Litig.,*
    319 F. Supp. 2d 152 (D. Mass. 2004) ...........................................9

*In re Westinghouse Sec. Litig.,*
    90 F.3d 696 (3d Cir. 1996) ..........................................................10

*In re Worldcom, Inc. Sec. Litig.,*
    No. 02-3288 (DLC), 2004 U.S. Dist. LEXIS 4240
    (S.D.N.Y. Mar. 19, 2004) ..............................................................9

*In re WorldSpace Sec. Litig.,*
    No. 07 Civ. 2252 (RMB), 2008 U.S. Dist. LEXIS 56224
    (S.D.N.Y. July 21, 2008) .............................................................23

*Lapin v. Goldman Sachs Group, Inc.,*
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) .........................................13

*Lewis v. Casey,*
    518 U.S. 343 (1996) .....................................................................11

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
    No. CIV A 3:08-CV-0261-L, 2008 WL 4449508
    (N.D. Tex. Sept. 30, 2008) ....................................................24, 25

Page

*Mayor and City Counsel of Baltimore v. Wells Fargo Bank, N.A.*,
No. 08-cv-062 (D. Md. 2008) ........................................................................6

*McMahan & Co. v. Wherehouse Entm't*,
65 F.3d 1044 (2d Cir. 1995)...........................................................................24

*Ong v. Sears, Roebuck & Co.*,
388 F. Supp. 2d 871 (N.D. Ill. 2004) .............................................................9

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004)............................................................................15

*Rescuecom Corp. v. Google, Inc.*,
562 F.3d 123 (2d Cir. 2009)...........................................................................5

*Rodriguez v. Bear Stearns Cos.*,
No. 07-cv-1816 (JCH), 2009 U.S. Dist. LEXIS 31525
(D. Conn. Apr. 14, 2009) ...............................................................................3

*Rombach v. Chang*,
355 F.3d 164 (2d. Cir. 2004)....................................................................3, 5

*Seale v. INS*,
323 F.3d 150 (1st Cir. 2003) .........................................................................11

*Staehr v. Hartford Fin. Servs. Group*,
547 F.3d 406 (2d Cir. 2008)...........................................................................3

*Sterling Foster & Co. Sec. Litig.*,
222 F. Supp. 2d 216 (E.D.N.Y. 2002) ..........................................................10

*Stratmore v. Combs*,
723 F. Supp. 458 (N.D. Cal. 1989), *aff'd*,
968 F.2d 810 (9th Cir. 1992) ........................................................................24

*Tanne v. Autobytel, Inc.*,
226 F.R.D. 659 (C.D. Cal. 2005) ....................................................................7

*TSC Indus. v. Northway, Inc.*,
426 U.S. 438 (1976)......................................................................................13

**Page**

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.

§77k ................................................................................ *passim*
§77k(a) ..........................................................................8, 12
§77k(b) ................................................................................2
§77l ................................................................................2, 9
§77l(a)(2) ...................................................................... *passim*
§77n ..............................................................................2, 24
§77o ..............................................................................5, 23
§78j(b) ................................................................................6
§78n ..................................................................................24
§78u-4(a)(3)(B) ....................................................................6

Federal Rules of Civil Procedure

Rule 8 ................................................................................5
Rule 8(a) ............................................................................5
Rule 9(b) ..........................................................................5, 6
Rule 12(b)(6) ......................................................................1
Rule 15(a) ..........................................................................25
Rule 23(a)(3) ........................................................................7

Lead Plaintiffs respectfully submit this memorandum of law in opposition to Defendants' Memorandum of Law in Support of Their Dismissal Motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' Amended Complaint for Violation of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Complaint").

## I.    INTRODUCTION

This is an action by investors who bought mortgage-backed securities issued and underwritten by defendants, some of the key actors in the mortgage securitization industry that brought the national economy to its knees.  In order to sell the mortgage-backed securities at issue, defendants issued one Registration Statement and 18 Prospectus Supplements, which were incorporated back into the Registration Statement (collectively, the "Offering Documents").  These Offering Documents contained false and misleading statements and material omissions regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (2) the maximum loan-to-value ("LTV") ratios used to qualify borrowers; (3) the appraisals of properties underlying the mortgage loans; (4) the debt-to-income ("DTI") ratios permitted on the loans; and (5) the ratings of the Certificates.  The Complaint details how the Offering Documents for the securities *affirmatively misrepresented* the true nature of the risk associated with the investment.  The effect of these misrepresentations is now apparent:  The securities issued and underwritten by defendants are now worth a fraction of their offering price.

Defendants chose to offer these securities via the federal securities regulation system and issue billions of dollars worth of Mortgage Pass-Through and Asset-Backed Pass-Through Certificates (collectively "Certificates").  They similarly chose to issue a Registration Statement and Prospectus Supplements pursuant to the strict liability and negligence liability framework of the

Securities Act of 1933 ("Securities Act" or "1933 Act").  ¶¶1-7.[1]  They therefore undertook the responsibility to be ***strictly liable*** for misstatements in the documents as, under §§11 and 12 of the 1933 Act (15 U.S.C. §§77k, 77l), liability for misstatements is "'virtually absolute, even for innocent misstatements.'"  *In re Lilco Sec. Litig.*, 625 F. Supp. 1500, 1503 (E.D.N.Y. 1986) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) and citing 15 U.S.C. §77k(b)).[2]  Section 11 of the 1933 Act "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  *Huddleston*, 459 U.S. at 381-82.  Section 12(a)(2) of the 1933 Act provides similar liability for statements involving the prospectuses for a security.  *In re Fuwei Films Sec. Litig.*, No. 07 Civ. 9416 (RJS), 2009 U.S. Dist. LEXIS 59658, at *31 n.10 (S.D.N.Y. July 10, 2009).  The statute is straight-forward:  Plaintiffs merely must allege a false statement and claim a loss, and any mitigation of that loss is a defense left for summary judgment or trial.  15 U.S.C. §77k.  Contrary to defendants' arguments, because of the misstatements and omissions alleged, the Securities Act damages provisions may ***not*** be waived by language in the securities themselves.  15 U.S.C. §77n.  Further, under applicable federal law, at the procedural juncture, Lead Plaintiffs in this action may represent all investors who purchased the artificially-inflated securities.

Defendants now seek to escape liability by claiming that generalized statements regarding possible risks informed investors about misstatements and omissions about then-existing facts. Defendants' Memorandum of Law in Support of Their Dismissal Motion ("Defs.' Mem.") at 11-22. They cannot.  *See In re Novagold Res. Inc. Secs. Litig.*, No. 08 Civ 7041 (DLC), 2009 U.S. Dist.

---

[1]        All paragraph ("¶_" and "¶¶__") references are to the Complaint (Dkt. #55).

[2]        Here, as elsewhere, emphasis has been added or citations omitted unless otherwise noted.

LEXIS 47561, at *46 (S.D.N.Y. June 5, 2009) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d. Cir. 2004)) ("'[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired'").

Defendants should be required to answer the Complaint and this case should proceed.

