UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CITY OF ANN ARBOR EMPLOYEES'
RETIREMENT SYSTEM, Individually and
on behalf of all others similarly situated,

                        MEMORANDUM AND ORDER

              Plaintiffs,                  CV 08-1418

       -against-                  (Wexler, J.)

CITIGROUP MORTGAGE LOAN
TRUST INC., et al.,

              Defendants.
-------------------------------------------------------------X
APPEARANCES:

      COUGHLIN STOIA GELLER RUDMAN ROBBINS LLP
      BY: DAVID A. ROSENFELD,ESQ.
      Attorneys for Plaintiffs
      58 South Service Road, Suite 200
      Melville, New York 11747

      CLEARY GOTTLEIB STEEN & HAMILTON LLP
      BY: LAWRENCE FRIEDMAN, ESQ.
      Attorneys for Defendants
      One Liberty Plaza
      New York, New York 10006

WEXLER, District Judge

     This is a class action alleging violation of Sections 11, 12(a)(2) and 15 of the Securities

Act of 1933. The action was commenced in the Supreme Court of the State of New York and

was thereafter removed to this court. Presently before the court is Defendants' motion, pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss. The motion alleges lack of

standing, and failure to state a claim upon which relief can be granted. For the reasons that

follow, the motion is granted in part and denied in part at this time, with leave to re-plead.

## BACKGROUND

I.     The Parties

Plaintiff is the City of Ann Arbor Employees' Retirement System (Ann Arbor). Ann Arbor brings this action on its own behalf, as well as on behalf of a class of individual investors, as described below (the "Plaintiff Class")(collectively "Plaintiffs").

Named as a defendant is Citigroup Mortgage Loan Trust, Inc., ("Citigroup Mortgage") a Delaware corporation formed for the purpose of acquiring, owning and transferring mortgage loan assets, and selling interests in them.   Also named as defendants are a group of eighteen mortgage loan trusts (the "Trusts"), established by Citigroup Mortgage.  The Trusts are common law trusts that are alleged to have issued hundreds of millions of dollars worth of "Mortgage pass-through Certificates and Asset Backed Pass-Through Certificates of Citigroup Mortgage Loan Trust" (the "Certificates").   Additionally named as defendants are certain individuals who are alleged to have signed disclosure documents relating to investment in the Certificates (collectively the "Individual Defendants").   The Plaintiff Class is alleged to consist of individuals and entities that acquired Certificates from the eighteen individually named Trusts, and suffered financial losses as a result of the acts set forth in the complaint.

II.    Mortgage Industry Practices Underlying the Allegations of the Complaint

The facts below are outlined in the Amended Complaint (hereinafter the "Complaint"), and set forth to provide background to Plaintiffs' claims.  Certain facts detail the historical practices of the mortgage industry.  Others describe more recent lending practices by loan originators, certain of which are alleged to have led to Plaintiffs' injury.

## A.    Evaluating Lending Risk and the Growth of the Sub-Prime Market

When extending credit to a potential property buyer a lender typically considers the borrower's credit profile, the amount requested, and the value of the property being mortgaged. The credit-worthiness of home buyers was, and continues to be, determined by a review of various factors, including the buyer's Fair Isaac and Company ("FICO") credit score. A borrower with a high FICO score is considered to be more credit-worthy than a borrower with a low FICO score, and is more likely the receive a "prime" mortgage, with a low interest rate. Lenders also consider the amount sought to be borrowed as a portion of the value of the property being mortgaged. This relationship is known as the loan to value ("LTV") ratio. A buyer with a high FICO score would likely qualify for a mortgage with a higher LTV ratio than a buyer who is less credit worthy. Thus, a credit worthy borrower is, generally speaking, able to borrow an amount closer to the actual total value of the property mortgaged than a less credit worthy borrower. The more credit worthy the buyer, the more likely that the mortgage extended  would be one with a high LTV ratio. Because LTV ratios are determined by comparing the amount of the loan to the value of the mortgaged property, an accurate property appraisal is critical to arriving at the proper LTV. If an appraisal is wrongfully inflated, a loan may appear to have a low LTV ratio, whereas in reality, the true value of the home makes the real LTV ratio higher.