## II.    FACTUAL BACKGROUND

The Complaint is straightforward.  On December 12, 2006, defendant Citigroup Mortgage Loan Trust, Inc.  ("Citigroup Mortgage"), an affiliate of defendant Citigroup Global Markets, Inc. ("Citigroup Global"), filed a Registration Statement with the Securities and Exchange Commission ("SEC") so it could issue billions of dollars of Certificates.  ¶3.  Defendants subsequently prepared 18 Prospectus Supplements, each of which was incorporated into the Registration Statement by reference.  *Id*.; *see also* ¶13 (listing out all 18 trusts).  Defendants sold the Certificates via the Prospectuses and the Registration Statement.  The Certificates were supported by pools of mortgage loans Citigroup Mortgage purchased from various originators.  ¶3.[3]

The Registration Statement described, *inter alia*, the loans, the manner in which the loans were created and the procedures by which Citigroup Mortgage selected them.  For example, defendants said originators would be "experienced in originating . . . mortgage loans in accordance with accepted practices and prudent guidelines" and that originators applied underwriting standards

---

[3]      In support of their motion to dismiss, defendants cite to a 2006 article published in *The Wall Street Journal*.  Defs.' Mem. at 1 n.2; Declaration of Jennifer A. Kennedy ("Kennedy Decl."), Ex. A.  If the Court takes judicial notice of the article, it should only do so to establish that the article was in fact published, and not for the truth of any matters asserted therein.  *See Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 424 (2d Cir. 2008) (noting with approval that, "[t]he District Court took judicial notice of, *inter alia*, media reports . . . and regulatory filings" but "'***did not take judicial notice of the documents for the truth of the matters asserted in them***, but rather to establish that the matters [had] been publicly asserted.'"); *Rodriguez v. Bear Stearns Cos.*, No. 07-cv-1816 (JCH), 2009 U.S. Dist. LEXIS 31525, at *33 (D. Conn. Apr. 14, 2009) ("The court takes judicial notice of the existence, publication, and/or availability of certain news articles and annual reports as requested by the defendants, ***but does not take notice of the truth of the matters asserted in those articles and reports***.").

- 3 -

to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  ¶62.

These statements were false when made.  In reality: (i) the originators of the mortgages transferred to the Trusts did not issue loans in accordance with the stated guidelines; (ii) many borrowers were given loans that they should have never qualified for in the first place, in part because of their high debt to income ratios; (iii) appraisals for many of the underlying properties were improperly manipulated and inflated by appraisers who were acting under pressure from mortgage brokers pushing to get more and more potential borrowers approved for high loan amounts; (iv) LTV ratios were wrong because of the inflated appraisals of many of the properties underlying these loans; and (v) because ratings agencies "were using flawed information and models to generate their ratings," the ratings assigned to the Certificates did not accurately reflect their risk. *See* ¶¶4-5; *see also* §III.C.3., *infra*.  None of this information was disclosed, and all of it contradicted the statements in the Offering Documents.  The Complaint details how Citigroup itself affirmatively turned a blind eye to the overly-aggressive lending practices of originators.  ¶¶54-59.  It further alleges that Citigroup Mortgage's "due diligence underwriting department," which evaluated incoming loan pools, had extremely loose standards, and loosened them further during the relevant period. ¶57. Citigroup underwriting employees also were constantly pressured to approve even the most problematic loans, and "find a way to accept [them]."  *Id*. In the end, "almost anything would pass" the underwriting standards defendants created but did not disclose.  ¶58.  As a result, the Certificates sold to plaintiffs and the Class were secured by assets that had a much greater risk profile than represented in the Registration Statement.  ¶6.

By the end of 2007, the increased risk inherent in the Certificates began to manifest itself as loans in the various trusts failed at massive rates. ¶7.  As the misstatements in the filing documents

- 4 -

became clear, the credit rating agencies also began to put negative watch labels on the Certificate

tranches or classes.  *Id*.  Now, ***Certificates in every single Trust*** have been downgraded, and now the

Certificates are no longer marketable at prices anywhere near the offering price.  *Id.*

## III.   ARGUMENT

### A.   Legal Standard

"When reviewing a motion to dismiss, a court must 'accept as true all of the factual

allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most

favorable to plaintiff, and construe the complaint.'"  *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123,

127 (2d Cir. 2009) (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)) (citations omitted in

original).  Claims brought under the Securities Act are governed by the notice pleading standard set

forth in Fed. R. Civ. P. 8(a), requiring just a ""'"short and plain statement of the claim showing that

the pleader is entitled to Relief."'"  *Novagold*, 2009 U.S. Dist. LEXIS 47561, at *22 (quoting

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (U.S. 2009)); *see also Erickson v. Pardus*, 551 U.S. 89*, 93

(2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To the extent the Court

requires the Complaint to comply with the heightened pleading standards of Fed. R. Civ. P. 9(b), it

also does so.  Where Securities Act claims are held to the heightened standards of Fed. R. Civ. P.

9(b), the pleader must simply "'(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'"  *Rombach*, 355 F.3d at 170.  As demonstrated *infra*, the Complaint

meets each of these components.[4]

---

[4]    *See also In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 208 (S.D.N.Y. 2004) (stating that
the "PSLRA does not apply because section 15, which arises under the Securities Act, does not require proof
of scienter.  Therefore, section 15 claims need only be pleaded under Rule 8 of the Federal Rules of Civil
Procedure . . . .").

Here, Lead Plaintiffs present detailed allegations of systematic practices inside Citigroup and the originators.[5]  These allegations are based on, *inter alia*, statements by former employees and other reliable sources.[6]  This detail more than meets any applicable standard.  *Id.*

**B.     Lead Plaintiffs Have Adequately Alleged Standing to Assert the Claims Set Forth in the Complaint**

On March 26, 2009, the Court granted appointed The City of Ann Arbor Employees' Retirement System and the Greater Kansas City Laborers Pension Fund as Co-Lead Plaintiffs in this litigation.  Dkt. #54.  Defendants did not oppose their appointment.

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Lead Plaintiffs are responsible for managing and directing the litigation.  15 U.S.C. §78u-4(a)(3)(B); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003).  As the Court of Appeals noted, "because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the

---

[5]     Ultimately, plaintiffs will not need to prove fraud to prove their case at trial, and many courts have declined to put an extra burden on plaintiffs at the pleading stage.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) ("***It is clear that  the Second Circuit did not intend Rombach as an instruction that all § 11 pleadings should be subjected to the Rule 9(b) standard***.").  In fact, this Court rejected the same argument in *Lilco*.  In *Lilco*, the plaintiffs alleged ***both §10(b) and §11*** violations, yet this Court still found that "[f]raud, however, is not a necessary element of a § 11 violation, and the Court will not read it into the statute or the Complaint."  625 F. Supp. at 1503.

[6]     Defendants' argument that plaintiffs' allegations are insufficient because they are based on "hearsay" or derived from other sources is misplaced.  *See* Defs.' Mem. at 14.  Even under the heightened fraud-pleading standards of Fed. R. Civ. P. 9(b), a plaintiff need not "'plead evidence.'"  *In re Tower Auto Sec. Litig.*, 483 F. Supp. 2d 327, 335 n.3 (S.D.N.Y. 2007); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act[,] we do not require the pleading of detailed evidentiary matter in securities litigation.").  With regard to recognizing allegations made in other courts, an examination of those allegations demonstrate their relevance.  For example, the allegations in *Mayor and City Counsel of Baltimore v. Wells Fargo Bank, N.A*., No. 08-cv-062 (D. Md. 2008), merely confirm this Complaint's allegations that Wells Fargo extended loans without regard to "the borrower's ability to repay."  ¶178.  More importantly, the Complaint cites to an action where Wells Fargo itself has brought an action, and allegations in that action further reinforce the allegations that Wells Fargo expected borrowers to overstate their income on loan applications and not have the ability to make their monthly mortgage loan payments.  *Id.*

lead plaintiff will not have standing to sue on every claim." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004); *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 438 (S.D.N.Y. 2008) ("the Second Circuit has held that there is no requirement that a court select as lead plaintiff only a movant with standing to assert every possible claim against every defendant, nor does the presumptive lead plaintiff fail to satisfy the typicality prong if he or she cannot assert every possible claim").[7]

As such, defendants' argument regarding Lead Plaintiffs' ability to represent the class is appropriately addressed at the class certification stage – not on this motion.  *See In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *8 (S.D.N.Y. Sept. 20, 2000) ("Courts have not addressed this concern *vis a vis* the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement.").