Borrowers with high FICO scores, but who are unable to provide income documentation have been able to receive mortgages known as "low-doc" or "Alt-A" loans. Such loans are extended, but with less favorable interest terms than prime mortgages. Buyers with lower FICO scores are typically referred to as "sub-prime" borrowers. Such borrowers are considered to be at higher risk of default, and have been extended mortgages that carry a higher rate of interest than

3

that extended to a prime borrower. The Complaint details the growth of the sub-prime mortgage market over the past thirty years, and how the growth of this market increased lenders' access to capital.

      B.      Changes to the Traditional Mortgage Model and The
              Growth of the Mortgaged-Backed Securities Market

The Complaint details mortgage industry practices forming the basis for it allegations. As explained in the Complaint, the traditional mortgage model involves nothing more than a prospective home buyer seeking, and obtaining a loan from a lending institution (also known as a "loan originator"). An underwriter evaluates the risk of lending, as described above, decides whether or not to recommend that the lender extend the loan, and the terms to be imposed on the borrower. If the loan is approved, the loan originator lends money in exchange for a promissory note pursuant to which the borrower agrees to repay the principle amount of the loan, plus an agreed upon interest. In this traditional model, the loan originator is the holder of the promissory note as well as a lien on the real property underlying the mortgage. That lien is released upon full payment of the loan.

The mortgage industry began to move away from this traditional model in the 1990's, when low interest rates and low inflation led to an increasing demand for mortgages. The market evolved into one where loan originators did not continue to hold loans they extended but, instead, sold mortgages into the financial markets to third party financial institutions. The fees generated by the sale of mortgages into the secondary market allowed loan originators to amass capital to finance the growing demand for mortgages.

Mortgages sold into the financial markets have been grouped together and securitized,

4

i.e., large groups, or "pools" of mortgages have been grouped together and transformed into securities known as "mortgage backed securities." The securitization process refers to the packaging of pools of loans into a trust. The trust originator sells interests in the trust to finance the purchase of the pools of mortgages. Interests in the trusts are sold to investors in the form mortgage backed securities. The value of sub-prime mortgage backed securities grew from $10 billion in 1991, to more than $60 billion in 1997 and to over $620 billion in 2005.

Investors in mortgaged-backed securities receive monthly payments, representing payments made pursuant to the many underlying pooled mortgages. Interests in trusts are often grouped into different sections or "tranches," which represent different levels of risk. The most senior tranche is the group that is paid first, and is the one that carries the highest rating. The most junior tranche, on the other hand, has the lowest rating, and is paid last. As time passes, the investment ratings on tranches can change, but the most senior tranche is paid before the more junior tranches.

III.     Allegations Regarding Practices of Loan Originators and Citibank Mortgage

The complaint sets forth allegations regarding the lending practices of several loan originators, as well as those of Citibank Mortgage. The loan originators referred to in the complaint are: (1) Countrywide Home Loans; (2) Silver State Mortgage; (3) Argent Mortgage Company, LLC; (4) Wells Fargo Bank, N.A.; (5) American Home Mortgage Corp.; (6) Opteum Financial Services, LLC; (7) Accredited Home Lenders, Inc.; (8) Aames Funding. These loan originators (none of which are defendants) are alleged to have extended mortgages to borrowers in violation of accepted underwriting standards and, essentially, without regard as to whether borrowers would be able to make payments pursuant to their mortgages. The Complaint alleges,

among other things, that:

- borrowers were coached to misstate their incomes;

- borrowers were steered to loans that exceeded their borrowing capacities;

- borrowers were approved at low "teaser" rates with the full knowledge that they could not pay the full rate, and

- unqualified borrowers were allowed to qualified based upon "compensating factors" without requiring proper documentation.

Essentially, these loan originators are alleged to have extended loans with little or no documentation, in violation of industry standards, and with false LTV's based upon knowingly inflated appraisals. All of these practices are alleged to have been undertaken in the name of generating fees when re-selling the mortgages into the secondary market.

As to Citibank Mortgage, the Complaint alleges the acquisition of mortgage loan pools, containing, in some cases, thousands of sub-prime and/or Alt-A loans for transfer to the Trusts. According to the Complaint, Citigroup Mortgage managers pressured underwriters charged with evaluating the pools of mortgages to accept all loans. These managers are alleged to have set the underwriting guidelines so low that any mortgage would pass, even if it was clear that the borrower was unable to repay the loan. Pursuant to the mortgaged backed security procedure described above, the pools of loans acquired by Citibank Mortgage were transferred to the Defendant Trusts. The Trusts thereafter issued the Certificates that were eventually sold to investors pursuant to the disclosure documents described below.