### 1.  Lead Plaintiffs Have Adequately Alleged Standing to Pursue §11 Claims on Behalf of the Entire Class

There is only one Registration Statement at issue in this action, and Lead Plaintiffs bought securities issued from it.  They have standing under §11 to represent others who did as well. Defendants want to make this simple issue complex.  Defs.' Mem. at 6.[8]

---

[7]    For these reasons, additional "named plaintiffs" are entitled to intervene prior to class certification, in order to cure any potential deficiencies in class representation. *See Hevesi*, 366 F.3d at 82-83 (affirming the lead plaintiff's ability to add named plaintiffs to aid in representing the class where a lead plaintiff does not have standing to bring every available claim); *Initial Pub. Offering*, 214 F.R.D. at 122-23 (granting leave to add new named plaintiffs for purposes of conferring standing prior to class certification); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. H-01-3624, 2004 U.S. Dist. LEXIS 8158 (S.D. Tex. Feb. 25, 2004) (granting motion to intervene to confer standing through named plaintiff); *Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669 n.38 (C.D. Cal. 2005) ("Even if none of the presently named plaintiffs has standing to pursue such a claim, however, plaintiffs may seek to add new named plaintiffs in order to assert the claim.").

[8]    Defendants rely on two cases that do not apply here. First, *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2006), was brought under the Securities Exchange Act of 1934, not the Securities Act, and the court found that plaintiffs could not represent purchasers of stock in separate companies whose stock they never bought.  In *Authentidate Holding Corp. Sec. Litig.*, No. 05 Civ. 5323 (LTS) (DFE), 2006 U.S. Dist. LEXIS 47971, at *20 (S.D.N.Y. July 14, 2006), plaintiffs were barred from

Section 11 of the Securities Act confers standing on any person acquiring a security where "any part of the ***registration statement***, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §77k(a). It is undisputed that Lead Plaintiffs purchased Certificates pursuant and/or traceable to the December 2006 Registration Statement – the only registration statement at issue in this case. ¶¶10-11. As such, Lead Plaintiffs clearly have standing to assert §11 claims based on the false and misleading statements contained in defendants' Registration Statement. 15 U.S.C. §77k(a); *see also In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) ("The pleading requirement for Section 11 standing is satisfied by 'general allegations that plaintiff purchased "pursuant to" or traceable to [a] false registration statement.'").

Defendants argue that Lead Plaintiffs lack standing to assert §11 claims based on 16 of the 18 Trusts at issue in this case because Lead Plaintiffs did not acquire Certificates pursuant to the Prospectus Supplements for them. Defs.' Mem. at 6-10. Section 11 liability, however, is premised on the ***registration statement, not prospectus supplements***, and Lead Plaintiffs, as well as the class of individuals they seek to represent, purchased Certificates pursuant to the only alleged false and misleading Registration Statement at issue in this case. ¶¶2, 10-11, 13-14, 23, 53, 60-62, 68. In *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), the district court analyzed the identical standing issue presented here and concluded that the plaintiffs had alleged sufficient §11 standing to survive a motion to dismiss because "[s]o long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common

representing purchasers of securities issued through a separate registration statement. Conversely, here there is only one registration statement.

'parts' that (3) were false and misleading at each effective date, there is § 11 standing." *Id*. at 1166;

*accord In re Worldcom, Inc. Sec. Litig.*, No. 02-3288 (DLC), 2004 U.S. Dist. LEXIS 4240, at *6-*7

(S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security had standing to pursue claims of

purchasers of a second type of debt security issued pursuant to the same registration statement).[9]

### 2.    Lead Plaintiffs Have Adequately Alleged Standing to Pursue §12(a)(2) Claims on Behalf of the Entire Class

In order to have standing to assert claims under §12(a)(2) of the 1933 Act, plaintiffs must

allege that they purchased securities in an offering pursuant to a false and misleading prospectus. 15

U.S.C. §77l(a)(2); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 577-78 (1995).   Here, the

Complaint alleges exactly that. *See, e.g.*, ¶¶10-13.  Just one underwriter – Citigroup Global – sold

all of the Certificates in this action. ¶14.  Lead Plaintiffs and ***all*** §12(a)(2) class members, therefore,

bought pursuant to the prospectuses it issued. ¶¶10-11.  Defendants assert that Lead Plaintiffs lack

standing to bring claims under §12 because they purportedly did not purchase directly from

----

[9]       Several cases upon which defendants rely do not address the issue that was decided in *Countrywide* and that is at issue here. Defs.' Mem. at 8-9.  For example, *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir. 1967), held merely that class members participating ***in a settlement fund*** needed to prove that their share were traceable to the flawed registration statement. *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345 (N.D. Ga. 2005), supports Lead Plaintiffs' arguments here.  There, the lead plaintiff purchased securities in one offering, and brought §11 claims on behalf of a class that – just as in this case – included purchasers from other offerings derived from the same shelf registration. *See id*. at 1372-73.  The court reasoned that because the lead plaintiff had standing to advance his own claims, the offerings involved similar misstatements, and because the defendant's involvement in each offering was similar, the issue of the lead plaintiff's "standing" to represent absent class members could be addressed "at a later stage." *Id*. at 1373.  *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152 (D. Mass. 2004), is similarly inapposite.  In that case, the company originally issued shares at some point before the alleged fraud began (*i.e.*, the Class Period), and then had a secondary offering during the class period.  Here, there is no secondary offering.  Instead, all of the Certificates issued by defendant Citigroup Global were equally tainted by misstatements in the Offering Documents.  ¶62; *see also Transkaryotic*, 319 F. Supp. 2d at 159 (the court denied the motion to dismiss as to the plaintiff whom the complaint "specifically pleads . . . purchased stock traceable to the December 12 offering" and only grants defendants' motions as to those plaintiffs who purchased their shares on ***the open market*** where there "were tens of millions of shares traceable to stock offerings held prior to the Class Period").  In regards to *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 892 (N.D. Ill. 2004), that case is distinguishable because there were multiple underwriters involved with the three offerings, whereas here, defendant Citigroup Global underwrote all 18 of the Trusts at issue.  *See* ¶14.

Citigroup Global. Defs.' Mem. at 10. They are wrong. *See* ¶¶10-11, 13-14, 252. Lead Plaintiffs purchased Certificates pursuant to the Prospectus Supplements for Trust No. 2007-AR5 and Trust No. 2007-WFH2. The Complaint further alleges that Citigroup Global served as the underwriter for all of these offerings. ¶¶13-14. Moreover, the Complaint alleges that all defendants "promoted and sold the Certificates to plaintiffs and other members of the Class." ¶252. Lead Plaintiffs have properly alleged that they purchased directly in the offering. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717-19 (3d Cir. 1996).

The cases relied upon by defendants do not apply. In *Sterling Foster & Co. Sec. Litig.*, 222 F. Supp. 2d 216 (E.D.N.Y. 2002), there were *multiple registration statements and multiple offerings* of the same security, and plaintiffs' complaint there did not "specifically allege which plaintiffs purchased shares in an IPO as opposed to in the aftermarket." *Id.* at 228. Here, there is one registration statement and one underwriter. ¶¶10-14.[10] Similarly, in the unpublished *Caiafa v. Sea Containers, Ltd.*, No. 08-3006-cv, 2009 U.S. App. LEXIS 10569 (2d Cir. May 19, 2009), not only did the plaintiffs fail to allege that they purchased the securities at issue in an initial offering, but "attached to plaintiffs' complaint *were certifications confirming that they acquired the securities in a secondary market*." *Id.* at *5.