IV.    The Alleged Securities Act Violations

As securities, mortgaged backed security instruments are subject to the registration and disclosure requirements of the federal securities laws. Such disclosure documents must contain

6

information that is neither false nor misleading, either in statement or omission. The specific federal securities laws at issue here are Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"). 15 U.S.C. §§77k, 77l(a)(2), and 77o. The Sections 11 and 12(a)(2) claims assert false statements and/or omissions. Section11 applies to statements made in Registration Statements, and Section 12(a)(2) applies to statements made in Prospectuses. See In re Morgan Stanley Information Fund Securities Litigation, 592 F.3d 347, 358 (2d Cir. 2010). Plaintiff's third cause of action, alleged pursuant to Section 15 of the 1933 Act, 15 U.S.C. § 77o, is asserted against the Individual Defendants and Citigroup Mortgage. The Individual Defendants are alleged to have been "control persons" of Citigroup Mortgage and the Trusts, by virtue of their positions as directors and/or senior officers of Citigroup Mortgage. Liability against the Individual Defendants is alleged on the ground that they signed and, along with Citigroup Mortgage, were responsible for the preparation of the false disclosure documents.

Plaintiffs allege that they purchased the Certificates in reliance on false statements contained in the disclosure documents relating to the Certificates that were filed with the Securities and Exchange Commission between December 2006 and October of 2007. The particular disclosure documents at issue are: (1) the shelf registration statement (the "Registration Statement");[1] (2) the base prospectus statement (the "Base Prospectus") and, (3) the prospectus supplements (the "Prospectus Supplements"). The Registration Statement and the Base Prospectus Statement apply to each of the eighteen Trusts at issue. As to each of these individual Trusts, each was issued pursuant to a different Prospectus Supplement, which supplement

---

[1]     A "shelf" registration statements allows an issuer of securities to prepare and file a registration statement, pursuant to SEC Rule 415, for an issue of securities for up to three years before the actual issuance of those securities.

7

applied only to the particular Trust to which each refers. Thus, as the each of the eighteen Trusts, there are shared Registration and Base Prospectus statements, and an individual, Trust-specific, Prospectus Supplement.

The disclosures made pursuant to the offering of the Certificates are alleged to have misrepresented, and more specifically, under-represented, the risk profile of the investment described. According to Plaintiffs, the relevant documents contained false statements about the underwriting standards used in connection with the underlying mortgages, including statements regarding: (1) the origination of the underlying mortgage loans; (2) the maximum LTV ratio used to qualify home buyers; (3) the appraisals of properties underlying the mortgage loans and, (4) the debt to income ratios permitted in the granting of the loans.

Plaintiffs' complaint alleges that by the Fall of 2007, the truth about the performance of mortgage loans underlying the Certificates began to be revealed to the public. This increased the risk of the Certificates receiving less absolute cash flow in the future, as well as the likelihood that investors would not receive a timely return on their investment. At the same time, credit agencies began to downgrade and put negative watch labels on the Certificate classes. The Certificates are allegedly no longer marketable at any price near the prices paid by Plaintiff. In sum, it is alleged that Plaintiff is now exposed to much more risk with respect to the investment in the Certificates than the risk represented in the disclosure documents.

V.     The Motion

Defendants move to dismiss the Complaint in its entirety. First, it is argued that the Plaintiffs lack standing, both statutory and in the Constitutional sense, to pursue claims with respect to all but two of the Certificates issued by the Defendant Trusts. This argument is based

8

on the fact that Ann Arbor purchased interests only in two of the eighteen Trusts alleged to have

issued Certificates pursuant to false disclosures. As to the two Trusts in which interests were

purchased, Defendants argue that dismissal is warranted because the disclosures made warned

precisely of the risks of which Plaintiffs now complain. It is argued that having agreed to assume

the risks disclosed, in return for potentially high returns, Plaintiffs cannot now complain when

those risks have come to fruition. Finally, dismissal is sought on the ground that the purchase of

the Certificates was accompanied by Defendants' promise to repurchase or substitute mortgages

that did not comply with the terms of the offering materials. Defendants argue that since

Plaintiffs have never sought to take advantage of this provision, they cannot complain that

Defendants have failed to perform as promised.