### 3.    Lead Plaintiffs Have Adequately Alleged Article III Standing

Because Lead Plaintiffs have standing to assert claims under both §§11 and 12(a)(2) of the 1933 Act, the Complaint adequately alleges their standing under Article III of the United States

---

[10]      *See also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3d. Cir. 2006) ("At the pleading stage, however, we accept as true plaintiffs' allegations that they made their stock purchases in or traceable to the Suprema public offerings."); *Friedman's*, 385 F. Supp. 2d at 1368 ("Viewing the allegations in the light most favorable to Plaintiffs, the Court finds the allegations that Plaintiffs purchased stock on the date of the offering at the offering price is sufficient at this stage to establish that Plaintiff Bortel purchased in the offering and thus has standing to pursue Plaintiffs' Section 12(a)(2) claims.").

Constitution as well.  *See, e.g.*, *Seale v. INS*, 323 F.3d 150, 156 n.5 (1st Cir. 2003) ("Article III, of course, expressly refers to federal statutes as one basis for conferring subject matter jurisdiction upon federal courts.").[11]  As such, there is no need for the Court to undertake the more abstract and generalized Article III standing analysis.  *See Financial Inst. Ret. Fund v. Office of Thrift Supervision*, 964 F.2d 142, 146 (2d Cir. 1992) ("'[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents.'").

In order to establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant[s'] allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  The Complaint clearly alleges that each of the defendants was a direct participant in the issuance of the materially false and misleading Offering Documents.  This satisfies Article III.  *See Countrywide*, 588 F. Supp. 2d at 1167 n.39 (rejecting defendants' Article III standing argument relating to §11 claims because the court found that the "actual injuries Plaintiffs allegedly suffered arose from the same harmful conduct and [are] of the same type as the injuries to those they propose to represent") (citing *Lewis v. Casey*, 518 U.S. 343, 357-58 (1996)).  In this case, Lead Plaintiffs allege a core set of statements in the sole Registration Statement that equally affected all trusts.  ¶¶62-67.  As such, Lead Plaintiffs have adequately alleged standing under Article III.[12]

---

[11]     Defendants incorrectly argue that this issue must be resolved prior to class certification. Defs.' Mem. at 6 n.9.  Again, they are wrong. *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739 (SWK) (MHD), 2006 U.S. Dist. LEXIS 78064, at *12 (S.D.N.Y. Oct. 25, 2006) ("[T]he alleged standing problems in this case arise only because the Named Plaintiffs are attempting to bring claims on behalf of a nationwide class.  As a result, *class certification is logically antecedent to standing and the Court will defer consideration of standing until after the class certification issue has been resolved*.").

[12]     Defendants seek to challenge Lead Plaintiffs' standing by analogizing the standing issues in this case to those in cases where purchasers of one *mutual fund* have sought to represent purchasers of another completely distinct *mutual fund*. Defs.' Mem. at 7.  The majority of these cases offer absolutely no guidance on the standing issues in this case because they do not even involve 1933 Act claims, but rather involve

- 11 -

C.      **The Complaint Alleges Actionable False Statements and Omissions**

    1.      **The 1933 Act Provides Strict Liability for Material Misstatements**

Under §11 of the 1933 Act, a plaintiff need only show that the registration statement (1) "contain[ed] an 'untrue statement of a material fact'"; (2) "'omit[ed] to state a material fact required to be stated therein'"; or (3) omitted to state a material fact "'necessary to make the statements therein not misleading.'" *Ca. Pub. Emples. Ret. Sys. v. Caboto-Gruppo Intesa BCI (In re Worldcom)*, 496 F.3d 245, 248-49 (2d Cir. 2007) (quoting 15 U.S.C. §77k(a)); *see also Fuwei*, 2009 U.S. Dist. LEXIS, at *46 ("'A prospectus will violate federal securities laws if it does not disclose "material objective factual matters," or buries those matters beneath other information, or treats them cavalierly.'"). Under the statute, liability is "'virtually absolute, even for innocent misstatements.'" *Lilco*, 625 F. Supp. at 1503 (quoting *Huddleston*, 459 U.S. at 382). Plaintiffs need not show **scienter** or even negligence on defendants' part, nor do they need to show reliance. While the Act provides liability only for "certain enumerated parties in a registered offering when false or misleading information is included in a registration statement," defendants here are those parties. *Huddleston*, 459 U.S. at 381-82.[13]

---

claims brought under an entirely different statutory scheme – namely, the Investment Company Act (the "ICA"). *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006); *AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885 (SWK), 2005 U.S. Dist. LEXIS 24263 (S.D.N.Y. Oct. 19, 2005).

[13]    Defendants make much noise about the fact that others, including the loan originators, are not named as co-defendants in this action. *See, e.g.*, Defs.' Mem at 5. Under the statute at issue, however, the originators are not proper defendants as they did not issue and/or underwrite the securities at issue here. Defendants here **chose** to misleadingly describe the originators' practices, however, and may be properly held liable for misleading statements. Similarly, entities to whom defendants outsourced their due diligence responsibilities (*e.g.* Defs.' Mem. at 12 n.15, 16 n.17), but who made no statement, are not proper defendants. Defendants may file a cross-claim against those entities for their poor performance.

Defendants' argument that the false statements at issue here are not actionable rests on two major premises: First, throughout their 25-page brief (and the 25-page "Annex" stapled to it), they grossly mischaracterize the Complaint's allegations via misleading summaries and partial quotations. Second, they ask the Court to make a long series of inferences in their favor. The Court should reject this attempt to subvert the Court's rules and the Federal Rules of Civil Procedure.

### 2. Defendants' Misstatements and Omissions Were Material

Defendants argue that the false statements at issue are not material and, therefore, the Complaint should be dismissed. Defs.' Mem. at 11. In this Circuit, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 636 (S.D.N.Y. 2008) ("materiality is a flexible, fact-based determination, generally a matter for the finder of fact, and should be decided on a motion to dismiss only when 'reasonable minds could not differ' on the importance of the misrepresentation 'to a reasonable investor'"). Here, the statements at issue either discuss the policies and procedures by which the aggregated mortgages were originated and/or underwritten, or the ratings assigned to the securities. As such, these clearly material misstatements and/or omissions "'significantly altered the 'total mix' of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1998) (quoting *TSC Indus. v. Northway, Inc*., 426 U.S. 438, 449 (1976)).

Moreover, defendants who choose to make disclosures in a registration statement have a duty to do so accurately and completely. *See, e.g.*, *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("once a party chooses to discuss material issues . . . one 'has a duty to be both accurate and complete'"); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. N.Y. 2002) ("upon choosing to speak, one must speak truthfully about material issues"). Here, the Complaint

alleges defendants failed to fulfill that duty by making affirmative misstatements concerning loan

underwriting and by disclosing the false and misleading credit ratings assigned to the Certificates.

### 3. The Various Disclosures Did Not Cure Defendants' Material Misstatements and Omissions

#### a. Defendants' Material Misstatements and Omissions Regarding Its Underwriting Standards Were Not Cured by Any Alleged "Risk Disclosures"

Defendants argue that their misstatements were rendered immaterial by various other

statements they made. Defs.' Mem. at 13. But the statements they rely on do not address the issues

raised in the Complaint. For example, statements that the "loans . . . *may have been* originated with

little or no documentation of borrower income and/or assets" and "loans or contracts included in a

trust fund *may* include loans made to borrowers who do not qualify for loans conforming to

underwriting standards of more traditional lenders" (*id*. at 13), may disclose a *possible risk*;

however, the reality was that the originators of many of these loans actually implemented policies

designed to extend mortgages to borrowers regardless of whether they were able to meet their

obligations under the mortgage. ¶63; *see also* ¶¶64-67; *Hunt v. Alliance North Am. Gov't Income

Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language, however, must relate

directly to that by which plaintiffs claim to have been misled."). Further, Lead Plaintiffs do not

dispute that the Offering Documents described the loans at issue here as different from those offered

by "more traditional lenders." However, the Offering Documents also repeatedly stated that the

originators' policies focused on the borrowers' "repayment ability" or "ability to repay." ¶¶62, 84,