DISCUSSION

I.    Standards on Motion to Dismiss and Pleading Standards of the PSLRA

In Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), the Supreme Court rejected

the "oft-quoted" standard set forth in Conley v. Gibson, 355 U.S. 41, 78 (1957), that a complaint

should not be dismissed, "unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." Id. at 45-46. The court discarded

the "no set of facts" language in favor of the requirement that plaintiff plead enough facts "to

state a claim for relief that is plausible on its face." Twombly, 127 S. Ct. at 1974, see also

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).

While heightened factual pleading is not the new order of the day, Twombly holds that a

"formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the

allegations in the complaint are true (even if doubtful in fact)." Williams v. Berkshire Fin. Grp. Inc., 491 F. Supp.2d 320, 324 (E.D.N.Y. 2007), quoting, Twombly, 127 S. Ct. at 1959. In the context of a motion to dismiss, this court must, as always, assume that all allegations set forth in the complaint are true and draw all inferences in favor of the non-moving party. Watts v. Services for the Underserved, 2007 WL 1651852 *2 (E.D.N.Y. June 6, 2007). The court must ensure, however, that the complaint sets forth "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974. A pleading that does nothing more that recite facts and bare legal conclusions is insufficient to "unlock the doors of discovery . . . and only a complaint that states a plausible claim for relief survives a motion to dismiss." Iqbal, 129 S. Ct. at 1950. While a Rule 12 motion is directed only to the sufficiency of the pleading, the court determining the motion may rightfully consider written documents attached to the complaint as well as documents incorporated thereto by reference and those of which plaintiff had knowledge and relied upon in commencing the action. See Brass v. Amer. Film Techn., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Watts, 2007 WL 1651852 *2.

The Private Securities Litigation Reform Act ("PSLRA") requires a plaintiff to set forth all facts upon which the plaintiff's claims or beliefs are based. Specifically, the pleading must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." See 15 U.S.C. §78u-4(b)(1)(B). The PSLRA also speaks to the burden of proving loss causation and states that the plaintiff shall bear the burden of proving that the act or omission complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u-4(b)(4).

II.    Legal Principles

   A.    Stating a Claim for A Violation of Securities Act of 1933

   The Securities Act of 1933 imposes liability on those who sign certain false and/or

misleading disclosure documents.  Section 11 applies to disclosures made in connection with

registration statements, while Section 12(a)(2) applies to disclosures made in connection with

prospectuses.  See 15 U.S.C. §§ 77k, 77l(a)(2).  Finally, Section 15 of the 1933 Act provides for

liability to be imposed on certain individuals on the ground that they signed unlawful disclosure

documents.  See 15 U.S.C. § 77o.  Liability under Section 15 is, for the most part, contingent

upon the imposition of liability under either Sections 11 or 12(a)(2).  See In re Morgan Stanley

Information Fund Securities Litigation, 592 F.3d 347, 358 (2d Cir. 2010).

   Section 11 provides that every signer and underwriter may be held liable for a registration

statement which "includes untrue statements of material facts or fails to state material facts

necessary to make the statements therein not misleading." 15 U.S.C. §77k; see Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 208 (1976).  A proper Section 11 claim must allege: (1) the purchase

of a "registered security, either directly from the issuer or in the aftermarket following the

offering"; (2) that the named defendant participated in the offering in a manner sufficient to give

rise to liability under Section 11; and (3) that the registration statement "contained an untrue

statement of a material fact or omitted to state a material fact required to be stated therein or

necessary to make the statements therein not misleading."  In re Morgan Stanley,

592 F.3d at 358.

   Section 12(a)(2) similarly imposes liability on any person who "offers or sells" a security

by means of, inter alia, a prospectus containing a materially false statement or that "omits to state

11

a material fact necessary to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l (a)(2). To be liable under Section 12(a)(2), the named defendant must be a "statutory seller." A "statutory seller "if is one who: (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities ['] owner." In re Morgan Stanley, 592 F.3d at 358 (citations omitted).