161, 169, 188, 197. Defendants *never* disclosed that the originators' policies were to the contrary.[14]

---

[14]     *See also* December 12, 2006 Registration Statement at 43, Form S-3/A (Kennedy Decl., Ex. B at 43)
("Unless otherwise specified in the related prospectus supplement, the underwriting standards are applied by
the originators to evaluate the borrower's credit standing and repayment ability, and the value and adequacy

Generalized possibilities, like that some loans "may have been given" without traditional documentation, do not neutralize false statements about the business practices at issue here.  *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim to those misrepresented facts with cautionary language.").  As the Complaint details, the key originators' actual policies differed materially from the underwriting practices defendants chose to set forth in the Registration Statements and Prospectus Supplements.  *See* ¶¶85, 90-91, 97, 100, 111-118, 120, 124-125, 129, 143-144, 146, 151, 152, 154, 156-158, 162-164, 172, 174, 177-178, 183, 188, 190, 194-195, 197, 199-200, 202-203, 206, 214.  For example, instead of objectively evaluating a borrowers ability to repay the underlying loan, the Complaint shows how originators were:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the underwriters' underwriting standards, including directing applicants to no-documentation ("no-doc") loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the loan rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

---

of the mortgaged property as collateral.  Initially, a prospective borrower is required to fill out a detailed application regarding pertinent credit information.  As part of the description of the borrower's financial condition, the borrower is required to provide a current balance sheet describing assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.").

¶63.

Defendants mischaracterize these allegations and ignore the sourced detail provided in the Complaint.  Instead, defendants claim that they disclosed various "risks" of events that ***might have occurred***.  The "risk" of unqualified borrowers receiving home loans – underlying the trusts, however had already occurred – and those risks were far worse than any disclosure even hinted at. *See In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at \*54 (S.D.N.Y. Feb. 3, 2005) ("A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability . . . . ***Moreover, discussing hypothetical risks that might occur in the future does not adequately disclose actual problems that already have materialized***."); *In re Prudential Sec. Ltd. P'shps. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("To warn that the untoward may occur when the event is contingent is prudent; ***to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit***.").

> **b.** **The Offering Documents Misrepresented the Property Appraisals in Connection with the Underlying Loans**

The Complaint details how defendants misrepresented the appraisal processes and results:

> The appraisals of many properties were inflated, as appraisers were pressured by lenders, lenders' correspondents and/or their mortgage brokers/agents to provide the desired appraisal value regardless of the actual value of the underlying property so the loans would be approved and funded.  In this way many appraisers were rewarded for their willingness to support preconceived or predetermined property values violating USPAP regulations.

¶5[15]; *see also* ¶¶68, 73, 189, 191.

---

[15]     *See* ¶72 (describing Uniform Standards of Professional Appraisal Practice ("USPAP") standards).

Defendants claim that alleged disclosed risks that property values "**might not remain** at their appraised value as determined on the date of origination of the related Mortgage Loan" shields them from any liability.  Defs.' Mem. at 14.  They are wrong.  The Complaint does not allege that defendants did not correctly predict the future.  Rather, it demonstrates how the appraisals of the subject properties were not done in accordance with the guidelines outlined in defendants' own Registration Statement *ab initio*.[16]

Because defendants' statements and alleged "risk disclosures" hide the fact that appraisals of the subject properties failed to meet the applicable guidelines as stated in the Offering Documents, their statements are materially misleading because they misrepresented the then-current risk.  *See, e.g.*, *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 618 (S.D.N.Y. 2008) (The cautionary language warning of "potential inability to follow through" on an investment plan did not neutralize the fact that the Fund was "currently undercapitalized.").

### c.     The Offering Documents Misstated the Loan-to-Value Ratios of the Underlying Loans

Defendants also claim that their alleged "risk disclosures" concerning the LTV ratios of the underlying loans shield them from liability.  Defs.' Mem. at 14.  Once again, they are wrong.  Plaintiffs agree that the Prospectus Supplements contained "detailed information about the LTV ratios of the loans underlying the trusts."  ¶219.  However, as the Complaint alleges, "the appraisals

---

[16]     *See* ¶68 ("The Registration Statement and Prospectus Supplements also represented that in determining the adequacy of the property to be used as collateral, the originators would obtain an appraisal for each property considered for financing.  In instances where appraisals were conducted, the appraisers were purportedly required to inspect the property to verify that it was in good repair and that, if new, construction had been completed."); *see also* ¶¶72-82, 130-142, 155, 167, 189, 191, 210, 215-216.

of the properties underlying the mortgage loans were inaccurate and inflated" so that information itself was false. *Id.*[17]

Even if defendants disclosed the risks related to the disclosed LTV ratios, defendants did not disclose that the reported LTV ratios themselves for many of the underlying loans were inflated due to improper appraisal practices, endorsed by the originators. *See* ¶219; *see also* ¶¶74-82, 130-142, 144, 155, 167, 189, 191, 210, 215-216. Therefore, defendants' alleged risk disclosures cannot cure the falsity of their statements and omissions in the Offering Documents. *See Heller*, 590 F. Supp. 2d at 618; *Prudential*, 930 F. Supp. at 72.

> ### d.     The Offering Documents Misstated the DTI Ratios of Borrowers for the Underlying Loans

Just as the Registration Statement and Prospectus Supplements misstated and omitted material information regarding a loan originator's underwriting standards, the same was true in regards to the borrowers' debt-to-income ratio. For example, in regards to the Prospectus Supplements that contained loans originated by Accredited Home Lenders, Inc. ("Accredited"), the Prospectus stated either:

> "Accredited's underwriting process is intended to assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan"; or (2) that Accredited's underwriting standards "are intended to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan and consider, among other things, a mortgagor's credit history, repayment ability ***and debt service-to-income ratio***, as well as the type and use of the mortgaged property."

¶197.[18]

---

[17]     *Cf.* ¶71 ("A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he, or she defaults on the loan. Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.").

Defendants omitted, and their alleged "risk disclosures" did not warn, that instead of taking into account the potential borrower's debt-to-income ratios and credit history, credit score and appraisals, Accredited and Aames Funding were granting loans without regard to creditworthiness. ¶197; *see also* ¶200.   Further, one Prospectus Supplement stated that "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%," in reality, Countrywide's debt-to-income ratios were misstated (understated) by the previously alleged falsely reported income levels on loan applications, many times with the knowledge of the mortgage broker.  ¶143; *see also* ¶109.[19]

Because defendants' alleged risk disclosures regarding a borrower's DTI did not cure the related material misstatements and omissions in the Registration Statement and Prospectus Supplements, defendants purported "warnings" are inapplicable.  *See In re Globalstar Sec. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496, at *33 (S.D.N.Y. Dec. 15, 2003) ("Defendants can seek no protection for the alleged misrepresentation of a currently existing fact.").

---

[18]     *See also* 12/12/2006 Form S-3/A at 43 (Kennedy Decl., Ex. B at 43) ("Initially, a prospective borrower is required to fill out a detailed application regarding pertinent credit information.  ***As part of the description of the borrower's financial condition, the borrower is required to provide a current balance sheet describing assets and liabilities and a statement of income and expenses***, as well as an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.").

[19]     Defendants' improperly submitted 25-page "Annex" does not even try to spin their tale about the debt-to-income problems at Accredited Lenders and Aames Funding.  To the extent it discusses Countrywide (Defs.' "Annex" at A-12-A-13), it ignores the Complaint's detailed allegations of how Countrywide employees affirmatively falsified debt-to-income figures for borrowers.  ¶¶109-116, 119-122, 124-125.