Liability pursuant to Sections 11 and 12(a)(2) is imposed only if the statements or omissions relied upon are "material." A statement or omission is deemed material if "taken together and in context," it "would have misled a reasonable investor." Id. at 360. The Second Circuit has observed that materiality is "a mixed question of law and fact." Thus, it has been stated, dismissal on the ground of materiality is not warranted "unless [the statements and/or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Id., quoting, ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009).

B. Standing

Constitutional standing requires a plaintiff to present a justiciable case or controversy. U.S. Const. art. III, § 2, cl. 1; see Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). For a plaintiff to properly allege standing he must demonstrate that he has personally suffered: (1) an injury-in-fact; (2) that is fairly traceable to defendants' alleged misconduct; and (3) is likely to be redressed by a favorable decision. Allen v. Wright, 468 U.S. 737, 751 (1984). To satisfy Article III, the plaintiff must plead that he has "personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant. Hoffman v. UBS-

AG, 591 F. Supp.2d 522, 530( S.D.N.Y. 2008), quoting, <u>Gladstone, Realtors v. Village of</u> <u>Bellwood</u>, 441 U.S. 91, 100 (1979).

In addition to Constitutional standing, a Plaintiff alleging a violation of Sections 11 or 12(s) must satisfy statutory standing requirements. Section 11 requires a plaintiff to show that he was a purchaser of the security at issue. <u>See</u> 15 U.S.C. § 77k(a) (limiting section 11 claims to "any person acquiring such security"); 15 U.S.C. § 77 l (a)(2) (limiting recovery to "the person purchasing such security"). As to Section 12, a plaintiff must show, as referred to above, that the defendant is a 'statutory seller." <u>In re Morgan Stanley</u>,592 F.3d at 358; <u>see</u> <u>also</u> <u>Pinter v. Dahl</u>, 486 U.S. 622, 645 (1988).

III.     <u>Disposition of the Motion</u>

   A.     <u>Standing</u>

Defendants allege, and Plaintiffs do not dispute, that they purchased Certificates issued by only two of the eighteen Trusts named as Defendants. Defendants argue that Plaintiffs' failure to have purchased certificates issued by sixteen named Trusts precludes Constitutional standing because, with respect to the sixteen Trusts not purchased, Plaintiffs have suffered no injury that is traceable to Defendant's conduct. The court agrees.

While Plaintiffs allege the falsity of statements contained in the common Registration and Prospectus Statements, they cannot allege harm flowing from reliance on the sixteen Prospectus Supplements issued in connection with securities that Plaintiffs did not purchase. Because these Prospectus Supplements refer specifically to mortgages contained in the particular Trusts to which they refer, statements contained therein go to the core of Plaintiffs' claims. To illustrate, Plaintiffs claim that mortgages pooled into the Trusts were issued in violation of accepted

13

standards, by a variety of different loan originators. As part of their case, Plaintiffs would have to show that the practices of which they complain occurred with respect to the mortgages in which they invested, and thereby caused injury. To the extent that they did not invest in any such pool of mortgages, they can make no such showing.

Allegations that disclosures in the commonly filed documents are the same, and the lending practices of the various lenders similar, are unavailing. Ultimately, Plaintiffs must be able to prove falsity with respect to statements, or omissions regarding the mortgages in which they purchased interests. Those statements will inevitably require reference to particular pools of mortgages contained in particular securities. If Plaintiffs did not purchase those securities, they lack standing to make any claim of injury flowing from false statements referring to lending practices of particular institutions. In sum, Plaintiffs lack Constitutional standing, because they cannot trace their injuries to Defendants' conduct.

This court is not the first to so hold. Recently, in <u>New Jersey Carpenters Vacation Fund</u> <u>v. Royal Bank of Scotland Group, PLC</u>, 2010 WL 1172694 *7-8 (S.D.N.Y. March 26, 2010), the District Court dismissed Securities Act claims arising out of the purchase of mortgaged-backed security trusts not purchased by Plaintiffs. There, as here, the court was not persuaded that standing was conferred by virtue of a common registration statement. <u>Id</u>. at *7. Instead, the court held that the difference in the underlying pools of mortgages precluded standing by plaintiffs that did not purchase particular trusts at issue. <u>Id</u>. <u>See also</u> <u>NECA_IBEW Health and</u> <u>Welfare Fund v. Goldman Sachs & Co.</u>, No. 08 Civ.10783 (S.D.N.Y January 28, 2010) (transcript of oral argument at 40-41) (granting motion to dismiss all claims arising out of fifteen

14

trusts in which plaintiffs had purchased no interest); accord Nomura, 658 F. Supp.2d at 304 [2];

see also Hoffman, 591 F. Supp.2d at 530-31 (holding that plaintiffs lacked standing to pursue

claims alleging false statements in mutual fund documents relating to funds that they did not

purchase).