### e.   The Offering Documents Misrepresented the Ratings of the Certificates

Defendants claim that because they "disclosed that any rating assigned to a Certificate was at the discretion of the ratings agency, and made no representations as to how that rating was derived," they are shielded from liability.  Defs.' Mem. at 15.  Again, defendants chose to include these statements, and under the Securities Act, are responsible for them.  As the Complaint alleges, "[t]he rating agencies rated the Certificates based in large part on data about each of the mortgage loans that Citigroup Mortgage provided to them – including appraisal values, LTV ratios, and borrower credit-worthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels." ¶234.  Moreover, because these agencies were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk.  As such, the statements regarding the ratings of the Certificates were false and misleading.  ¶236; *see also* ¶¶237-239.

Because the investment ratings defendants' Certificates received were based on the inaccurate information listed above, no disclosures can shield them from liability.  *See In re Giant Interactive Group, Inc. Sec. Litig.*, No. 07 Civ. 10588 (RWS), 2009 U.S. Dist. LEXIS 69414, at *15 (S.D.N.Y. Aug. 7, 2009) (denying motion to dismiss where offering documents did not "disclose the prevalence of [certain issues] and the risks that activity presented to the Company.  These allegations are sufficient to state claims for violations of Sections 11 and 12(a)(2).").

### f.   The Offering Documents Misrepresented Citigroup Mortgage's Underwriting Standards

As the Complaint alleges, defendants' Registration Statement "stated that each originator of mortgage loans would be 'experienced in originating . . . mortgage loans in accordance with accepted practices and prudent guidelines.'"  ¶62.  But defendants did not disclose that its own internal underwriters were under pressure to accept all loans, and that "anything" would pass even

when a common sense reading of the borrower's circumstances revealed that there was no way the borrower could successfully repay the loan. ¶54; *see also* ¶¶56-59.[20]  Again, while defendants claim that they were disclosing a potential "risk," at the time of the offering that risk was already manifested and not disclosed. *In re Evci Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006) ("***To be meaningful, cautionary language must precisely address the substance of the specific statement – or omissions that is challenged***."); *Credit Suisse First Boston Corp. v. Arm Fin. Group*, No. 99 Civ. 12046 (WHP), 2001 U.S. Dist. LEXIS 3332, at *23 (S.D.N.Y. Mar. 28, 2001) (finding that "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described").

### g.    The Offering Documents Misrepresented Wells Fargo's Underwriting Standards

As detailed above in §III.C.3.(a.-f.), *supra*, defendants cannot shelter themselves from liability behind ineffective risk disclosures because "[g]eneralized disclosures of amorphous risks will not shield defendants from liability as the cautionary language must be 'too prominent and specific to be disregarded' and must 'warn investors of exactly the risk that plaintiffs claim was not disclosed.'" *Initial Pub. Offering*, 358 F. Supp. 2d at 211-12; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311 (S.D.N.Y. 2009) ("The cautionary language must be specific, prominent and must directly address the risk that plaintiffs claim was not disclosed.").

In their discussion of Wells Fargo's undisclosed business practices (Defs.' Mem. at 17-22), defendants ignore the actual statements they made about Wells Fargo.  As alleged in the Complaint,

---

[20]     Moreover, the originators of the mortgages were not originating loans in accordance with prudent guidelines and were not reviewing loan applications to determine whether borrowers had sufficient income to meet their monthly mortgage obligations.  Rather, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage. ¶63; *see also* ¶¶85, 90-91, 97, 100, 111-118, 120, 124-125, 129, 143-144, 146, 151, 152, 154, 156-158, 162-164, 172, 174, 177-178, 183, 188, 190, 194-195, 197, 199-200, 202-203, 206, 214.

defendants told investors that "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank *to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral*." ¶169.  Further, for "stated income" loans, defendants stated:  "The borrower's income as stated *must be reasonable for the borrower's occupation* as determined at the discretion of the loan underwriter."  ¶170.  As alleged in the Complaint, these statements were false and misleading (¶¶168-180), and none of the "disclosures" now raised by defendants directly address them.

Defendants erroneously argue that their alleged disclosures regarding *the type of loans* (*i.e.*, Alt-A loans, sub-prime loans, adjustable rate loans, etc.) underlying certain Certificates neutralizes any material misstatement or omission concerning these loans.  Defs.' Mem. at 18.  The Complaint, however, does not allege that defendants failed to disclose that these categories of loans were being made.  It alleges that "Wells Fargo sold sub par loans to Citigroup Mortgage *that should never have been made in the first instance*" under its stated guidelines.  ¶¶170-172.  Even Wells Fargo has acknowledged this practice now.  *See* ¶179 ("We should not have offered such lenient loan terms . . . , and we made the mistake of taking on too much risk.  We should have known better.").

Similarly, though defendants stated that Wells Fargo "evaluate[d] the applicant's credit standing and ability to repay the loan" (¶169), the truth was that when Wells Fargo underwrote Alt-A and other sub-prime loans, it did not require the borrower to provide documentation of basic information relevant to the risk that the borrower would not be able to repay the loan.  ¶¶176-177.  Defendants' purported disclosure that many of the loans underlying the Certificates "had been originated with little or no documentation regarding the borrowers' income or employment" (Defs.' Mem. at 19) *does not address the risk* that loans were being given to individuals who did not qualify

under the stated requirements, and does not cure the falsity.[21]  The same is true for defendants' other

alleged "risk disclosures."  Defs.' Mem. at 20-22.  Comparing the Complaint's actual allegations to

the warnings, instead of the misleading summaries and truncated quotes provided by defendants,

Wells Fargo's business practices created far more risk in the loan portfolio than described in the

Offering Documents, including any risk disclosures.  Indeed, even "warnings of specific risks . . . do

not shelter defendants from liability *if they fail to disclose hard facts critical to appreciating the*

*magnitude of the risks described*."  *Credit Suisse*, 2001 U.S. Dist. LEXIS 3332, at *23.

Indeed, defendants claim that one of the statements alleged to be false and misleading in the

Complaint actually protects them from liability.  ¶180.  Defendants ask the Court to examine a

portion of the statement regarding the purported efforts they said Wells Fargo took to ensure loans

originated by third parties passed its underwriting standards, but ignore the balance of the statement,

including the representation that "the originator must meet certain requirements including, among

other things, certain quality, operational and financial guidelines."  *Id*.  The Complaint alleges that

this statement, as a whole, itself was false, but defendants provide no explanation.

### D.    The Complaint Adequately Alleges a Violation of §15

Section 15 extends liability created under §§11 and 12(a)(2) to "[e]very person who, by or

through stock ownership, agency, or otherwise . . . controls any person liable under section[s] [11 or

12]."  15 U.S.C. §77o.  "In order to state a claim for control person liability under Section 15, a

plaintiff must allege (a) a primary violation by a controlled person, and (b) control by the defendant

of the primary violator."  *In re WorldSpace Sec. Litig.*, No. 07 Civ. 2252 (RMB), 2008 U.S. Dist.

---

[21]       *See* ¶¶170, 172, 179; *see also* ¶170 (all that was required for acceptance by Wells Fargo was some
evidence of a credit score high enough to qualify for the loan product, and the other qualifications were either
ignored, or "made to fit"); ¶63 (originators of mortgages steering borrowers to loans that exceeded their
borrowing capacity and approving borrowers based on "teaser rates" for loans despite the knowledge that the
borrower would not be able to afford the "fully indexed rate" once the loan was adjusted).

LEXIS 56224, at *20 (S.D.N.Y. July 21, 2008).  The relevant defendants admit they are properly named. Defs.' Mem. at 25.  If the Court finds that the primary violation alleged should proceed, they admit that the control person claims should proceed as well.