B.      Failure to State A Claim

i.      Statements and Omissions

The court turns next to consider whether, with respect to the Trusts in which Plaintiffs

have standing to assert a claim, such a claim is stated. Defendants claim that their disclosures

were honest and adequate. It is therefore necessary, when evaluating whether a claim is stated, to

compare the statements and omission alleged against the risks disclosed.

General statements regarding the misstatements and omissions relied upon by Plaintiffs

are referred to above. Those statements – regarding underwriting practices, LTV's, appraisals,

and borrower income – refer generally to the risk profile of the loans in the underlying pools of

mortgages contained within the Trusts. As to the Trusts purchased by Plaintiffs (which are the

only causes of action not dismissed for lack of standing), those statements and omissions are

those that refer to the particular lending practices of Wells Fargo, as set forth in paragraphs 168-

180 of the Complaint. Specifically, the Complaint alleges that the relevant Prospectus

Supplements stated that:

Wells Fargo stated that its "underwriting standards are applied by or on behalf of Wells

---

[2]      The Nomura court noted that plaintiffs also lacked statutory standing on the
ground that they were not purchasers of securities issued by trusts from which
they did not purchase certificates. Id. at 304 n.3.

15

Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral." (Complaint ¶169).

As to "stated income" loans, the Complaint alleges that the Prospectus Supplements stated that:

the borrower's income as stated must be reasonable for the borrower's occupation as determined at the discretion of the loan underwriter. (Complaint ¶ 170).

The Complaint alleges that these statements were materially false because Wells Fargo's underwriting standards were not, in fact, concerned with the borrower's ability to repay the loan. Instead, it is alleged that the focus was simply on making loans to re-package as securities, without any regard as to whether the borrower could repay the loan. As a result of this poor underwriting, Wells Fargo is alleged to have made 'subpar" loans that should not have been extended in the first place. Well's Fargo's Alt-A division is alleged to have underwritten loans that were "overwhelmingly sub-prime loans or sub-par loans, or loans that should not have ever been made to the people to whom they were given." This group is alleged to have written a variety of Alt-A and sub-prime liens that required no documentation of information relevant to the assessment of risk. The Wells Fargo loans are also alleged to have included "no income verification" loans, "no-doc" loans and "stated income" loans.

The Complaint also makes reference to Wells Fargo's practice of acquiring loans pursuant to a "Delegated Underwriting" arrangement with outside mortgage brokers. Such loans are alleged to have been acquired by Wells Fargo pursuant to underwriting agreements that were "not reviewed prior to acquisition of the mortgage loan," but as to which Wells Fargo stated that "the file is reviewed . . . to confirm that certain documents are included in the file . . . ."

Additionally, these loan originators were stated to have been required to "meet certain requirements including, among other things, certain quality, operational and financial guidelines." In truth, according to the Complaint, Wells Fargo did not confirm the standards used by third parties from which it acquired mortgages. Therefore, these third parties were able to engage in "serious underwriting deficiencies without review or correction by Wells Fargo."

For their part, Defendants seek dismissal on the ground that Plaintiffs were adequately advised of the risks attendant to the purchase of the Certificates. Those disclosures appear in the general Prospectus as well as in the trust-specific Prospectus Supplements. General warnings regarding the suitability of investing in mortgage-backed securities appear throughout the disclosure documents, including the statements that:

- the offered securities are not suitable investments for all investors (Exhibit B at 5);

- **[t]he Securities Will have Limited Liquidity So Investors May Be Unable To Sell Their Securities or May Be Forced to Sell them at a Discount from Their Initial Offering Price** (Ex B at 5) (emphasis in original);

- **The Types of Loans Included in the Trust Fund Related to Your Securities May be Especially Prone to Defaults Which May Expose Your Securities to Greater Losses** (Ex B at 5) (emphasis in original).