### E.   Defendants Cannot Escape Liability by Pointing to Purported "Cure" Provisions in the Offering Documents

Effectively admitting that the class has suffered damages, defendants contend that they should be relieved of liability because the Offering Documents purportedly describe a process by which bad loans could be "cured" or replaced at the request of the Investor.  *See* Defs.' Mem. at 23-25.  But this "cure" procedure does not apply here, as liability exists under §§11 and 12(a)(2) for a misstatement in the Offering Documents irrespective of any other remedial relief.  *See* 15 U.S.C. §77k.  These provisions may not be waived, and language to the contrary in any offering document is void *ab initio*.  15 U.S.C. §77n ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this title . . . or of the rules and regulations of the Commission shall be void.").[22]  Significantly, "[t]he statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision."  *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1050-51 (2d Cir. 1995) (holding that claims under the federal securities laws cannot be precluded by a "no-action clause" in an indenture).  Defendants rely on one decision from the Northern District of Texas, *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, No. CIV A 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008).  *Lone Star*, however,

---

[22]      Because of the express terms of §14 of the Securities Act, "courts have been careful in securities cases to preserve the rights of private action under the securities laws."  *Stratmore v. Combs*, 723 F. Supp. 458, 461 (N.D. Cal. 1989) ("***Since the securities laws are a remedial measure intended to encourage the prosecution of securities fraud actions, the Court refuses to enforce this indemnity provision***."), *aff'd*, 968 F.2d 810 (9th Cir. 1992) (emphasis in original).

- 24 -

only addressed waiver law and Texas state law remedies, including common law fraud and Texas securities statues, not the federal Securities Act. *Id*. at *3-*4, *22-*30. As defendants note, the *Lone Star* court found that defendants had "not made any misrepresentation" so the anti-waiver statute did not apply. Defs.' Mem. at 24 n.29. Here to the contrary, defendants made misstatements.[23]

### F.   Leave to Amend Should Be Granted

If for any reason the Court should deem Lead Plaintiffs' allegations lacking, Lead Plaintiffs respectfully request leave to amend the Complaint. *See* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"). As set forth herein, plaintiffs have established that the Complaint is sufficient. Defendants' arguments to the contrary are unavailing.[24] A complaint should only be dismissed with prejudice if an amendment would be futile. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). There has been no showing of futility here, thus leave to amend should be granted should the Court deem the current allegations insufficient.

## IV.   CONCLUSION

For the above stated reasons, defendants' motion should be denied.

DATED:  September 15, 2009                  Respectfully submitted,


                                   s/ THOMAS E. EGLER
                                   THOMAS E. EGLER

---

[23]     Further, *Lone Star* is wholly distinguishable on its facts as, unlike the *Lone Star* plaintiffs who alleged that a small number of specific loans in each of the pools were delinquent (2008 WL 449508, at *3), plaintiffs here allege that the value of the securities as a whole were inflated because of defendants' misstatements about their systemic business practices which were used to underwrite all of the loans at issue. ¶¶54-239.

[24]     Defendants' assertion that the fact they previously filed motions to strike and dismiss should render plaintiffs' opportunity to amend void, makes no sense. Those motions were never heard and the Court has never previously examined the Complaint's sufficiency, thus they have no bearing on whether or not the current Complaint states a cause of action or whether an amendment could cure any perceived deficiency.

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
ARTHUR C. LEAHY
THOMAS E. EGLER
SCOTT H. SAHAM
SUSAN G. TAYLOR
MATTHEW I. ALPERT
NATHAN R. LINDELL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CAROLINA C. TORRES
JARRETT S. CHARO
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiff

VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

S:\CasesSD\CitiGroup Mortgage Loan\BRF00061198_Opp MTD.doc

- 26 -

**LEAD PLAINTIFFS' RESPONSE TO DEFENDANTS' SO-CALLED "ANNEX"**

Attached to Defendants' Memorandum of Law in Support of Their Dismissal Motion is a 25-page document referred to simply as an "Annex."  The document, which serves to double the page length of their brief, is improperly submitted under the Court's practices, and is filled with misleading summaries about the detailed allegations of the Amended Complaint for Violation of §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Complaint") in this action, and the effect of the various "disclosures" defendants made.  The Court should disregard defendants' attempt to circumvent its briefing rules.  However, to the extent the Court considers the unsigned assertions made in the "Annex" document, Lead Plaintiffs request that it also consider the following issues.

First, as shown below, the "Annex" oversimplifies the Complaint's allegations, incompletely summarizing them, misrepresenting them, and twisting them to suit defendants' disclosure arguments.  Ultimately, any fair reading of the Complaint's detailed allegations, separate from the interpretations defendants create, demonstrates that not only did defendants make false and misleading affirmative statements about the issues raised, but also that the various "disclosures" defendants address do not contain any meaningful information about  the hidden business practices at issue in this action.  As shown in Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss, the statements defendants cite, therefore, must fail, as "'warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.'"  *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 n.15 (S.D.N.Y. 2003).[1]  A few examples of the gross distortions of the Complaint's allegations are listed below.

---

[1]      Citations are omitted throughout unless otherwise noted.

Second, the "Annex" does not address the false affirmative statements defendants chose to make in the Registration Statement and the Offering Documents, and how the Complaint demonstrates that each of the affirmative statements was false or misleading when made.  To the extent any purported disclosures are argued to be neutralizing, they must address the language in the affirmative statement, for "[t]o be meaningful, cautionary language 'must precisely address the substance of the specific statement or omission that is challenged.'"  *In re Evci Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006).  Because defendants chose to speak on these various subjects, they had a concomitant duty to do so accurately and completely.  *See, e.g.*, *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("once a party chooses to discuss material issues . . . one 'has a duty to be both accurate and complete'"); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, one must speak truthfully about material issues").

Just one example of defendants' attempt to minimize the 20 paragraphs and more than 9 pages of detail recounted in the Complaint is defendants' summarization of detail provided in Complaint regarding the results of Lead Plaintiffs' investigation of Accredited Home Lenders and Aames Funding (¶¶196-218).[2]  Defs.' "Annex" at A-1-A-4.  Defendants oversimplify the allegations, and twist them to suit their arguments.  An examination of the Complaint's detailed allegations demonstrates why those allegations regarding Accredited and Aames not only rendered defendants' affirmative statements false, but why the purported risk disclosures defendants rely upon are inapt.

Contrary to the rhetoric in defendants' "Annex," the Complaint's section on Accredited actually begins by quoting the misleading statements defendants made about Accredited:

---

[2]      All paragraph ("¶__" and "¶¶__") references are to the Complaint.

The Prospectus Supplements for each of the above Trusts stated either: (1) "Accredited's underwriting process is intended to assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan"; or (2) that Accredited's underwriting standards "are intended to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan and consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property."

¶197.

The Complaint further lays out the other statements defendants chose to make about

Accredited and Aames:

"All underwriting and re-underwriting is performed by Accredited's underwriting personnel, and Accredited does not delegate underwriting authority to any broker, correspondent or other mortgage loan provider. Accredited's underwriting standards are applied in a standardized manner which complies with applicable federal and state laws and regulations."

\*        \*        \*

"A full appraisal of the property proposed to be pledged as collateral is required in connection with the origination of each first priority mortgage loan and each second priority mortgage loan greater than $50,000. Appraisals are performed by licensed, third-party, fee-based appraisers and include, among other things, an inspection of the exterior and interior of the subject property. Appraisals are also required to address neighborhood conditions, site and zoning status and the condition and value of improvements. Following each appraisal, the appraiser prepares a report which includes a reproduction costs analysis (when appropriate) based on the current cost of constructing a similar home and market value analysis based on recent sales of comparable homes in the area. Appraisals generally conform to the Uniform Standards of Professional Appraisal Practice and must be on forms acceptable to Freddie Mac and Fannie Mae."