As to the types of loans included in the underlying mortgage pools, the disclosures state clearly that such loans include negatively amortizing loans, balloon loans, multifamily loans, high LTV loans, and junior lien mortgage loans. Specific statements regarding high LTV ratio loans, and the increased likelihood of default appear throughout the Trusts' disclosure documents. As to LTV ratios, the disclosure documents state that mortgages in the underlying

17

pools may have LTV ratios in excess of 80% and as high as 125%. Additionally, it is stated that "high LTV loans with combined loan-to-value ratios in excess of 100% may have been originated with a limited expectation of recovering any amounts from the foreclosure of the related mortgaged property . . . but that such loans were underwritten with an emphasis on the creditworthiness of the related borrower." (Exhibit B at 8).

Particular statements regarding the loans underlying the mortgage pools in the trusts at issue refer to practices of Wells Fargo, and those companies with which it did business. The Prospectus Supplements refer to the approval of borrowers pursuant to "No Documentation" and "Stated Income" programs. The trust documents disclose, as pointed out by Defendants, that borrowers approved under a "No Documentation" program would not be required to provide any information regarding employment, and any information provided would not be verified. As to "Stated Income," borrowers, the trust documents state, (as noted by Plaintiffs), that the stated income (while not verified by any documents) must be "reasonable for the borrower's occupation as determined at the discretion of the loan underwriter," and the assets stated must be similarly reasonable.

With respect to underwriting standards, the Prospectus Supplements at issue refer to a Wells Fargo program designed to "make prudent loans available to customers where such loans may have been denied in the past because of underwriter hesitancy to maximize the use of their ability to consider compensating factors to permitted by the underwriting guidelines." The Prospectus Supplement goes on to disclose that the successful implementation of this initiative may result in an increase in the amount of delinquencies and foreclosures. (Exhibit S-52)

ii.     Disposition of the Motion to Dismiss

The court's extensive review of the disclosure documents, only a few of which are described above, reveal that the high risk profile of the investment offered was disclosed. The mortgages in the pools underlying the trusts are disclosed to include sub-prime, balloon or second lien mortgages. They are clearly described as issued with little or no documentation, based upon high LTV ratios with an accompanying high risk of default. All of this is acknowledged by Plaintiffs. However, according to Plaintiffs, while the disclosure documents state the high risk of default, they also state the existence of at least some level of underwriting standards. This low standard, however, is alleged to have not existed at all. For example, Plaintiffs argue the falsity of statements regarding the loan originators' investigation, and the conclusion that the income stated by an applicant is at least reasonable given the occupation stated.

The strong nature of the cautionary language contained in the disclosure materials brings this case very close to the dismissal line, and at least one other court has dismissed a similar case on the pleadings. See Nomura, 658 F. Supp.2d 299. However, given the length of the Complaint (261 paragraphs spanning 89 pages), and the fact that most of Plaintiffs' claims have been dismissed on the ground that Plaintiffs lack standing, the court will not dismiss the case at this time. Instead, the court gives Plaintiffs leave to re-plead the causes of action that remain. The amended pleading (which will be the second such pleading) shall plead only the causes of action with respect to the Trusts actually purchased by Plaintiffs. With respect to those Trusts, Plaintiffs shall specify the tranches in which they invested. They shall also plead the false statements and/or omissions upon which they rely. They shall plead how those statements and/or

19

amended pleading (which will be the second such pleading) shall plead only the causes of action with respect to the Trusts actually purchased by Plaintiffs. With respect to those Trusts, Plaintiffs shall specify the tranches in which they invested. They shall also plead the false statements and/or omissions upon which they rely. They shall plead how those statements and/or omissions are tied to the loans in which they invested, and the basis for their damages claim. In particular, Plaintiffs shall state whether their damages claims arise from the non-payment of amounts due under the Certificates or the inability to sell their interests in those Certificates in a secondary market. Such pleading will put the court in a better position from which to evaluate the merits of the claims alleged, particularly the issues of materiality and the impact of any promise to repurchase or substitute mortgages that did not comply with the terms of the offering materials.

Plaintiffs shall serve and file the amended pleading within thirty days of the date of this Memorandum and Order. Defendants shall answer, or otherwise move, without the necessity of a conference with the court, thirty days thereafter.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part. Plaintiffs are given leave to re-plead as set forth above.

SO ORDERED.

_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       April 6 , 2010

20