\*        \*        \*

"A critical function of Aames Funding's underwriting process was to identify the level of credit risk associated with each applicant for a mortgage loan. Aames Funding established six principal classifications, with respect to the credit profile of potential borrowers, and assigned a rating to each loan based upon these classifications. Aames Funding assigned credit grades by analyzing mortgage payment history, consumer credit history, credit score, bankruptcy history and debt to- income ratio. If an individual loan application did not meet Aames Funding's formal written underwriting guidelines, its underwriters could make underwriting

exceptions up to certain limits within its formal exception policies and approval authorities.  From time to time, Aames Funding may have applied underwriting criteria that were either more stringent or more flexible depending upon the economic conditions of a particular geographic market."

\*       \*       \*

"The underwriting of a mortgage loan to be originated or purchased by Aames Funding generally included a review of the completed loan package, which included the loan application, a current appraisal, a preliminary title report and a credit report. All loan applications and all closed loans offered to Aames Funding for purchase were required to be approved by Aames Funding in accordance with its underwriting criteria. Aames Funding regularly reviewed its underwriting guidelines and made changes when appropriate to respond to market conditions, the performance of loans representing a particular loan product or changes in laws or regulations."

¶¶215, 217-218.

Defendants now ignore these affirmative statements because the Complaint demonstrates how the relevant underwriting process did not function to "assess a mortgage loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed mortgage loan," how the appraisal practices did not function as defendants chose to characterize them, how the "critical function" of "identify[ing] the level of credit risk associated with each applicant" was undone by exceptions that became the rules, and how the "review of the completed loan package[s]" was cursory and, in some cases, non-existent.  *Id.*

The Complaint alleges, among other things, that Accredited's systems were affirmatively manipulated and abused so that loans were given to borrowers who were known to lack the creditworthiness required because of perverse incentives and huge pressure put on underwriters at the companies, and constant ignoring of the rules by managers.  ¶¶199-214.  The Complaint alleges that Accredited's underwriting guidelines were frequently overridden by managers in the sales side of the company in order to reach sales goals, including some overrides that were in the face of specific notes from underwriters noting problems such as "straw borrowers," and unverifiable and

- 4 -

unbelievable salary information.  ¶200.  The Complaint also delves into the internal workings of the

Accredited "overrides" process, the pressure placed on sales managers to make the overrides, and the

tremendous decrease in underwriting quality between August 2003 and February 2006.  ¶¶199-209.

Based on information from a former corporate underwriter, the Complaint details how, at the end of

the month, underwriters were handed loan files and told to just sign them with no audit, and how

not-credible salary levels (such as housekeepers claiming to make $8,000 per month and landscapers

claiming to make between $10,000 and $12,000 a month) were accepted on loan applications.  ¶210.

Further, based on other investigations, the Complaint alleges that account executives at Accredited

constantly gamed the internal system to get loans approved, re-submitting rejected loans to various

entities within the Company to get approval.  ¶211.

Defendants' "Annex" simply ignores this detail, and re-characterizes the allegations in an

attempt to fit the ultimately ineffective disclosures on which they now seek to rely.  Defendants

reduce the details of problematic loans in the Complaint to the bland understated summary that

"Accredited extended loans without regard to the creditworthiness of borrowers."  Defs.' "Annex" at

A-1.  Defendants then claim that the following statements somehow precisely address the substance

of the above-challenged statements and omissions:

- "Accredited focuses on originating mortgage loans which do not conform to credit and other criteria established by Fannie Mae and Freddie Mac, commonly referred to as 'non-conforming' and 'subprime' mortgage loans.'"

- "There can be no assurance that the credit scores of the mortgagors will be an accurate predictor of the likelihood of repayment of the related mortgage loans."

- "The Types of Loans Included in the Trust Fund Related to Your Securities May be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses . . . ."

*Id*.  None of these statement address (a) the fact that Accredited's business practices differed

materially from the affirmative statements listed above as made in the Offering Documents; or (b)

- 5 -

the heightened risks investors faced from loans from Accredited in their securities because of the undisclosed business practices.

Defendants similarly claim that the above-listed detail from the Complaint can be blandly summarized to: "Loans were of greater risk because Accredited allowed exceptions to and overriding of underwriting guidelines." *Id*. at A-1-A-2. Defendants argue that the following words disclosed the massive number of deviations from the policies stated above:

- "Accredited may allow exceptions to its underwriting guidelines in accordance with Accredited's established exception policy. Exceptions may be allowed based upon the presence of compensating factors, such as low LTV, demonstrated pride of ownership and stability of employment."

- "[U]nderwriting standards may be varied in appropriate cases."

*Id*.

Again, against the backdrop of the detailed allegations of business practices at Accredited that contradicted defendants' affirmative statements defendants chose to make about the company, these "disclosures" provide no meaningful information.

Defendants summarize the allegations in the 20 paragraphs as stating that "[l]oans were of greater risk because Accredited did not verify income and/or employment." *Id*. at A-2. Again, the Complaint alleges Accredited regularly disregarded its own underwriting procedures, heightening the risk of loan failure. ¶¶199-209. Further, the Complaint affirmatively alleges that loan applications regularly contained "stated incomes" that were just not credible, such as housekeepers claiming to make $8,000 a month, and landscapers making $10,000 to $12,000 per month. ¶210. Neither of these facts were ever disclosed. The disclosures defendants now point to (that "[u]nder the Stated Income program, applicants are evaluated based upon income as stated in the mortgage loan application," and that the number of loans originated with reduced or no documentation was disclosed (Defs.' "Annex" at A-2)) do not disclose the depth of the problems at Accredited.

Throughout the balance of their "Annex," defendants go through the same practice of ignoring the detailed allegations in the Complaint, creating misleading "straw man" summaries of the Complaint's detail, and comparing them to various disclosures. *See* Defs.' "Annex" at A-3-A-25. As with their characterization of the Accredited and Aames issues, the summaries for the balance of the allegations are misleading.

Further, for each of the six remaining companies that originated loans that ultimately ended up in the trusts at issue in this action, defendants ignore the affirmative statements they chose to make about the companies. ¶¶182, 188, 189, 190, 191, 192 (American Home Mortgage); ¶¶161, 167 (Argent Mortgage Company); ¶¶84, 129, 130, 143, 144 (Countrywide Home Loans); ¶¶194, 195 (Opteum Financial Services); ¶146 (Silver State Mortgage); ¶¶167, 179, 180 (Wells Fargo Bank). Even apart from the misleading summaries of the detail provided in the Complaint, this failure to put their purported ameliorative "disclosures" in the context of the statements they chose to make in the Offering Documents demonstrates the failure of their argument.

Defendants' request that the Court ignore the allegations of the Complaint, as well as their own prior statements, should be denied. None of the warnings they now seek to rely on disclose the actual business practices at the various originators, or internally at defendants' various entities.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 30, 2009.

s/ THOMAS E. EGLER
THOMAS E. EGLER

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  tome@csgrr.com

## Mailing Information for a Case 2:08-cv-01418-LDW-ETB

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  malpert@csgrr.com,hectorm@csgrr.com

- **Jarrett S Charo**
  jcharo@csgrr.com,e_file_sd@csgrr.com

- **Thomas E. Egler**
  tome@csgrr.com,nlindell@csgrr.com,e_file_sd@csgrr.com

- **Lawrence B. Friedman**
  lfriedman@cgsh.com,tgeiger@cgsh.com,maofiling@cgsh.com,kspiering@cgsh.com,jkpark@cgsh.com,lvitale@cgsh.com

- **Shawn Hynes**
  shynes@cgsh.com

- **Arthur C. Leahy**
  artl@csgrr.com,e_file_sd@csgrr.com

- **Nathan R Lindell**
  nlindell@csgrr.com,e_file_sd@csgrr.com

- **David A. Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H. Rudman**
  srudman@csgrr.com

- **Scott H Saham**
  scotts@csgrr.com,e_file_sd@csgrr.com

- **Susan G. Taylor**
  susant@csgrr.com,e_file_sd@csgrr.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)