UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————— x

CITY OF ANN ARBOR EMPLOYEES'         :      Civil Action No. 08-CV-01418
RETIREMENT SYSTEM, Individually and On :
Behalf of All Others Similarly Situated,    :      CLASS ACTION
                                            :
                         Plaintiff,         :      SECOND AMENDED COMPLAINT FOR
                                            :      VIOLATION OF §§11, 12 AND 15 OF THE
            vs.                             :      SECURITIES ACT OF 1933
                                            :
CITIGROUP MORTGAGE LOAN TRUST               :
INC., et al.                                :
                                            :
                         Defendants.        :      DEMAND FOR JURY TRIAL
——————————————————— x

521318_1

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE ACTION ........................................................................................1

    The 2007-AR5 Trust Was Backed by Faulty Loans as a Direct Result of the
        Originators' Failure to Utilize the Underwriting and/or Appraisal
        Standards Referenced in the Offering Documents...................................3

    The 2007-WFHE2 Trust Was Backed by Faulty Loans as a Direct Result of the
        Originators' Failure to Utilize the Underwriting and/or Appraisal
        Standards Referenced in the Offering Documents...................................5

    The Certificates Purchased by Lead Plaintiff and the Class Have Declined in
        Value as a Result of the Offering Documents' Misrepresentation and
        Omissions................................................................................7

JURISDICTION AND VENUE ....................................................................................9

PARTIES ...................................................................................................................9

CLASS ACTION ALLEGATIONS ...........................................................................13

BACKGROUND ......................................................................................................14

    Residential Mortgage Loan Categories................................................14

    The Secondary Market.......................................................................16

    Sub-Prime and Low Documentation Alt-A Loans and the Secondary Market ...............19

THE FALSE AND MISLEADING OFFERING DOCUMENTS................................23

    The Offering Documents Misrepresented and Omitted Material Facts Regarding
        the Underwriting Standards Citigroup Mortgage and the Loan Originators
        Applied...............................................................................24

    The Registration Statement/Prospectus Supplements Misrepresented and Omitted
        Material Facts Regarding the Appraisals Conducted by or for the Loan
        Originators .........................................................................38

    The Prospectus Supplements Misstated the True LTV Ratios Associated with the
        Underlying Mortgages ..........................................................44

    The Prospectus Supplements Misstated the Certificates' True Investment Rating ..........53

The Models that Produced the Certificates' Ratings Were Based upon Outdated Assumptions Regarding Loan Performance ..................................................57

The Rating Agencies' Relaxing of Ratings Criteria Led to Artificially High Ratings for the Certificates ......................................................................59

Due to Defects in the Underwriting Process, Inaccurate Data was Entered into the Ratings Models Thereby Yielding Inaccurate Ratings ..........................61

DISCLOSURES EMERGE ABOUT PROBLEMS WITH LOANS UNDERLYING THE CERTIFICATES .............................................................................63

COUNT I .............................................................................................63

Violations of §11 of the 1933 Act Against All Defendants.............................63

COUNT II ............................................................................................65

Violations of §12(a)(2) of the 1933 Act Against All Defendants......................65

COUNT III...........................................................................................66

Violations of §15 of the 1933 Act Against the Individual Defendants and Citigroup Mortgage.............................................................................66

PRAYER FOR RELIEF ...........................................................................67

A.   Determining that this action is a proper class action and certifying plaintiffs as Class representatives; ............................................67

B.   Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon; ...................67

C.   Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;................................................................................67

D.   Awarding rescission or a rescissory measure of damages; and ................67

E.   Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court...............................................68

JURY DEMAND ...................................................................................68

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who acquired the Mortgage Pass-Through Certificates and Asset-Backed Pass-Through Certificates (collectively, the "Certificates") of Citigroup Mortgage Loan Trust Inc. ("Citigroup Mortgage" or the "Depositor" or the "Company") pursuant and/or traceable to the false and misleading Registration Statement and Prospectus Supplements issued during 2007 (collectively, the "Registration Statement").  This action involves solely strict liability and negligence claims brought pursuant to the Securities Act of 1933 ("1933 Act").  By order of the Court, this action is limited to the securities issued as discussed herein.

2.      Citigroup Mortgage is a Delaware corporation formed for the purpose of acquiring, owning and transferring mortgage loan assets and selling interests in them.  Citigroup Mortgage is an affiliate of defendant Citigroup Global Markets Inc. ("Citigroup Global").  The issuers of the various offerings (the "Defendant Issuers") are Citigroup Mortgage and the two Trusts identified in ¶35, established by Citigroup Mortgage to issue billions of dollars worth of Certificates in 2007.

3.      On December 12, 2006, the Defendant Issuers caused a Registration Statement to be filed with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing billions of dollars of Certificates.  The Certificates were issued pursuant to Prospectus Supplements, each of which was incorporated into the Registration Statement.  The Certificates were supported by pools of mortgage loans Citigroup Mortgage purchased from various originators.  The Registration Statement represented that the mortgage pools would primarily consist of loans generally secured by liens on residential properties, including conventional and adjustable-rate mortgage loans.

- 1 -

4.      Plaintiffs and members of the class purchased the Certificates based upon three primary factors: return (in the form of interest payments), timing of principal and interest payments, and safety (risk of default of the underlying mortgage loan assets).  The Registration Statement included false statements and/or omissions about:  (i) the underwriting standards purportedly used in connection with the origination of the underlying mortgage loans; (ii) the maximum loan-to-value ("LTV") ratios used to qualify borrowers; (iii) the appraisals of properties underlying the mortgage loans; (iv) the debt-to-income ratios permitted on the loans; and (v) the ratings of the Certificates.

5.      According to reports of governmental investigations and statements of former executives and employees of Citigroup and of the key originators who were responsible for ensuring that the underwriting practices were as stated, the true, material facts, which defendants omitted from the Offering Documents, were that:

- •      Citigroup materially lowered its internal standards in 2006 and 2007 in order to gain market share in mortgage securitizations, but never told investors that it had done so;

- •      Borrowers were not evaluated on their ability to repay the loans; instead, loans were made regardless of a borrower's ability to repay; loan originators made as many loans as possible regardless of repayment ability since they were selling the loans to defendants at a profit; in addition, borrowers and loan originators were routinely inflating borrowers' incomes to falsely high levels to qualify borrowers for loans they could not afford to repay;

- •      Property appraisers' future compensation was contingent upon providing loan originators with predetermined, inflated property appraisals which allowed borrowers to qualify for loans; in addition, appraisals were not based on recent sales of comparable properties; and appraisals did not conform to USPAP,[1] Fannie Mae or Freddie Mac standards;

---

[1]      The Uniform Standards of Professional Appraisal Practice ("USPAP") are the generally accepted standards for professional appraisal practice in North America.  USPAP contains standards for all types of appraisal services.  Standards are included for real estate, personal property, business and mass appraisal.

- Documents submitted for loan underwriting contained untrue and false statements – potential borrowers and loan originators inflated borrowers' incomes and appraisers submitted falsely inflated property appraisals;

- Because the specified LTV ratios contained in the Offering Documents were based on inaccurate and inflated property appraisals, the LTV ratios specified in the Offering Documents were false, inaccurate and understated;

- The credit ratings of the Certificates were inaccurate and understated the investment risk associated with the Certificates because the rating agencies used outdated assumptions, overly-relaxed rating criteria and inaccurate data in formulating the ratings; and

- At the same time defendants were selling the Certificates to plaintiffs and the Class, and representing that the Certificates were "investment grade," defendants were also engaging in credit default swaps and other investments that expected that loans like those underlying the Certificates would not be repaid.

6.     As a result, the Certificates sold to plaintiffs and the Class were secured by assets that had a much greater risk profile than represented in the Offering Documents.  In this way, defendants were able to obtain superior ratings on the tranches or classes of Certificates, when in fact these tranches or classes were not equivalent to other investments with the same credit ratings.

7.     Indeed, as detailed by a Citigroup whistleblower, Richard M. Bowen III, in testimony before the Financial Crisis Inquiry Commission ("FCIC") in 2006, Citigroup knowingly lowered its standards for accepting risky loans solely to increase its market share in securitizations.  By adopting these new, lax standards, Citigroup greatly increased the risk of failure for the securities here.  Yet, defendants never told investors.

**The 2007-AR5 Trust Was Backed by Faulty Loans as a Direct Result**
**of the Originators' Failure to Utilize the Underwriting and/or**
**Appraisal Standards Referenced in the Offering Documents**

8.     A review of documentation for 64 loans backing the CMLT 2007-AR5 Trust, including information from the attendant borrowers which have been made publicly available pursuant to bankruptcy proceedings or other records, reveals that with respect to 46 of those 64 loans

- 3 -

(or 72%) no apparent determination was made to ensure that the loan met Wells Fargo Bank, N.A.'s ("Wells Fargo") and Citigroup's standards.

9.      For example, a review of  sworn bankruptcy filings related to the borrower for one loan from the 2007-AR5 Trust reveals that the borrower reported a loss of $56,801 in self-employment income in 2006, and $0 income in 2007.  Yet, in October 2006, the borrower received mortgages totaling more than $590,000.  The 2007-AR5 securitization reports state that the borrower's debt-to-income ratio was 41.09.  As the borrower actually had no positive income in 2006, no debt-to-income ratio can be calculated.  Further, the borrower's bankruptcy filings state that he resided in Indiana from before 2006, and continues to live there through 2010.  Indeed, his bankruptcy filing was made in the Northern District of Indiana.  Yet, the 2007-AR5 securitization reports list the mortgage as being given to an owner who *occupied the mortgaged property* in Florida.

10.      A separate review of sworn bankruptcy filings related to the borrower for one loan from the 2007-AR5 Trust reveals that the borrower reported no income for 2006 and 2007 in his bankruptcy filing and, indeed, stated that, during the time-frame, he had no profit as his "real estate business operated at a loss."  While the borrower had no income, and the mortgage at issue was for $331,200, the 2007-AR5 securitization reports state that the borrower's debt-to-income ratio was 41.09.

11.      A separate review of sworn bankruptcy filings related to the borrowers for a loan from the 2007-AR5 Trust reveals that the borrowers reported to the bankruptcy court that their 2006 annual income was $18,369, or $1,530.75 per month.  Their $334,300 mortgage loan, however, called for a monthly principal and interest payment of $1,881, and additional monthly insurance and tax payments of at least $375.  All told, the borrowers' total payments for housing alone each month

- 4 -

totaled almost one and a half times their monthly income (147%).  Yet, the 2007-AR5 securitization reports list that the borrowers' debt-to-income ratio as 39.6%.

12.     A review of property information from 46 loans backing the CMLT, Series 2007-AR5 Trust, including the automated valuation of the attendant properties, reveals that 17 of those loans (or 37%) overvalued the property by 9% or more, compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

13.     If Wells Fargo's underwriting was actually designed to weigh all risk factors inherent in the loan files, or to determine the applicant's ability to repay the loans, these loans would not have been originated or placed in the securitization.

**The 2007-WFHE2 Trust Was Backed by Faulty Loans as a Direct Result of the Originators' Failure to Utilize the Underwriting and/or Appraisal Standards Referenced in the Offering Documents**

14.     A review of documentation for 72 loans backing the CMLT 2007-WFHE2 Trust, including information from the attendant borrowers which have been made publicly available pursuant to bankruptcy proceedings or other records, reveals that with respect to 36 of those 72 loans (or 47%) no apparent determination was made to ensure that the loan met Wells Fargo's and Citigroup's standards.

15.     For example, a review of sworn bankruptcy filings related to the borrower for one loan from the 2007-WFHE2 Trust reveals that the borrower reported an income of $24,808.49 (or $2,067.37 per month) for 2006.  On December 6, 2006, the borrower received a $559,995 mortgage from Wells Fargo on a house in California, with a monthly principal and interest payment of $5,432.40 (not including taxes and insurance).  The debt-to-income ratio for this borrower listed in documents filed with the SEC was 42.71%.  In reality, the borrower's monthly payments were almost triple (287%) her monthly income.

- 5 -

16.     A separate review of sworn bankruptcy filings related to the borrower for a loan from the 2007-WFHE2 Trust reveals that the borrower reported an income of $14,237 ($1,186 per month) for 2006 and $19,668 ($1,639 per month) for 2005.  Again, on December 6, 2006, the borrower received a $155,320 mortgage from Wells Fargo on a house in Nevada, with a monthly principal and interest payment of $1,153.44 (not including taxes and insurance).  The debt-to-income ratio for this borrower listed in documents filed with the SEC was 33.7%.  In reality, the borrower's monthly payments were more than equal to (122%) her monthly income.

17.     A separate review of sworn bankruptcy filings related to the borrower for a loan from the 2007-WFHE2 Trust reveals that the borrower reported that the borrower had a residence in Matteson, Illinois but sought, and received, a mortgage for a property in Calumet City, Illinois, stating that the Calumet City address was his "primary residence."  At no time did the borrower live in the Calumet City home and, indeed, only in the bankruptcy court did Wells Fargo seek relief from the automatic stay, asserting that the Calumet City home was "not the debtor's homestead residence" because "the subject property's address is different from the [borrower's] mailing address."

18.     A review of public filings related to the borrower for a loan from the 2007-WFHE2 Trust reveals that the borrower was approved by Wells Fargo for a "cash-out 100% refinance" less than three months after the borrower originally bought the property.  The borrower first bought the property, located in Monroe, Michigan, for $234,000 in October 2006.  By January 2007, Wells Fargo refinanced the mortgage and increased it by more than 10%, to $260,000, with a 100% listed "Loan to Value."  Further, public records show that the borrower purchased three other properties through other lenders in the months between originally buying the house and completing the Wells Fargo refinancing.

- 6 -

19.     A review of property information from 55 loans backing the CMLT, Series 2007-WFHE2 Trust, including the automated valuation of the attendant properties, reveals that 22 of those loans (or 40%) overvalued the property by 9% or more, compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

20.     As with the 2007-AR5 examples shown above, if Wells Fargo's underwriting was actually designed to weigh all risk factors inherent in the loan files, or to determine the applicant's ability to repay the loans, these loans would not have been originated or placed in the securitization.

**The Certificates Purchased by Lead Plaintiff and the Class**
**Have Declined in Value as a Result of the Offering Documents'**
**Misrepresentation and Omissions**

21.     As a result of defendants' misrepresentations and omissions of material fact, the loans backing the Certificates sold to plaintiffs were not originated utilizing the underwriting and appraisal practices described in the Offering Documents, and a significant number of these loans were originated based upon materially false information.  As a result, the Certificates at issue were secured by assets that had a much greater risk profile than represented in the Offering Documents. In this way, defendants were able to obtain superior "investment grade" ratings on the tranches or classes of Certificates when, in fact, these tranches or classes were at or below risky "junk grade" level.

22.     As a result of defendants' misrepresentations and omissions, the Certificates have not performed consistent with the ratings which they received.  According to the March 2010 "Certificate Holders Statement" for Series 2007-AR5 1A, 303 of the loans (or 34%) were delinquent, bankrupt, "REO" or foreclosed loans.  According to the March 2010 Trustee distribution report for

- 7 -

Series 2007 WFHE2, 1, 459 of the loans (or 41.4%) were delinquent, bankrupt, "REO" or foreclosed loans.

23.     By the fall of 2007, the truth about the performance of the mortgage loans that secured the Certificates began to be revealed to the public, disclosing that the Certificates were much riskier investments than represented, and that investors likely would receive less absolute cash flow in the future and that investors would not receive it on a timely basis.  The credit rating agencies also began to put negative watch labels on the Certificate tranches or classes.  At present, Certificates in both Trusts have been downgraded from investment grade to near junk status.  As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiffs and the Class, and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Registration Statement/Prospectus Supplements represented.

24.     As an additional result, the Certificates are no longer marketable at prices anywhere near the price paid by plaintiffs and the Class, and the holders of the Certificates are exposed to much more risk with respect to both the timing and absolute cash flow to be received than the Offering Documents represented.

25.     There is a secondary market for the purchase and sale of the Certificates.  There has been a market for the resale of investments like the Certificates since at least 2007.  The trading volume of Certificates like those at issue was at least $750 million during March of 2008, the time at which the first of the actions asserting the claims herein was filed.  In a non-forced sale in the secondary market in March of 2008, the time the first lawsuit alleging the wrongful actions herein was filed, Lead Plaintiffs and the Class would have netted, at most, between 70 and 80 cents on the

dollar.  In other words, a sale on the date the first lawsuit was filed would have resulted in a loss of at least 20 to 30 cents on each dollar amount purchased.

26.     Thus, because of the downgrades, as well as the revelation of other information that was unknown to investors at the time the Certificates were issued, the value of the Certificates has diminished greatly since their original offering, as has the price at which plaintiffs and members of the Class could dispose of them.  These diminutions in value and price have caused damages to plaintiffs and the Class.

27.     Further, as noted above, on February 29, 2008, one of the Lead Plaintiffs sold its investment in two 2007-AR5 tranches at a substantial loss.

## JURISDICTION AND VENUE

28.     The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.

29.     The violations of law complained of herein occurred in this District, including the dissemination of materially false and misleading statements complained of herein into this District. Defendants conduct business in this District.

## PARTIES

30.     Lead Plaintiff City of Ann Arbor Employees' Retirement System ("Ann Arbor") acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplements and has been damaged thereby.  Specifically, on August 23, 2007, Ann Arbor purchased Citigroup Mortgage Loan Trust 2007-AR5 Mortgage Pass-Through Certificates, Class 2-A1A, with a face value of $443,768.31, directly from defendant Citigroup Global in the public offering at 98.257% of par.  On August 24, 2007, Ann Arbor purchased additional Citigroup

- 9 -

Mortgage Loan Trust 2007-AR5 Mortgage Pass-Through Certificates, Class 1-A1A, with a face value of $197,761.26 at 98.949% of par.  On February 29, 2008, Ann Arbor sold its Certificates at a substantial loss.  It sold its Certificates from the 1-A1A Class at 0.87% of par, and sold its Certificates from the 2-A1A Class at 84.75% of par.

31.    The 2007-AR5 1-A1A Certificates were originally rated "AAA" by Standard and Poor's ("S&P") and Fitch Ratings agencies – the agencies' top rating, and "investment grade."  The Certificates are now rated "CCC" by S&P and "C" by Fitch Ratings.  The 2007-AR5 2-A1A Certificates were originally rated "AAA" by S&P and Fitch Ratings agencies – the agencies' top rating, and "investment grade."  The Certificates are now rated "CCC" by both S&P's and Fitch Ratings.

32.    Lead Plaintiff Greater Kansas City Laborers Pension Fund ("Kansas City") acquired Certificates pursuant and traceable to the Registration Statement and Prospectus Supplement and has been damaged thereby.  Specifically, on March 13, 2007, Kansas City purchased Citigroup Mortgage Loan Trust 2007-WFHE2 Asset-Backed Pass-Through Certificates, Class A2, with a face value of $100,000 directly from defendant Citigroup Global in the public offering at par.  Kansas City continues to hold its Certificates, which are now worth significantly less than when Kansas City first purchased them.

33.    The 2007-WFHE2 A2 Certificates were originally rated "AAA" by S&P and Aaa by Moody's Investors Services, Inc. ("Moody's") ratings agencies – the agencies' top rating, and "investment grade."  The Certificates are now rated "BB" by S&P and "Ba3" by Moody's.

34.    Defendant Citigroup Mortgage is a Delaware corporation headquartered in New York, New York.  It is a special purpose corporation formed in 2002.  Defendant Citigroup Mortgage was the Depositor and an issuer of the various Certificates.

- 10 -

35.     The Defendant Issuer of the various Certificates was Citigroup Mortgage and two New York common law trusts.  Through each of these Trusts, Citigroup Mortgage issued hundreds of million of dollars worth of Certificates pursuant to a Registration Statement and Prospectus Supplement.  The Trusts at issue here are:

> Citigroup Mortgage Loan Trust 2007-AR5
> Citigroup Mortgage Loan Trust 2007-WFHE2[2]

36.     The 2007-AR5 Prospectus Supplement, filed on March 9, 2007, described the supporting trust as follows:

> The mortgage pool will consist of approximately 2,445 conventional, one- to four-family, adjustable-rate mortgage loans secured by first liens on residential real properties and having an aggregate principal balance as of the cut-off date of approximately $931,023,677, after application of scheduled payments due on or before the cut-off date whether or not received and subject to a permitted variance of plus or minus 5%. The mortgage loans will have original terms to maturity of 30 years.

37.     The 2007-WFHE2 Prospectus Supplement, filed on March 13, 2007, described the supporting trust  as follows:

> The trust will consist of a pool of 6,718 one- to four-family, fixed-rate and adjustable-rate, first lien and second lien residential mortgage loans having an aggregate principal balance as of the cut-off date of approximately $1,005,346,178, after application of scheduled payments due on or before the cut-off date whether or not received and subject to a permitted variance of plus or minus 10%. The mortgage loans have original terms to maturity of not greater than 30 years.

38.     Defendant Citigroup Global is a securities firm which provides a range of financial services, including engaging in the mortgage banking business.  Citigroup Global is a corporation based in New York, New York.  Citigroup Global acted as the underwriter in the sale of all the

---

[2]     The WFHE Certificates are Asset-Backed Pass-Through Certificates whereas the AR5 Certificates are Mortgage Pass-Through Certificates.

Citigroup Mortgage offerings, helping to draft and disseminate the offering documents.  Citigroup Global was the underwriter for all of the Trusts.

39.     Defendant Randall Costa ("Costa") was Principal Executive Officer, President and director of Citigroup Mortgage during the relevant time period.  Defendant Costa signed the December 12, 2006 Registration Statement.

40.     Defendant Scott Friedenrich ("Friedenrich") was Principal Financial Officer and Treasurer of Citigroup Mortgage during the relevant time period.  Defendant Friedenrich signed the December 12, 2006 Registration Statement.

41.     Defendant Peter Patricola ("Patricola") was Controller of Citigroup Mortgage during the relevant time period.  Defendant Patricola signed the December 12, 2006 Registration Statement.

42.     Defendant Mark I. Tsesarsky ("Tsesarsky") was a director of Citigroup Mortgage during the relevant time period.  Defendant Tsesarsky signed the December 12, 2006 Registration Statement.

43.     Defendant Jeffrey Perlowitz ("Perlowitz") was a director of Citigroup Mortgage during the relevant time period.  Defendant Perlowitz signed the December 12, 2006 Registration Statement.

44.     Defendant Evelyn Echevarria ("Echevarria") was a director of Citigroup Mortgage during the relevant time period.  Defendant Echevarria signed the December 12, 2006 Registration Statement.

45.     The defendants identified in ¶¶39-44 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Trusts as they were directors to Citigroup Mortgage and signed the Registration Statement for the registration of the securities issued by the Trusts.

521318_1

46.     These defendants aided and abetted, and/or participated with and/or conspired with the other named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs bring this action as a class action on behalf of a class consisting of all persons or entities who acquired the Certificates between January 2007 and October 2007 pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-138237) and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Citigroup Mortgage and Citigroup Global or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The Registration Statement issued billions of dollars worth of Certificates.

49.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 13 -

521318_1

50. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the 1933 Act; whether the Registration Statement issued by defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

**Residential Mortgage Loan Categories**

53. Borrowers who require funds to finance the purchase of a house, or to refinance an existing mortgage, apply for residential mortgage loans with a loan originator. These loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score. Borrowers with higher FICO scores were able to receive loans with less documentation during the approval process, as well as higher LTVs. Using a person's FICO score, a loan originator assesses a borrower's risk profile to

- 14 -

determine the rate of the loan to issue, the amount of the loan (LTV), and the general structure of the loan.

54.    A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health.  Borrowers who are issued "prime" mortgage loans are deemed to be the most credit-worthy and receive the best rates and structure on mortgage loans.

55.    If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a "low-doc" or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower.  While borrowers of "low-doc" or Alt-A loans typically have clean credit histories, the risk profile of the "low-doc" or Alt-A loan increases because of, among other things, higher LTV, higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves.

56.    A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt to equity ratios.  Borrowers that have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger-than-average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.

521318_1

**The Secondary Market**

57.     Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan.  The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation.  Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan.  As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

58.     Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages.  As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market.  As discussed below, these innovations altered (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender, and (2) the risks normally associated with mortgage loans.

59.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages.  Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution.  By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages.  The mortgages sold into the financial markets

- 16 -

are typically pooled together and securitized into what are commonly referred to as mortgage-backed securities or MBS. In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

60.    As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:



(Source: *The Wall Street Journal*)

61.    When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors. The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage. Of course, since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

62.    In this MBS structure, the senior tranches received the highest investment rating by the Rating Agencies, usually AAA. After the senior tranche, the middle tranches (referred to as

- 17 -

mezzanine tranches) next receive their share of the proceeds.  In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the Rating Agencies.

63.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches.  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage-borrowers are current on their mortgages.  The following diagram illustrates the concept of tranches within a MBS comprised of residential mortgages (often referred to as a "residential mortgage backed securities" or "RMBS"):



(Source: *The Wall Street Journal*)

64.     As illustrated below in ¶65, in the typical securitization transaction, participants in the transaction are (1) the servicer of the loans to be securitized, often called the "sponsor", (2) the depositor of the loans in a trust or entity for securitization, (3) the underwriter of the MBS, (4) the entity or trust responsible for issuing the MBS, often called the "trust," and (5) the investors in the MBS.

65.     The securitization process begins with the sale of mortgage loans by the sponsor—the original owner of the mortgages – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the

depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors:



66.    Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors.  After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

**Sub-Prime and Low Documentation Alt-A Loans and the Secondary Market**

67.    Over the past 30 years, the sub-prime mortgage market has evolved from being just a small percentage of the overall U.S. home mortgage market to one that has originated hundreds of billions of dollars of sub-prime loans annually.  While several important legislative and regulatory changes have induced such growth, the sub-prime mortgage market would not have experienced such enormous growth without the development of a strong secondary market for home mortgage loans.

- 19 -

68.     During the 1980s, credit rating agencies began rating privately-issued MBS, which made them more suitable to a wider range of investors and expanded the market for MBS.  By 1988, 52% of outstanding residential mortgage loans had been securitized, up from 23% four years earlier.

69.     This rapid expansion of the secondary mortgage market significantly increased mortgage lenders' access to capital and dramatically reduced the need for loan originators to possess a large deposit base in order to maintain their liquidity.  As a result, non-depository mortgage lenders proliferated, comprising approximately 32% of lenders of home mortgage loans by 1989.

70.     During the early to mid-1990s, rising interest rates decreased the demand for prime mortgage loans.  To spur continued sales of mortgages, lenders became amenable to originating sub-prime mortgages.  This willingness, coupled with technological advances that helped credit rating companies accumulate credit information on a greater number of debtors, increased the market for sub-prime mortgage loans.  By 1998, approximately $150 billion in sub-prime mortgage loans were originated, up from approximately $35 billion in 1994.

71.     The growth in the sub-prime mortgage loan market during the 1990s was also aided by mechanisms that allocated and/or moderated risk in sub-prime MBS.  These mechanisms, called "credit enhancements," allowed issuers to obtain investment-grade ratings on all, or part of, their MBS, despite the higher risk on the sub-prime mortgages upon which the MBS were based.

72.     As a result of these credit enhancement mechanisms, MBS were deemed to be suitable to a wider market of investors, and the value of sub-prime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997.  These sales of MBS provided lenders, including non-depository and mortgage-only companies who were responsible for much of the sub-prime mortgage lending, with ample liquidity to originate new sub-

prime loans.  By 2005, the amount of new sub-prime mortgage loans that were originated grew to over $620 billion.

73.     During the 1990s, a new category of mortgage loans emerged.  These loans, which became very popular between 2004 through 2006, offered more lenient lending standards than "prime" loans, but were considered less risky than "sub-prime" loans.  This loan category, which consisted primarily of Alt-A loans, was originally designed for self-employed borrowers who had high FICO scores and were able to document assets, but could not easily document their income.  The Alt-A loans enabled these borrowers to be approved for a mortgage without extensive supporting documentation of their financial history or income.

74.     While Alt-A loans generally have hard to define characteristics, their most distinctive attribute is that borrowers are not required to provide supporting documentation with their applications.  For example, a borrower typically does not provide complete documentation of his assets or the amount or source of his income.  Other characteristics of Alt-A loans include: (i) loan to value ratio in excess of 80%, but that lacks primary mortgage insurance; (ii) a borrower who is a temporary resident alien; (iii) the loan is secured by non-owner occupied property; or (iv) a debt-to-income ratio above normal limits.  MBS that are backed by Alt-A loans are appealing because Alt-A loans are perceived to offer temporary protection from prepayment risk, which is the risk that borrowers will pay off their loans immediately.  Mortgage loan securitizations were traditionally valued using prepayment speeds as an important component.  Alt-A loan borrowers show greater resistance to prepayments during the first nine to twelve months following their origination.  Prime borrowers, by contrast, tend to be very sensitive to changing interest rates and they refinance or prepay their mortgage loans on a continual basis as interest rates decline.

75.     The market for Alt-A loans has increased faster than that of sub-prime.  A record $400 billion of Alt-A loans were originated in 2006 and accounted for 13.4% of all mortgages offered last year, up from 2.1% in 2003.  However, the delinquency rate for Alt-A loans also increased.  After 18 months, Alt-A loans that were originated in 2006 had a delinquency rate of 4.71%, versus 1.97% for such loans from 2005 and 1.07% for 2004.  The trend for 2007 loans was even worse than 2006.

76.     Additionally, over the past several years, the quality of the borrowers of Alt-A-type mortgage loans has weakened.  During this time, Alt-A-type loans were extended to borrowers who should otherwise have qualified for: (i) sub-prime loans; (ii) much smaller dollar value loans at lower LTVs; or (iii) no mortgage loans at all.  These lower quality Alt-A-type loans were either Alt-B loans, sub-prime loans, or loans for completely unqualified borrowers and included increased risk such as a high LTV ratio and the lack of supporting financial documentation.  Essentially, these Alt-B loans are sub-prime loans in disguise and should not have been securitized without sufficient disclosures as to the true quality of the loans.  However, certain of these Alt-B mortgage loans were securitized and improperly presented as being the higher-quality Alt-A loans.

77.     Citigroup Mortgage is engaged in mortgage lending and other real estate finance-related businesses, including mortgage loan banking, mortgage loan warehouse lending, and insurance underwriting.  Citigroup Mortgage was set up to acquire mortgage loan pools that were transferred to the Trusts, from which the Certificates of various classes were sold to investors pursuant to the Registration Statement and Prospectus Supplements.   While these offering documents contained data about the mortgage loans, some of the most important information for plaintiffs and the other members of the Class, which was omitted from the Registration Statement and Prospectus Supplements, involved the underwriting, quality control, due diligence, approval and

- 22 -

funding practices and policies for the mortgage loans and the likelihood and ability of borrowers to repay the mortgage loans according to the terms of the mortgage note and the mortgage or the deed of trust. This depended on several factors, including creditworthiness of borrowers, debt-to-income levels, LTV ratios, assets of the borrower, occupancy of the property securing the mortgage loan, and the accuracy of other data collected during the origination of the mortgage loans.

### THE FALSE AND MISLEADING OFFERING DOCUMENTS

78.     Defendants caused the Offering Documents to be filed with the SEC in connection with the issuance of the Certificates. Various statements in the Offering Documents were false and misleading. The December 12, 2006 Registration Statement represented that:

> This Registration Statement consists of (i) a basic prospectus for use in a residential or multifamily transaction and (ii) two forms of prospectus supplement (one form to be used in offering a Series of Senior/Subordinate Certificates and the second form to be used in offering Mortgage-Backed Notes). Each basic prospectus used (in either preliminary or final form) will be accompanied by the applicable prospectus supplement.

79.     Citigroup Mortgage caused the Registration Statement, dated December 12, 2006, to be filed with the SEC. The Registration Statement discussed the mortgage loans contained in the mortgage pools held by the Trusts. The Registration Statement also incorporated by reference the subsequently filed Prospectus Supplements.

80.     The Offering Documents emphasized the underwriting standards utilized to generate the underlying mortgage loans purchased by Citigroup and eventually transferred to the Trusts, but omitted material facts related thereto. The Registration Statement, for example, stated that each originator of mortgage loans would be "***experienced in originating . . . mortgage loans in accordance with accepted practices and prudent guidelines***." This was false and misleading.

**The Offering Documents Misrepresented and Omitted Material Facts Regarding the Underwriting Standards Citigroup Mortgage and the Loan Originators Applied**

81.     The Registration Statement also represented that with respect to each mortgage loan, underwriting standards were applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. The Registration Statement further stated that in many cases an employment verification was obtained from an independent source.  The verification purportedly confirmed, among other things, the length of employment with an organization, the borrower's actual salary and whether it is expected that the borrower would continue employment in the future.  Where a prospective borrower was self-employed, the Registration Statement/Prospectus Supplements stated that the borrower was required to submit other verification materials.

82.     The Prospectus for Citigroup Mortgage Loan Trust 2007-WFHE2 further stated as follows:

> *The originator's underwriting standards are intended to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan and consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property*.  The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae or Freddie Mac credit guidelines.  The originator's underwriting standards do not prohibit a mortgagor from obtaining, at the time of origination of the originator's first lien, additional financing which is subordinate to that first lien, which subordinate financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originator's loan-to-value ratio determination for the originator's first lien.  [Emphasis added.]

83.     Further,

> *The underwriting guidelines used by Wells Fargo Bank are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral*. A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant with particular emphasis on the applicant's financial health (assets, liabilities, income

- 24 -

and expenses), the property being financed and the type of loan desired. A self-employed applicant may be required to submit his or her most recent signed federal income tax returns. With respect to every applicant, credit reports are obtained from commercial reporting services, summarizing the applicant's credit history with merchants and lenders. Under certain circumstances, significant unfavorable credit information reported by the applicant or a credit reporting agency must be explained by the applicant and is taken into account in the credit decision.  [Emphasis added.]

84.     Although some of the loans in the 2007-WFHE2 trust were originally made by and underwritten by "Correspondent" lenders, the Prospectus stated that all Correspondent lenders must, among other things, "evaluate each loan offered to Wells Fargo Bank for consistency with Wells Fargo Bank's underwriting guidelines and represent that each loan was underwritten in accordance with Wells Fargo Bank standards," and "utilize the services of qualified appraisers."

85.     The Prospectus for Citigroup Mortgage Loan Trust 2007 AR5 stated as follows:

***Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral***. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including, among others, the amount of the loan, the ratio of the loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain Mortgage Loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process.  [Emphasis added.]

86.     In regard to "stated income" loans, the Prospectus Supplement stated:

The borrower's income as stated must be reasonable for the borrower's occupation as determined at the discretion of the loan underwriter.

87.     Contrary to these representations, the originators of the mortgages transferred to the Trusts were not originating loans in accordance with prudent guidelines and were not reviewing loan applications in order to determine whether borrowers had sufficient income to meet their monthly

- 25 -

mortgage obligations.  Rather, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the underwriters' underwriting standards, including directing applicants to no-documentation ("no-doc") loan programs when their income was insufficient to qualify for full documentation loan programs;

- Steering borrowers to loans that exceeded their borrowing capacity;

- Encouraging borrowers to borrow more than they could afford by suggesting No Income No Assets ("NINA") and Stated Income Stated Assets ("SISA") loans when they could not qualify for full documentation loans based on their actual incomes;

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the loan rate adjusted; and

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the underwriters' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

88.    The entities originating loans were not required to produce products that met any standards.  Citigroup underwriters, evaluating pools of loans that Citigroup Mortgage would buy, were under pressure to accept all loans, and the underwriting guidelines were set low enough so that "anything" would pass even when a common sense reading of the borrower's circumstances revealed that there was no way the borrower could successfully repay the loan.  Citigroup management repeatedly told underwriters to "look at it again," and to accept virtually any loan.

89.    The due diligence mortgage underwriting department that underwrote the loans transferred to Citigroup Mortgage evaluated and selected pools of loans to be bought from various originators and pooled to back the certificates Citigroup Global would sell to investors.

90.    According to a former Citigroup senior underwriter in 2006-2007, due diligence underwriting involved reviewing and determining the validity of "closed" mortgage loans.  Closed loans are those that already had been underwritten, accepted and funded by the originators or initial

521318_1

lenders, who offered them in pools for sale to Citigroup Mortgage.  According to this former senior underwriter, Citigroup Mortgage's underwriting standards were "too loose" in that they allowed for very aggressive lending practices.  The loan pools varied in size, with the larger pools containing thousands of loans.  The loans were non-prime and included both Alt-A and sub-prime loans.  Many of the companies from which the loans were purchased began going out of business in the latter half of 2007 when the sub-prime residential mortgage loan market began to implode.

91.     According to this former senior underwriter, Citigroup Mortgage's underwriting standards were "too easy-going," as they allowed for very aggressive lending practices.  Citigroup Mortgage continued to loosen their standards by changing their guidelines so frequently that due diligence underwriters received new guidelines by email, "nearly every other day."  Underwriters conducting the underwriting for Citigroup Mortgage knew the borrowers could not afford the loans, but the guidelines allowed approval of the loans, so they were approved nonetheless.  Even though the loan might fit the guidelines, common sense revealed it would not work.  At the end of the day, the underwriter was expected to validate the loans being offered and find them acceptable as Citigroup Mortgage purchases.  According to this former senior underwriter team leaders would tell due diligence underwriters to look at problematic loans again meaning they should "find a way to accept it."

92.     Citigroup Mortgage shifted toward purchasing loans resulting from progressively more aggressive lending during 2005 and 2006, and ultimately "conventional lending ideas went out the window."  In 2005, underwriting guidelines began to become very loose, as the loan programs shed the usual restraints that would help control their riskiness.  The loosened requirements included the combination of less stringent guidelines for the use of adjustable rate mortgages ("ARMs"), FICO scores, documentation of income and indebtedness, and higher LTV ceilings.  In April 2006,

- 27 -

the guidelines were further loosened with respect to each of the aforementioned guideline items that served as loan qualification requirements, as Citigroup Mortgage faced increasing competition. According to this former senior underwriter, in effect, "almost anything would pass" the underwriting standards that served as the due diligence guidelines underwriters followed.

93.     Citigroup Mortgage accepted very risky loans by purchasing loans that combined ARMs, stated income (meaning no documentation of income required) and so-called "piggyback loans," which meant that a first lien was given for 80% of the property value, and a second mortgage was given for the remaining 20%, so that the borrower had a 100% loan to value ratio and made no down payment.  That meant that the borrowers had no equity at stake to incentivize them to pay on the loan when the monthly payment rose or the property value fell.  Citigroup Mortgage was very aggressive, driven by competition, and took huge risks by combining a number of very liberal loan requirements.   In other words, Citigroup Mortgage did what was necessary to compete for the opportunity to buy and resell these loans.

94.     Citigroup Mortgage's internal policy of affirmatively turning a blind eye to defective mortgages was confirmed on April 9, 2010, when Richard M. Bowen III, CitiFinancial Mortgage's Business Chief Underwriter for Correspondent Lending in the Consumer Lending Group, testified in front of the FCIC in Washington, D.C.

95.     CitiMortgage was the master servicer and trust administrator pursuant the pooling and servicing agreement for the CMLT 2007-AR5 Trust.

96.     Along with oral testimony, Mr. Bowen supplied detailed written testimony and a document detailing the internal affirmative avoidance of the Company's internal control process throughout 2006 and 2007.  Bowen testified that since at least June 2006, he had warned his superiors a number of times about the breakdowns in processes and internal controls internally at the

- 28 -

Company, but his warnings were ignored.  Bowen stated that Citigroup employees *knew that the loans they were buying to put into its mortgage backed securities did not meet the Company's standards, but the loans were purchased and securitized anyway*.

97.    As Bowen wrote in his testimony:

> During 2006 and 2007 I witnessed many changes to the way the credit risk was being evaluated for these pools during the purchase processes.  These changes included the Wall Street Chief Risk Officer's reversing of large numbers of underwriting decisions on mortgage loans from "turn down" to "approved."  And variances from accepted Citi credit policy were made.  Subprime mortgage pools, many over $300 million, were purchased even though the minimum credit-policy-required-criteria was not met.

98.    Bowen's testimony discusses how in 2006 the Company expected large growth in the "subprime mortgage business" in 2007, and how executives made clear that all employees in the Company's Real Estate Lending ("REL") group were pressured to constantly expand their business and market share.  According to Bowen, the REL is a group inside the larger "Consumer Lending Group" ("CLG").  In response to this pressure, employees made wholesale deviations from internal policy.

99.    For example, as Bowen noted, under usual practice, in reviewing a large pool of loans originated outside the Company, the "Wall Street Senior Risk Officer" would identify a sample of loans to examine (*i.e.*, "underwrite").  Before purchasing the pool, "[i]t was required that there was a 95% statistical confidence level that the loans in the sample represented the loans in the unsampled portion of the pool."  Then,

> The underwriters then underwrote all of the loans identified in the sample, and approved only those loans meeting Citi policy guidelines.  It was standard procedure that those mortgages not meeting Citi guidelines were turned down and never purchased.

> Citi policy dictated that sub-prime pools could only be purchased if a minimum of 90% of the loans in the sample were approved by the underwriters using Citi policy guidelines for subprime mortgages.

- 29 -

If the minimum approval rate (also called "execution rate") was not met, it was standard practice to "expand the sample" and underwrite an additional sample to determine if the larger sample approval rate met the minimum. In a worst case situation, where we could not meet the minimum approval rate, the sample was expanded to 100% due diligence. In this situation all of the mortgages in the pool were underwritten. And in this instance only those loans approved by the underwriters would be purchased.

100.    According to Bowen, in the third quarter of 2006, however, the "the Wall Street Chief Risk Officer started changing many of the underwriting decisions from 'turn down' to 'approve.' This was done either personally or by direction to the underwriters. This artificially increased the approval rate on the sample. This higher approval rate was then used as justification to purchase these pools."

101.    Further, the Risk Officers "also started approving subprime pools for purchase with low approval rates, without an expanded sample." According to Bowen, for one pool, when he objected to the purchase of one large pool of loans he considered to be too risky and was promised that his objections would be considered, he left for vacation only to have see pool purchase finalized before he returned.

102.    Bowen also detailed how in response to complaints from companies that originated loans using lower standards than Citigroup Mortgage that the Company lowered its own standards to match the new, lower ones rather than lose the loans to competition that "was not as restrictive." Further, Bowen wrote about how employees knew that the use of outside, hired "contract" underwriting companies would further undermine the quality of the underwriting review work, and that the "Chief Underwriter was concerned about the quality of decisions made by their contract underwriters," but that due to the high volume of deals, and hiring freezes at the Company, Citigroup could not use the preferred, experienced internal underwriters.

103.    In the end, after being repeatedly ignored by his supervisors, on November 3, 2007 (almost eight months after the securities at issue here were sold to investors), Bowen sent an email to top Citigroup executives, summarizing the internal disaster that had developed because of the Company's rush to gain market share in securitizations.

104.    The email went to:

- Robert E. Rubin, who was just becoming Citigroup Inc.'s CEO;

- Gary Crittenden, Citigroup Inc.'s CFO;

- David C. Bushnell, Citigroup Inc.'s Chief Risk Officer; and

- Bonnie Howard, Citigroup Inc.'s Chief Auditor.

105.    The two-page email summarized many of the issues above.  Further, as Bowen wrote in the email:

> Since mid-2006, I have continually identified these breakdowns in processes and internal controls.  The REL Chief Underwriter (my 2006 manager) and I have widely communicated these breakdowns, with possible ramifications, in weekly reports, emails, and discussions (which included the CLG Chief Risk Officer).  There also have been two special investigations by CLG Business Risk and Control (the first initiated by me), with the findings confirming these breakdowns.

> However, to my knowledge, these breakdowns have not been communicated to or recognized by either Audit or Finance.

> I have been agonizing for some time over these issues, and in all good conscience feel I must now communicate these concerns outside of the Consumer Lending Group.  I sincerely regret the delay.

106.    Bowen told the Citigroup executives that "[d]uring 2006-7 there were pools of mortgage loans aggregating $10 billion which were purchased from large mortgage companies with significant number of files identified as 'exceptions' (higher risk and substantially outside of [Citigroup's] credit policy criteria).  These exceptions were approved by the Wall Street Channel Chief Risk Officer, many times over underwriting objections and with the files having been turned down by underwriting."

- 31 -

107. He further stated that "[t]he purchase decisions on many of these pools were approved even though the execution rates and other criteria established by the CLG Bulk Acquisition Policy were not met."

108. Further, "[b]ecause of the initial high losses associated with many of these pools, CLG [Business Risk and Control] investigated and reviewed correspondence which documented the underwriting objections to purchasing identified pools."

109. In the end, Bowen testified he did not know whether any action was taken with respect to people who were involved in the underwriting process after he sent his email.

110. Because of the free-for-all standards at Citigroup Mortgage, the originators of loans transferred to the Trusts and the originators' agents, such as mortgage brokers, had become so aggressive in approving and funding the mortgage loans that many of the mortgage loans were made to borrowers who had either not submitted or had altered the required documentation. Moreover, in many instances the income/employment verifications that were purportedly completed by the originators were insufficient because the clerical staff at the lenders typically did not have proper verification skills, the mortgage brokers or their agents often completed verifications that were suspect, and oftentimes verifications were provided by inappropriate contacts at the borrower's place of employment (*e.g.*, a friend of the borrower would complete the verification instead of human resources). Unbeknownst to investors, these factors had the effect of dramatically increasing the risk profile of the Certificates.

111. Similarly, those borrowers who were actually required to submit stated income applications would include income levels which were routinely inflated to extreme levels, relative to the stated job titles, in order to get the mortgage loans approved and funded. Inflation of stated income was so rampant that a study cited by Mortgage Asset Research Institute found that almost all

- 32 -

stated-income loans exaggerated the borrower's actual income by 5 percent or more, ***and more than half increased the amount by more than 50%***.

112.    The originators' lack of underwriting controls essentially encouraged this type of income inflation.  For instance, many stated income borrowers were actually wage earners who could have supplied W-2s or other income-verifying documentation, but did not.  Numerous mortgages transferred to the trusts were issued without requiring the borrowers to execute a Form 4506, which would have allowed the lender to access the borrower's tax returns from the Internal Revenue Service ("IRS"), out of fear that they would then learn of information that was inconsistent with the income level that the borrower reported on his or her loan application.

113.    Further, the originators were not limiting their grant of reduced documentation loans to instances where borrowers could demonstrate ***acceptable compensating factors***.  Instead, the originators were granting "reduced documentation" and "no-doc" loans to borrowers with high loan to value ratios, low credit scores, and stated income that was not reasonable given the borrower's stated job title.

114.    Wells Fargo went as far as firing one senior underwriter for choosing not to compromise his underwriting standards when he was pressured to do so.  Wells Fargo's mortgage underwriting was a "production based shop," meaning that underwriters had to make the numbers, regardless of risk, and were expected to "find a way" to deem the loans as acceptable, when in fact they did not meet the required standards.  As a result of its poor underwriting, Wells Fargo sold sub-par loans to Citigroup Mortgage that should never have been made in the first instance.  All that was required for acceptance by Wells Fargo was some evidence of a credit score high enough to qualify for the loan product, and the other qualifications were either ignored, or "made to fit."

- 33 -

115.    Loan applications were originated by a stable of residential mortgage loan brokers affiliated with Wells Fargo's wholesale mortgage loan broker channel, and these brokers submitted the loan application packages from prospective borrowers to Wells Fargo's account executives.

116.    As a result of its lax underwriting, Wells Fargo's Alt-A Division underwrote loans that overwhelmingly were sub-prime loans or sub-par loans, or loans that should not ever have been made to the people to whom they were given.  One Senior Underwriter was terminated from his job for bringing to the attention of superiors that these loans were being made to people who could not repay them.

117.    In late 2005/early 2006, the Controller of the Currency conducted an audit or examination of the Wells Fargo Des Moines, IA facility, and one of the managers told the underwriting group not to mention to the examiners the fact that they were underwriting sub-prime loans in the Alt-A division.

118.    Wells Fargo's Alt-A group was a "production based shop" where people had to make the numbers regardless of risk.  There were about 40 underwriters in this group, and generally speaking, each was expected to underwrite eight to ten loans per day.  The primary objective of this group was to increase sales and meet sales targets which meant that underwriters could not underwrite to quality loan standards, but were expected to "find a way" to deem the loans as acceptable when in fact they did not meet the required standards.

119.    The resulting loans were sub-par because all that was required was some evidence of a credit score high enough to qualify for the loan product, and other qualifications were either ignored, or "made to fit."  In some cases even the credit scores were problematic because sometimes they were wholly fictitious, and generally the underwriting guidelines did not include performing a thorough examination of whether the credit score matched the borrower's profile in terms of such

- 34 -

indicators as age, time on the job, time in the neighborhood, savings history, and other factors. Some loan products required a certain number of "trade lines," meaning the borrower had to have a certain number of credit-related transactions from which to confirm a record of good credit. However, if a prospective borrower did not have enough trade lines, then "alternative measures" of credit were accepted, and this meant that almost any credit history would qualify.

120.     The group underwrote Alt-A loans and a wide variety of sub-prime loans, including a variety of loan products that did not require the borrower to provide documentation of basic information relevant to the risk that the borrower would not be able to repay the loan.  The loan products were known by a variety of names such as "no-doc," or stated income (without verification), light documentation, no income verification, and NINA verification.  The products also included a variety of ARMs and low payment loans, such as interest-only for a certain period of time, with payment escalation afterwards.

121.     During 2006 and into 2007, the number of loans being underwritten and funded began to decline.  To sustain revenues, the Des Moines group was required to increase production, and as a result the underwriting standards were stretched, or more accurately, simply "ignored."  The process practiced in this group was as follows, according to a former employee: Get a file, look at the credit score, and if the credit score is okay, then find any scrap of information concerning income and take it at face value without any investigation, and ignore all negative information on the grounds that it "has no bearing on the file."  One Senior underwriter was terminated for bringing to his managers' attention what he believed was an obviously fraudulent loan application that he would not sign off on as the assigned underwriter.

122.     Wells Fargo's departure from its underwriting standards was also highlighted in a lawsuit styled *Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A. et al.*, 08-cv-062-

- 35 -

JFM (D. Md. 2008), that alleged Wells Fargo extended loans without regard to "the borrower's ability to repay." This case is currently pending. Also, contrary to the representations in the Prospectus Supplement, Wells Fargo did not, for its "stated income" loans, ensure that "The borrower's income as stated must be reasonable for the borrower's occupation as determined in the discretion of the loan underwriter." Rather, as alleged in a lawsuit styled *Wells Fargo Bank, N.A. v. Quicken Loans Inc.*, 2:08-cv-12408-SJM-SDP (E.D. Mich. 2008), Wells Fargo expected that their borrowers would overstate their income on "stated income" loan applications and that these borrowers would not have the ability to make their monthly mortgage loan payments. In fact, contrary to the representations in the Prospectus Supplement, Wells Fargo viewed verification of its borrowers' income as unnecessary given the then appreciating value of homes.

123.    Wells Fargo acknowledged its poor underwriting practices in its 2007 Annual Report. In a section entitled "Credit Quality: What We Did Wrong" Wells Fargo noted:

> We made some mistakes . . . . Too many of our home equity loans had "loan-to-value" ratios that were too high . . . . Sometimes we did not require full documentation for these home equity loans we purchased from brokers because these were prime borrowers who had high credit scores with lower expected risk of default . . . . We should not have offered such lenient loan terms . . . , and we made the mistake of taking on too much risk. ***We should have known better***. [Emphasis added.]

124.    The Prospectus Supplement dated March 29, 2007 for Series 2007-AR5 further represented that:

> With respect to all mortgage loans underwritten by Wells Fargo Bank, Wells Fargo Bank's underwriting of a mortgage loan may be based on data obtained by parties other than Wells Fargo Bank that are involved at various stages in the mortgage origination or acquisition process. This typically occurs under circumstances in which loans are subject to an alternative approval process, as when Correspondents, certain mortgage brokers or similar entities that have been approved by Wells Fargo Bank to process loans on its behalf, or independent contractors hired by Wells Fargo Bank to perform underwriting services on its behalf ("contract underwriters") make initial determinations as to the consistency of loans with Wells Fargo Bank underwriting guidelines. Wells Fargo Bank may also permit these third

- 36 -

parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank may also permit these third parties to utilize scoring systems in connection with their underwriting process. The underwriting of mortgage loans acquired by Wells Fargo Bank pursuant to a Delegated Underwriting arrangement with a Correspondent is not reviewed prior to acquisition of the mortgage loan by Wells Fargo Bank although the mortgage loan file is reviewed by Wells Fargo Bank to confirm that certain documents are included in the file. In addition, in order to be eligible to sell mortgage loans to Wells Fargo Bank pursuant to a Delegated Underwriting arrangement, the originator must meet certain requirements including, among other things, certain quality, operational and financial guidelines.

125.     An action alleging similar activities by Wells Fargo with regard to their loan underwriting practices, styled as *In re Wells Fargo Mortgage Backed Certificates Litig.*, No. C 09-01376 SI, has been filed in the Federal District Court Northern District of California. On April 22, 2010, Hon. Susan Illston of the Northern District of California denied defendants' motion to dismiss the claims, which, as here, were brought under the 1933 Act. The Complaint alleges a company-wide series of practices at Wells Fargo, which, as here, were not disclosed in the issuance of mortgage-backed securities.

126.     As the Court found there,

Plaintiffs allege that the Offering Documents contained numerous false and misleading statements and omissions. First, plaintiffs state that the documents misstated Wells Fargo's underwriting process and loan standards. According to plaintiffs, Wells Fargo often extended loans to borrowers who did not meet its creditworthiness standards, resulting in a low-quality mortgage pool. *Id.* at ¶¶70, 76. Plaintiffs cite statements by several confidential witnesses ("CWs") who assert that Wells Fargo placed "intense pressure" on its loan officers to close loans, including by coaching borrowers to provide qualifying income information, accepting blatantly implausible or falsified income information, and lowering its standards near the end of the calendar year. *Id.* ¶¶83-88. Plaintiffs allege that the third-party loan originators disregarded Wells Fargo's stated underwriting standards "in order to approve as many mortgages as possible." *Id.* ¶94.

*         *         *

One of plaintiff's CWs states that approximately 70% of the loans he signed off on while working as a Wells Fargo underwriter involved mortgages worth more than 95% of the home's value. *Id.* ¶108.

- 37 -

*　　*　　*

Plaintiffs allege, in other words, that the true loan-to-value ratio frequently exceeded 100% because the homes were actually worth far less than their stated appraisal value. *Id.* ¶100.

Plaintiffs again support their allegations primarily with statements from confidential witnesses. *Id.* ¶103 ("CW 2 confirmed that, at Wells Fargo Home Mortgage, representatives constantly pushed the appraisers they worked with to inflate the value of the real estate underlying the mortgage loans"); ¶107 ("CW 1 remarked that 'appraisals were very inflated,' and observed that the retail officers 'always managed to get the value they wanted'"); ¶108 (CW 7, a former Senior Underwriter with Wells Fargo Home Mortgage, "estimated that 70% of the loans CW7 worked with had an LTV over 95%"). Plaintiffs additionally cite to a 2007 survey which "found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through," and to congressional testimony in which Alan Hummel, Chair of the Appraisal Institute, stated that loan appraisers had "experience[d] systemic problems of coercion." *Id.* ¶¶104-05. Plaintiffs' allegations concerning the allegedly improper appraisal practices are sufficiently specific to state a claim with respect to the securities at issue in this case. In particular, plaintiffs have alleged that Wells Fargo's practices permitted the pervasive and systematic use of inflated appraisals, affecting all types of mortgages. . . .

**The Registration Statement/Prospectus Supplements Misrepresented and Omitted Material Facts Regarding the Appraisals Conducted by or for the Loan Originators**

127.    The Registration Statement and Prospectus Supplements also represented that in determining the adequacy of the property to be used as collateral, the originators would obtain an appraisal for each property considered for financing. In instances where appraisals were conducted, the appraisers were purportedly required to inspect the property to verify that it was in good repair and that, if new, construction had been completed. The Registration Statement asserted that appraisals were purportedly based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the home, and adhered to established appraisal guidelines.

128.    The 2007-WFHE2 Prospectus (all of which was originated through Wells Fargo) stated as follows with regard to appraisals:

- 38 -

Wells Fargo Bank's underwriting of every mortgage loan submitted consists of not only a credit review, but also a separate appraisal conducted by (i) a third-party appraiser, (ii) an appraiser approved by RELS, an entity jointly owned by an affiliate of Wells Fargo Bank and an unaffiliated third party, or (iii) RELS itself. ***Appraisals generally conform to current Fannie Mae and Freddie Mac secondary market requirements for residential property appraisals***. All appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the mortgage loan amount or the identity of the appraiser. Certain loans require a third party review in the form of either a desk review or field review. At the discretion of Wells Fargo Bank, any mortgage loan is subject to further review in the form of a desk review, field review or additional full appraisal. [Emphasis added.]

129.   The 2007-AR5 Prospectus (again, all of which was originated through Wells Fargo) stated as follows with regard to appraisals:

Wells Fargo Bank's underwriting of every Mortgage Loan submitted (as to which underwriting authority has not been delegated) consists of a credit review. In addition, Wells Fargo Bank's underwriting of every Mortgage Loan submitted consists of a separate appraisal conducted by (i) a third-party appraiser, (ii) an appraiser approved by RELS, or (iii) RELS itself. ***Appraisals generally conform to current Fannie Mae and Freddie Mac secondary market requirements for residential property appraisals***. All appraisals are subject to an internal appraisal review by the loan underwriter irrespective of the loan-to-value ratio, the amount of the Mortgage Loan or the identity of the appraiser. Certain loans require a third-party review in the form of either a desk review or field review. At the discretion of Wells Fargo Bank, each Mortgage Loan is subject to further review in the form of a desk review, field review or additional full appraisal. [Emphasis added.]

130.   Independent and accurate real-estate appraisals are essential to the entire mortgage lending and securitization process, providing borrowers, lenders, and investors in MBS with supposedly independent and accurate assessments of the value of the mortgaged properties. Accurate appraisals ensure that a mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in MBS in the event a borrower defaults on a loan. Accurate appraisals also provide investors with a basis for assessing the price and risk of MBS.

- 39 -

131.    An accurate appraisal is also critical in determining the LTV ratio, which is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of MBS.  The LTV ratio is a mathematical calculation that expresses the amount of a mortgage as a percentage of the total appraised value of the property.  For example, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000, or 90%.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

132.    A high LTV ratio is riskier because a borrower with a small equity position in a property has less to lose if he, or she defaults on the loan.  Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

133.    The Fannie Mae and Freddie Mac secondary market appraisal requirements, as discussed in the Prospectuses, required that appraisers comply with the USPAP.  To ensure the accuracy of appraisals, the USPAP imposes certain requirements on appraisers.  With respect to real estate appraisals, the USPAP provide:

(a)    An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests;

(b)    In appraisal practice, an appraiser must not perform as an advocate for any party or issue;

(c)    An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions; and

(d)    It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

- 40 -

(i)      The reporting of a predetermined result (*e.g.*, opinion of value);

(ii)     A direction in assignment results that favors the cause of the client;

(iii)    The amount of a value opinion;

(iv)    The attainment of a stipulated result; or

(v)     The occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

134.    Wells Fargo and RELS Valuation, an appraisal entity jointly owned by an affiliate of Wells Fargo, are the subject of investigation and litigation over the illegal practice of pressuring and intimidating appraisers into using techniques that produce appraisals meeting Wells Fargo's objectives even when the use of such techniques is improper and violates industry standards.  *See Sound Appraisal and Savage Appraisal Services, Inc. v. Wells Fargo Bank, N.A.*, 09-CV-01630 CW (N.D. Cal. 2009).

135.    As alleged in the Amended Complaint in that action:

As part of its corporate objective to abandon underwriting standards in order to maximize market share and profits, Wells Fargo and Rels Valuation have together engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that produce appraisals that meet Wells Fargo's business objectives even if the use of such appraisal techniques is improper and in violation of industry and regulatory standards.  If appraisers fail to "play ball" as Wells Fargo demands, Wells Fargo, through Rels Valuation, removes the appraiser from the list of approved appraisers, which essentially "blacklists" the appraiser.  Once an appraiser is blacklisted, Wells Fargo and Rels Valuation will no longer request appraisals or accept appraisals from these persons and companies.

136.    The representations regarding appraisals also were materially false and misleading in that they omitted to state that the appraisals were inaccurate due to: (i) a complete lack of controls at Wells Fargo and Citigroup Mortgage; and (ii) contrary to USPAP, the appraisers were not independent from the brokers such that the lenders and/or their agents, such as mortgage brokers,

- 41 -

exerted pressure on appraisers to come back with pre-determined, preconceived, inflated and false appraisal values.

137.   For instance, in retail or in-house mortgage loan originations, many lenders allowed the sales personnel or account executives to order and control the appraisals.  These sales personnel were typically on a commission-only pay structure and were therefore motivated to close as many loans as possible.  These sales personnel and account executives would secretly pressure appraisers to appraise properties at artificially high levels or they would not be hired again, resulting in appraisals being done on a "drive-by" basis where appraisers issued their appraisals without reasonable bases for doing so.

138.   This lack of independence was noted by Alan Hummel, Chair of the Appraisal Institute, in his testimony before the Senate Committee on Banking.  Hummel noted this dynamic created a "terrible conflict of interest" where appraisers "experience systemic problems of coercion" and were "ordered to doctor their reports" or else they would never "see work from these parties again" and were "placed on exclusionary or 'do-not-use' lists."  Too often, this pressure succeeded in generating artificially high appraisals and appraisals being done on a "drive-by" basis where appraisers issued their appraisal without reasonable bases for doing so.

139.   A 2007 survey of 1,200 appraisers conducted by October Research Corp. – a firm in Richfield, Ohio, who publishes Valuation Review – found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  This figure was nearly double the findings of a similar study conducted just three years earlier.  The 2007 study also "found that 75% of appraisers reported 'negative ramifications' if they did not cooperate, alter their appraisal, and provide a higher valuation."  Adding to these problems was the fact that, lenders, for originations completed by mortgage brokers, generally lacked

- 42 -

***knowledge of the accuracy of the appraisals*** since they were typically located far from the actual property and knew very little about the general area where the property was located.

140.     As a result of this conduct, loans were frequently based on inflated appraisals stating that the home securing the loan was worth more than it really was.  For example, Wells Fargo provided $599,800 in financing – ***$130,800 more than the asking price for a home***.  Based on the recorded price of nearly $600,000, the property had a LTV ratio of approximately 100% ($599,800/$600,000).  However, taking into account the true price of the home, ***the true LTV ratio was approximately 128%***.  As a result of this conduct, there was rampant inflation of the appraised value of homes underlying loans which were transferred to the Trusts at issue.

141.     A review of property information from 46 loans backing the CMLT, Series 2007-AR5 Trust, including the automated valuation of the attendant properties, reveals that 17 of those loans (or 37%) overvalued the property by 9% or more, compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

142.     A review of property information from 55 loans backing the CMLT, Series 2007-WFHE2 Trust, including the automated valuation of the attendant properties, reveals that 22 of those loans (or 40%) overvalued the property by 9% or more, compared to the true value of the property at the time of origination.  This overvaluation resulted in an understated LTV ratio for each of these 17 loans.

143.     Numerous appraisers have confirmed that the inflation of appraisals was common place.  For example, the owner of a small Midwest residential real estate appraisal firm in Illinois – who was approved and/or utilized by Wells Fargo, and other companies, in approximately 200 transactions – stated that mortgage brokers would call him and say "I need this number."  This

- 43 -

appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

144.    A real estate appraiser in Las Vegas stated that when "the Vegas market had peaked, Countrywide and Wells Fargo were requiring appraisers to come up with real estate appraisals reflecting escalating values or they would black ball them."  This appraiser conducted over 300 appraisals that, in his opinion, were inflated for Wells Fargo and other originators.  According to this appraiser, typically the appraisals demanded by these lenders were 15% to 25% over the actual market.

145.    Another independent appraiser stated that Wells Fargo mortgage brokers demanded inflated numbers from him in Compton and Watts, California.  The lenders told him to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California.  According to this appraiser, "I did over 100 over-inflated appraisals just for Wells Fargo and Countrywide."  In some cases he was appraising houses that he described as "crack houses" that should have been bulldozed, for $100,000 more than they were worth.  The neighborhoods were so bad, sometimes he never even got out of his car.  He would simply drive by and take pictures of the house and give the broker or the lender the number they demanded.

**The Prospectus Supplements Misstated the True LTV**
**Ratios Associated with the Underlying Mortgages**

146.    The Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts.  In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.  The following charts appeared in the 2007-WFHE2 Prospectus:

- 44 -

**Combined Loan-to-Value Ratios of the Mortgage Loans**

| Combined Loan-To-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance | % of Aggregate Principal Balance | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Combined Loan-to-Value Ratio | Weighted Average Fully Combined Loan-to-Value Ratio | Weighted Average Effective Loan-to-Value Ratio | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|---|---|
| 10.87-15.00 | 6 | $ 351,365.06 | 0.03% | $ 58,560.84 | 9.394% | 12.91% | 17.97% | 12.91% | 603 |
| 15.01-20.00 | 38 | 1,725,805.34 | 0.17 | 45,415.93 | 10.409 | 19.28 | 71.51 | 19.28 | 617 |
| 20.01-25.00 | 11 | 866,710.66 | 0.09 | 78,791.88 | 8.980 | 23.63 | 23.63 | 23.63 | 588 |
| 25.01-30.00 | 23 | 1,790,686.74 | 0.18 | 77,855.95 | 9.342 | 27.66 | 27.66 | 27.66 | 559 |
| 30.01-35.00 | 29 | 3,986,720.39 | 0.40 | 137,473.12 | 8.055 | 32.96 | 33.79 | 32.96 | 616 |
| 35.01-40.00 | 37 | 3,761,545.17 | 0.37 | 101,663.38 | 8.490 | 37.43 | 38.05 | 37.43 | 579 |
| 40.01-45.00 | 43 | 4,863,877.71 | 0.48 | 113,113.44 | 8.315 | 42.39 | 43.60 | 42.39 | 602 |
| 45.01-50.00 | 53 | 7,089,114.58 | 0.71 | 133,756.88 | 8.055 | 47.50 | 47.50 | 47.50 | 603 |
| 50.01-55.00 | 70 | 13,141,354.79 | 1.31 | 187,733.64 | 8.072 | 52.73 | 54.52 | 52.73 | 594 |
| 55.01-60.00 | 94 | 14,451,730.54 | 1.44 | 153,741.81 | 8.251 | 57.75 | 57.98 | 57.75 | 592 |
| 60.01-65.00 | 126 | 21,163,776.80 | 2.11 | 167,966.48 | 7.990 | 62.93 | 62.93 | 62.93 | 588 |
| 65.01-70.00 | 244 | 43,964,516.30 | 4.37 | 180,182.44 | 8.078 | 68.68 | 69.95 | 68.68 | 603 |
| 70.01-75.00 | 292 | 51,363,068.71 | 5.11 | 175,900.92 | 8.221 | 73.87 | 75.14 | 73.87 | 598 |
| 75.01-80.00 | 1,577 | 275,587,631.86 | 27.41 | 174,754.36 | 7.880 | 79.70 | 91.97 | 79.70 | 617 |
| 80.01-85.00 | 613 | 98,727,098.15 | 9.82 | 161,055.63 | 8.778 | 84.40 | 84.70 | 83.64 | 599 |
| 85.01-90.00 | 771 | 142,276,478.89 | 14.15 | 184,534.99 | 8.571 | 89.60 | 89.73 | 86.98 | 623 |
| 90.01-95.00 | 1,119 | 161,716,970.73 | 16.09 | 144,519.19 | 9.205 | 94.80 | 94.82 | 89.30 | 619 |
| 95.01-100.00 | 1,572 | 158,517,725.45 | 15.77 | 100,838.25 | 9.794 | 99.94 | 99.94 | 90.54 | 639 |
| Total | 6,718 | $1,005,346,177.87 | 100.00% | $149,649.62 | 8.632% | 84.37% | 88.03% | 81.55% | 617 |

- 45 -

**Fully Combined Loan-to-Value Ratios of the Mortgage Loans[1]**

| Fully Combined Loan-To-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance | % of Aggregate Principal Balance | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Combined Loan-to-Value Ratio | Weighted Average Fully Combined Loan-to-Value Ratio | Weighted Average Effective Loan-to-Value Ratio | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|---|---|
| 10.87-15.00 | 5 | $ 329,138.90 | 0.03% | $ 65,827.78 | 9.338% | 12.76% | 12.76% | 12.76% | 604 |
| 15.01-20.00 | 9 | 591,035.30 | 0.06 | 65,670.59 | 8.314 | 18.11 | 18.11 | 18.11 | 595 |
| 20.01-25.00 | 11 | 866,710.66 | 0.09 | 78,791.88 | 8.980 | 23.63 | 23.63 | 23.63 | 588 |
| 25.01-30.00 | 23 | 1,790,686.74 | 0.18 | 77,855.95 | 9.342 | 27.66 | 27.66 | 27.66 | 559 |
| 30.01-35.00 | 28 | 3,845,817.43 | 0.38 | 137,350.62 | 8.061 | 32.95 | 32.95 | 32.95 | 614 |
| 35.01-40.00 | 36 | 3,596,819.15 | 0.36 | 99,911.64 | 8.561 | 37.39 | 37.39 | 37.39 | 580 |
| 40.01-45.00 | 42 | 4,763,877.71 | 0.47 | 113,425.66 | 8.337 | 42.42 | 42.42 | 42.42 | 601 |
| 45.01-50.00 | 53 | 7,089,114.58 | 0.71 | 133,756.88 | 8.055 | 47.50 | 47.50 | 47.50 | 603 |
| 50.01-55.00 | 69 | 12,288,555.00 | 1.22 | 178,095.00 | 8.077 | 52.58 | 52.77 | 52.58 | 594 |
| 55.01-60.00 | 93 | 14,414,630.14 | 1.43 | 154,996.02 | 8.244 | 57.51 | 57.74 | 57.51 | 593 |
| 60.01-65.00 | 126 | 21,163,776.80 | 2.11 | 167,966.48 | 7.990 | 62.93 | 62.93 | 62.93 | 588 |
| 65.01-70.00 | 233 | 41,054,162.21 | 4.08 | 176,198.12 | 8.133 | 68.63 | 68.63 | 68.63 | 601 |
| 70.01-75.00 | 272 | 48,364,830.26 | 4.81 | 177,811.88 | 8.240 | 73.77 | 73.87 | 73.77 | 596 |
| 75.01-80.00 | 606 | 103,713,751.01 | 10.32 | 171,144.80 | 8.356 | 78.98 | 79.21 | 78.98 | 598 |
| 80.01-85.00 | 594 | 95,214,854.46 | 9.47 | 160,294.37 | 8.745 | 84.26 | 84.37 | 83.47 | 599 |
| 85.01-90.00 | 782 | 146,858,304.45 | 14.61 | 187,798.34 | 8.553 | 89.08 | 89.57 | 86.57 | 623 |
| 90.01-95.00 | 1,184 | 173,514,452.52 | 17.26 | 146,549.37 | 9.113 | 93.77 | 94.79 | 88.62 | 620 |
| 95.01-100.00 | 2,552 | 325,885,660.55 | 32.42 | 127,698.14 | 8.687 | 89.52 | 99.92 | 84.94 | 634 |
| Total | 6,718 | $1,005,346,177.87 | 100.00% | $149,649.62 | 8.632% | 84.37% | 88.03% | 81.55% | 617 |

[1]   The Fully Combined Loan-to-Value Ratio is equal to the original balance of the loan plus any senior lien balance or known silent second lien balance (as applicable) divided by the property value as determined at origination.

- 46 -

**Effective Loan-to-Value Ratios of the Mortgage Loans[1]**

| Effective Loan-To-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance | % of Aggregate Principal Balance | Average Principal Balance | Weighted Average Mortgage Rate | Weighted Average Combined Loan-to-Value Ratio | Weighted Average Fully Combined Loan-to-Value Ratio | Weighted Average Effective Loan-to-Value Ratio | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|---|---|
| 10.87-15.00 | 6 | $ 351,365.06 | 0.03% | $ 58,560.84 | 9.394% | 12.91% | 17.97% | 12.91% | 603 |
| 15.01-20.00 | 38 | 1,725,805.34 | 0.17 | 45,415.93 | 10.409 | 19.28 | 71.51 | 19.28 | 617 |
| 20.01-25.00 | 11 | 866,710.66 | 0.09 | 78,791.88 | 8.980 | 23.63 | 23.63 | 23.63 | 588 |
| 25.01-30.00 | 23 | 1,790,686.74 | 0.18 | 77,855.95 | 9.342 | 27.66 | 27.66 | 27.66 | 559 |
| 30.01-35.00 | 29 | 3,986,720.39 | 0.40 | 137,473.12 | 8.055 | 32.96 | 33.79 | 32.96 | 616 |
| 35.01-40.00 | 37 | 3,761,545.17 | 0.37 | 101,663.38 | 8.490 | 37.43 | 38.05 | 37.43 | 579 |
| 40.01-45.00 | 43 | 4,863,877.71 | 0.48 | 113,113.44 | 8.315 | 42.39 | 43.60 | 42.39 | 602 |
| 45.01-50.00 | 53 | 7,089,114.58 | 0.71 | 133,756.88 | 8.055 | 47.50 | 47.50 | 47.50 | 603 |
| 50.01-55.00 | 70 | 13,141,354.79 | 1.31 | 187,733.64 | 8.072 | 52.73 | 54.52 | 52.73 | 594 |
| 55.01-60.00 | 94 | 14,451,730.54 | 1.44 | 153,741.81 | 8.251 | 57.75 | 57.98 | 57.75 | 592 |
| 60.01-65.00 | 555 | 87,649,962.49 | 8.72 | 157,927.86 | 8.688 | 89.30 | 89.30 | 64.39 | 615 |
| 65.01-70.00 | 398 | 66,314,018.85 | 6.60 | 166,618.14 | 8.422 | 76.66 | 77.52 | 68.09 | 607 |
| 70.01-75.00 | 342 | 58,911,855.72 | 5.86 | 172,256.89 | 8.304 | 75.22 | 76.34 | 73.90 | 597 |
| 75.01-80.00 | 1,577 | 275,587,631.86 | 27.41 | 174,754.36 | 7.880 | 79.70 | 91.97 | 79.70 | 617 |
| 80.01-85.00 | 564 | 91,266,135.21 | 9.08 | 161,819.39 | 8.770 | 84.41 | 84.73 | 84.41 | 600 |
| 85.01-90.00 | 683 | 126,144,122.48 | 12.55 | 184,691.25 | 8.553 | 89.59 | 89.73 | 89.59 | 624 |
| 90.01-95.00 | 919 | 131,540,866.34 | 13.08 | 143,134.78 | 9.284 | 94.80 | 94.82 | 94.80 | 619 |
| 95.01-100.00 | 1,276 | 115,902,673.94 | 11.53 | 90,832.82 | 10.043 | 99.93 | 99.93 | 99.93 | 644 |
| Total | 6,718 | $1,005,346,177.87 | 100.00% | $149,649.62 | 8.632% | 84.37% | 88.03% | 81.55% | 617 |

[1]   The Effective Loan-to-Value Ratio is equal to the product of (i) the original balance of the loan plus any senior lien balance (as applicable) divided by the property value as determined at origination and (ii) one minus the Coverage Percentage.

- 47 -

147.    The following charts appeared in the 2007-AR5 Prospectus:

**Loan-to-Value Ratios of the Group 1 Mortgage Loans at Origination**

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 21.43 - 25.00 | 8 | $ 2,362,555.37 | 0.31% | 6.230% | 745 | 22.69% |
| 25.01 - 30.00 | 4 | 763,646.19 | 0.10 | 6.600 | 746 | 28.43 |
| 30.01 - 35.00 | 14 | 4,634,347.75 | 0.61 | 6.266 | 751 | 32.06 |
| 35.01 - 40.00 | 11 | 2,522,630.63 | 0.33 | 6.345 | 754 | 37.83 |
| 40.01 - 45.00 | 29 | 11,959,411.18 | 1.57 | 6.282 | 752 | 42.84 |
| 45.01 - 50.00 | 45 | 22,051,467.57 | 2.90 | 6.407 | 751 | 48.31 |
| 50.01 - 55.00 | 51 | 22,920,146.42 | 3.01 | 6.355 | 744 | 52.61 |
| 55.01 - 60.00 | 63 | 27,025,905.32 | 3.55 | 6.447 | 731 | 58.04 |
| 60.01 - 65.00 | 130 | 65,464,045.18 | 8.60 | 6.446 | 745 | 63.54 |
| 65.01 - 70.00 | 163 | 76,678,529.16 | 10.08 | 6.558 | 737 | 69.17 |
| 70.01 - 75.00 | 182 | 73,045,435.33 | 9.60 | 6.612 | 728 | 73.99 |
| 75.01 - 80.00 | 1,171 | 407,748,529.02 | 53.58 | 6.472 | 733 | 79.65 |
| 80.01 - 85.00 | 15 | 4,665,852.72 | 0.61 | 6.564 | 731 | 84.13 |
| 85.01 - 90.00 | 79 | 21,689,071.36 | 2.85 | 6.829 | 722 | 89.47 |
| 90.01 - 95.00 | 57 | 14,717,439.30 | 1.93 | 6.774 | 704 | 94.73 |
| 95.01 - 100.00 | 12 | 2,817,293.04 | 0.37 | 6.486 | 757 | 99.33 |
| Total | 2,034 | $761,066,305.54 | 100.00% | 6.497% | 735 | 73.61% |

The weighted average loan-to-value ratio at origination of the Group 1 Mortgage Loans was approximately 73.61%. No Group 1 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 100.00% or less than approximately 21.43%.

- - -

**Loan-to-Value Ratios of the Group 1-1 Mortgage Loans at Origination**

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 21.43-25.00 | 5 | $ 664,555.37 | 0.21% | 6.329% | 750 | 23.15% |
| 25.01-30.00 | 3 | 539,486.45 | 0.17 | 6.694 | 766 | 28.56 |
| 30.01-35.00 | 9 | 1,797,452.92 | 0.56 | 6.421 | 758 | 32.44 |
| 35.01-40.00 | 8 | 1,468,798.15 | 0.46 | 6.319 | 766 | 38.28 |

- 48 -

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 40.01-45.00 | 15 | 3,105,618.36 | 0.97 | 6.401 | 743 | 42.52 |
| 45.01-50.00 | 27 | 6,243,609.13 | 1.95 | 6.328 | 741 | 48.48 |
| 50.01-55.00 | 27 | 6,857,179.92 | 2.15 | 6.244 | 744 | 52.92 |
| 55.01-60.00 | 42 | 10,427,008.13 | 3.26 | 6.397 | 742 | 58.05 |
| 60.01-65.00 | 69 | 19,874,657.48 | 6.22 | 6.370 | 741 | 63.40 |
| 65.01-70.00 | 75 | 20,185,516.23 | 6.32 | 6.449 | 740 | 68.74 |
| 70.01-75.00 | 108 | 27,734,211.69 | 8.68 | 6.682 | 722 | 74.05 |
| 75.01-80.00 | 775 | 193,994,210.34 | 60.72 | 6.519 | 730 | 79.73 |
| 80.01-85.00 | 10 | 2,896,382.17 | 0.91 | 6.472 | 748 | 84.13 |
| 85.01-90.00 | 50 | 11,784,179.99 | 3.69 | 6.941 | 722 | 89.57 |
| 90.01-95.00 | 42 | 10,113,221.91 | 3.17 | 6.743 | 709 | 94.79 |
| 95.01-100.00 | 11 | 1,796,293.04 | 0.56 | 6.620 | 725 | 98.95 |
| Total | 1,276 | $319,482,381.28 | 100.00% | 6.526% | 731 | 75.60% |

The weighted average loan-to-value ratio at origination of the Group 1-1 Mortgage Loans was approximately 75.60%. No Group 1-1 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 100.00% or less than approximately 21.43%.

- - -

### Loan-to-Value Ratios of the Group 1-2 Mortgage Loans at Origination

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 22.00-25.00 | 2 | $ 1,600,000.00 | 0.42% | 6.164% | 746 | 22.39% |
| 30.01-35.00 | 3 | 2,539,894.83 | 0.67 | 6.119 | 741 | 31.81 |
| 35.01-40.00 | 2 | 954,000.00 | 0.25 | 6.369 | 739 | 37.06 |
| 40.01-45.00 | 10 | 8,120,592.82 | 2.13 | 6.228 | 755 | 42.94 |
| 45.01-50.00 | 15 | 14,869,983.44 | 3.89 | 6.437 | 755 | 48.18 |
| 50.01-55.00 | 15 | 13,532,975.64 | 3.54 | 6.367 | 743 | 52.54 |
| 55.01-60.00 | 14 | 15,449,042.71 | 4.04 | 6.467 | 723 | 58.16 |
| 60.01-65.00 | 46 | 39,770,309.11 | 10.41 | 6.484 | 745 | 63.60 |
| 65.01-70.00 | 70 | 48,945,303.59 | 12.82 | 6.583 | 736 | 69.35 |
| 70.01-75.00 | 51 | 37,582,123.19 | 9.84 | 6.546 | 730 | 74.04 |
| 75.01-80.00 | 296 | 186,358,875.23 | 48.79 | 6.392 | 735 | 79.57 |

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 80.01-85.00 | 3 | 1,414,500.00 | 0.37 | 6.718 | 701 | 84.36 |
| 85.01-90.00 | 14 | 7,432,440.42 | 1.95 | 6.597 | 724 | 89.31 |
| 90.01-95.00 | 5 | 2,341,817.84 | 0.61 | 6.682 | 672 | 94.22 |
| 95.01-100.00 | 1 | 1,021,000.00 | 0.27 | 6.250 | 813 | 100.00 |
| Total | 547 | $381,932,858.82 | 100.00% | 6.445% | 736 | 71.92% |

The weighted average loan-to-value ratio at origination of the Group 1-2 Mortgage Loans was approximately 71.92%. No Group 1-2 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 100.00% or less than approximately 22.00%.

- - -

**Loan-to-Value Ratios of the Group 1-3 Mortgage Loans at Origination**

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 24.50-25.00 | 1 | $ 98,000.00 | 0.16% | 6.625% | 686 | 24.50% |
| 25.01-30.00 | 1 | 224,159.74 | 0.38 | 6.375 | 696 | 28.13 |
| 30.01-35.00 | 2 | 297,000.00 | 0.50 | 6.593 | 793 | 31.89 |
| 35.01-40.00 | 1 | 99,832.48 | 0.17 | 6.500 | 729 | 38.46 |
| 40.01-45.00 | 4 | 733,200.00 | 1.23 | 6.370 | 764 | 43.11 |
| 45.01-50.00 | 3 | 937,875.00 | 1.57 | 6.473 | 754 | 49.12 |
| 50.01-55.00 | 9 | 2,529,990.86 | 4.24 | 6.592 | 749 | 52.19 |
| 55.01-60.00 | 7 | 1,149,854.48 | 1.93 | 6.634 | 739 | 56.37 |
| 60.01-65.00 | 15 | 5,819,078.59 | 9.76 | 6.449 | 754 | 63.58 |
| 65.01-70.00 | 18 | 7,547,709.34 | 12.65 | 6.684 | 740 | 69.10 |
| 70.01-75.00 | 23 | 7,729,100.45 | 12.96 | 6.679 | 738 | 73.54 |
| 75.01-80.00 | 100 | 27,395,443.45 | 45.93 | 6.683 | 741 | 79.56 |
| 80.01-85.00 | 2 | 354,970.55 | 0.60 | 6.707 | 715 | 83.26 |
| 85.01-90.00 | 15 | 2,472,450.95 | 4.14 | 6.994 | 713 | 89.49 |
| 90.01-95.00 | 10 | 2,262,399.55 | 3.79 | 7.004 | 717 | 95.00 |
| Total | 211 | $59,651,065.44 | 100.00% | 6.671% | 740 | 73.79% |

- 50 -

The weighted average loan-to-value ratio at origination of the Group 1-3 Mortgage Loans was approximately 73.79%. No Group 1-3 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 95.00% or less than approximately 24.50%.

- - -

### Loan-to-Value Ratios of the Group 2 Mortgage Loans at Origination

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 13.64-15.00 | 1 | $ 150,000.00 | 0.09% | 6.875% | 783 | 13.64% |
| 20.01-25.00 | 1 | 200,000.00 | 0.12 | 7.000 | 694 | 24.69 |
| 25.01-30.00 | 2 | 526,500.00 | 0.31 | 6.815 | 775 | 26.81 |
| 35.01-40.00 | 7 | 5,278,539.58 | 3.11 | 6.533 | 749 | 39.11 |
| 40.01-45.00 | 7 | 2,758,754.87 | 1.62 | 6.790 | 767 | 44.00 |
| 45.01-50.00 | 11 | 6,121,812.86 | 3.60 | 6.608 | 747 | 48.30 |
| 50.01-55.00 | 7 | 3,103,690.81 | 1.83 | 6.787 | 698 | 53.11 |
| 55.01-60.00 | 19 | 15,502,741.10 | 9.12 | 6.849 | 723 | 58.70 |
| 60.01-65.00 | 30 | 16,431,824.37 | 9.67 | 6.695 | 738 | 63.35 |
| 65.01-70.00 | 29 | 18,486,313.53 | 10.88 | 6.911 | 727 | 68.18 |
| 70.01-75.00 | 53 | 23,271,894.86 | 13.69 | 6.813 | 724 | 74.19 |
| 75.01-80.00 | 203 | 69,080,500.79 | 40.65 | 6.745 | 731 | 79.66 |
| 80.01-85.00 | 2 | 736,198.08 | 0.43 | 6.578 | 688 | 83.25 |
| 85.01-90.00 | 24 | 4,553,258.71 | 2.68 | 7.104 | 731 | 89.78 |
| 90.01-95.00 | 15 | 3,755,342.08 | 2.21 | 6.955 | 718 | 94.78 |
| Total | 411 | $169,957,371.64 | 100.00% | 6.781% | 730 | 71.05% |

The weighted average loan-to-value ratio at origination of the Group 2 Mortgage Loans was approximately 71.05%. No Group 2 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 95.00% or less than approximately 13.64%.

- - -

**Loan-to-Value Ratios of the Group 2-1 Mortgage Loans at Origination**

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 13.64-15.00 | 1 | $   150,000.00 | 0.21% | 6.875% | 783 | 13.64% |
| 20.01-25.00 | 1 | 200,000.00 | 0.28 | 7.000 | 694 | 24.69 |
| 25.01-30.00 | 2 | 526,500.00 | 0.73 | 6.815 | 775 | 26.81 |
| 35.01-40.00 | 4 | 829,000.00 | 1.14 | 6.491 | 720 | 38.27 |
| 40.01-45.00 | 6 | 1,908,754.87 | 2.63 | 6.807 | 757 | 43.67 |
| 45.01-50.00 | 6 | 1,334,268.24 | 1.84 | 6.556 | 736 | 47.36 |
| 50.01-55.00 | 4 | 884,490.81 | 1.22 | 6.553 | 750 | 51.88 |
| 55.01-60.00 | 10 | 2,594,185.57 | 3.58 | 6.847 | 737 | 58.03 |
| 60.01-65.00 | 16 | 5,263,559.34 | 7.26 | 6.802 | 749 | 62.87 |
| 65.01-70.00 | 20 | 6,865,482.41 | 9.47 | 6.802 | 748 | 68.26 |
| 70.01-75.00 | 36 | 9,600,362.71 | 13.25 | 6.820 | 731 | 74.04 |
| 75.01-80.00 | 148 | 34,230,745.56 | 47.24 | 6.844 | 731 | 79.75 |
| 80.01-85.00 | 2 | 736,198.08 | 1.02 | 6.578 | 688 | 83.25 |
| 85.01-90.00 | 22 | 3,588,754.31 | 4.95 | 7.149 | 728 | 89.73 |
| 90.01-95.00 | 15 | 3,755,342.08 | 5.18 | 6.955 | 718 | 94.78 |
| Total | 293 | $72,467,643.98 | 100.00% | 6.839% | 734 | 74.17% |

The weighted average loan-to-value ratio at origination of the Group 2-1 Mortgage Loans was approximately 74.17%. No Group 2-1 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 13.64% or less than approximately 95.00%.

- - -

**Loan-to-Value Ratios of the Group 2-2 Mortgage Loans at Origination**

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 38.07-40.00 | 3 | $ 4,449,539.58 | 4.56% | 6.541% | 754 | 39.26% |
| 40.01-45.00 | 1 | 850,000.00 | 0.87 | 6.750 | 790 | 44.74 |
| 45.01-50.00 | 5 | 4,787,544.62 | 4.91 | 6.622 | 751 | 48.57 |
| 50.01-55.00 | 3 | 2,219,200.00 | 2.28 | 6.880 | 678 | 53.60 |
| 55.01-60.00 | 9 | 12,908,555.53 | 13.24 | 6.849 | 721 | 58.83 |
| 60.01-65.00 | 14 | 11,168,265.03 | 11.46 | 6.644 | 733 | 63.57 |

- 52 -

| Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date | Weighted Average Mortgage Rate (%) | Weighted Average FICO | Weighted Average Original LTV (%) |
|---|---|---|---|---|---|---|
| 65.01-70.00 | 9 | 11,620,831.12 | 11.92 | 6.976 | 715 | 68.13 |
| 70.01-75.00 | 17 | 13,671,532.15 | 14.02 | 6.807 | 719 | 74.30 |
| 75.01-80.00 | 55 | 34,849,755.23 | 35.75 | 6.647 | 730 | 79.56 |
| 85.01-90.00 | 2 | 964,504.40 | 0.99 | 6.936 | 743 | 90.00 |
| Total | 118 | $97,489,727.66 | 100.00% | 6.738% | 727 | 68.73% |

The weighted average loan-to-value ratio at origination of the Group 2-2 Mortgage Loans was approximately 68.73%. No Group 2-2 Mortgage Loan had a loan-to-value ratio at origination greater than approximately 90.00% or less than approximately 38.07%.

148.    The above-stated LTV ratios were false, inaccurate and understated because, as alleged above, the appraisals of the properties underlying the mortgage loans were inaccurate and inflated.  Incorporating an inflated appraisal into the LTV calculation will result in an artificially lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90 percent.  If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75 percent ($90,000/$120,000).  Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts were safer and less risky than they really were.

**The Prospectus Supplements Misstated the Certificates' True Investment Rating**

149.    Each of the Prospectus Supplements stated that the Certificates would not be offered unless they received ratings from a rating agency – such as S&P, Moody's, or Fitch Ratings – that were at least as high as those set forth in the Prospectus Supplements.  All of the ratings set forth in the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB).

- 53 -

150.    The 2007-WFHE2 Prospectus stated the following with regard to investment ratings:

It is a condition to the issuance of the offered certificates that the offered certificates receive not lower than the following ratings from Moody's Investors Service, Inc., or Moody's, and Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or S&P:

| Offered Certificates | Moody's | S&P |
|---|---|---|
| Class A-1 | Aaa | AAA |
| Class A-2 | Aaa | AAA |
| Class A-3 | Aaa | AAA |
| Class A-4 | Aaa | AAA |
| Class M-1 | Aa1 | AA+ |
| Class M-2 | Aa2 | AA |
| Class M-3 | Aa2 | AA- |
| Class M-4 | Aa3 | A+ |
| Class M-5 | A1 | A |
| Class M-6 | A2 | A- |
| Class M-7 | A3 | BBB+ |
| Class M-8 | Baa1 | BBB |
| Class M-9 | Baa2 | BBB- |
| Class M-10 | Baa3 | BB+ |

151.    The 2007-AR5 Prospectus stated the following with regard to investment rating:

It is a condition to the issuance of the Offered Certificates that the Offered Certificates receive not lower than the following ratings from Fitch Ratings, or Fitch, and Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or S&P:

| Offered Certificates | Fitch | S&P |
|---|---|---|
| Class 1-A1A | AAA | AAA |
| Class 1-A2A | AAA | AAA |
| Class 1-A12B | AAA | AAA |
| Class 1-12IO | AAA | AAA |
| Class 1-A3A | AAA | AAA |
| Class 1-A3B | AAA | AAA |
| Class 1-3IO | AAA | AAA |
| Class 1-B1 | AA | (1) |
| Class 1-B2 | A | (1) |
| Class 1-B3 | BBB | (1) |
| Class 1-R | AAA | AAA |

- 54 -

| Offered Certificates | Fitch | S&P |
|---|---|---|
| Class 2-A1A | AAA | AAA |
| Class 2-A2A | AAA | AAA |
| Class 2-AB | AAA | AAA |
| Class 2-AIO | AAA | AAA |
| Class 2-BIO | AAA | AAA |
| Class 2-B1 | AA | (1) |
| Class 2-B2 | A | (1) |
| Class 2-B3 | BBB | (1) |
| Class 2-R | AAA | AAA |

_____
(1) Not rated by this rating agency.

152.    S&P and Fitch Ratings summarize their credit ratings as follows:

| AAA | Extremely strong capacity to meet financial commitments.  Highest Rating. |
|---|---|
| AA | Very strong capacity to meet financial commitments. |
| A | Strong capacity to meet financial commitments, but somewhat susceptible to adverse economic conditions and changes in circumstances. |
| BBB | Adequate capacity to meet financial commitments, but more subject to adverse economic conditions. |
| BBB- | Considered lowest investment grade by market participants. |
| BB+ | Considered highest speculative grade by market participants. |
| BB | Less vulnerable in the near-term but faces major ongoing uncertainties to adverse business, financial and economic conditions. |
| B | More vulnerable to adverse business, financial and economic conditions but currently has the capacity to meet financial commitments. |
| CCC | Currently vulnerable and dependent on favorable business, financial and economic conditions to meet financial commitments. |
| CC | Currently highly vulnerable. |
| C | Currently highly vulnerable obligations and other defined circumstances. |
| D | Payment default on financial commitments. |

153.     Moody's summarizes their credit ratings as follows:

| Aaa | Obligations rated Aaa are judged to be of the highest quality, with minimal credit risk. |
|---|---|
| Aa | Obligations rated Aa are judged to be of high quality and are subject to very low credit risk. |
| A | Obligations rated A are considered upper-medium grade and are subject to low credit risk. |
| Baa | Obligations rated Baa are subject to moderate credit risk.  They are considered medium grade and as such may possess certain speculative characteristics. |
| Ba | Obligations rated Ba are judged to have speculative elements and are subject to substantial credit risk. |
| B | Obligations rated B are considered speculative and are subject to high credit risk. |
| Caa | Obligations rated Caa are judged to be of poor standing and are subject to very high credit risk. |
| Ca | Obligations rated Ca are highly speculative and are likely in, or very near, default, with some prospect of recovery of principal and interest. |
| C | Obligations rated C are the lowest rated class of bonds and are typically in default, with little prospect for recovery of principal or interest. |

154.     Moody's further appends numerical modifiers 1, 2, and 3 to each generic rating classification from Aa through Caa.  The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of that generic rating category.

155.     The ratings stated in the Prospectus Supplements were based, as alleged below, on outdated assumptions, relaxed ratings criteria, and inaccurate loan information.  These flaws produced artificially high credit ratings for the Certificates, making them appear safer and less risky than they really were.

156.    Indeed, 33 out of the 34 tranches in 2007-AR5 and 2007-WFHE2 securities have been severely downgraded since the Offering took place.  For example, the S&P ratings for the classes bought by Lead Plaintiffs all have fallen from AAA to less than "Investment Grade":

| Security (Class) | Original Rating | Current Rating |
|---|---|---|
| CMLT 2007-AR5 (1-A1A) | AAA | CCC |
| CMLT 2007-AR5 (2-A1A) | AAA | CCC |
| CMLT 2007-WFHE2 (A2) | AAA | BB |

**The Models that Produced the Certificates' Ratings Were Based upon Outdated Assumptions Regarding Loan Performance**

157.    Moody's and S&P used models to produce the ratings for the Certificates.  These models were based upon loan performance *prior* to the year 2000.  However, an unprecedented decline and deterioration in mortgage lending standards occurred *after* 2000.  For instance, from 2001 through 2005, (i) the percentage of "sub-prime" mortgage loans tripled; (ii) the combined LTV ratio of loans in excess of 90% tripled; (iii) "limited documentation" loans (or "liar loans") nearly quadrupled; (iv) "interest only" and "option" ARMs quintupled; (v) "piggy back" or second-lien mortgages doubled; (vi) the amount of equity U.S. homeowners stripped out of their homes tripled; (vii) the volume of loans originated for "second homes" more than tripled; (viii) the percentage of loans including "silent seconds" – a nearly non-existent phenomenon a few years prior to the issuance of the Certificates – experienced over a 16,000% increase; and (ix) the volume of nontraditional mortgages more than quintupled.

158.    This decline in lending standards and increase in riskier exotic mortgage products during the 2001 through 2005 time period rendered Moody's and S&P's pre-2000 loan performance data obsolete.  However, these agencies did not update their models to reflect these changes.  Thus, by the time the agencies provided "investment grade" certifications to the Certificates, their historical data no longer reflected the reality that mortgage credit quality was rapidly deteriorating.

- 57 -

159.    Moody's and S&P continued to use these outmoded models even though more current and accurate models were available.  According to Frank Raiter – the Managing Director and Head of RMBS Ratings at S&P from March 1995 to April 2005 – S&P had developed models that accounted for the new type of mortgage products available after 2000 (particularly Alt-A type loans). These models better captured the changes in the post-2000 mortgage landscape and were therefore better at determining default risks posed by these new mortgages.  However, S&P did not implement these models due to their cost and because improving the model would not add to S&P's revenues (as S&P's RMBS group already enjoyed the largest ratings market share amongst the three major rating agencies).  As Raiter explained, the unfortunate consequences of continuing to use out-dated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market."  The current President of S&P, Deven Sharma, agreed, noting "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work. . . . [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

160.    Executives at Moody's also acknowledged a lack of investment in Moody's rating models and the failure of Moody's rating models to capture the deterioration in lending standards.  In an internal e-mail, Raymond McDaniel, the current Chairman and Chief Executive Officer of Moody's, noted that a lack of investment in updating the rating models can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment."  McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. Brian Clarkson – the former President and Chief Operating Officer of Moody's – also recognized

- 58 -

Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decline in underwriting standards]."

161.    Not only were Moody's and S&P's models based on outmoded data, but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And in some instances real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor rating agency.

**The Rating Agencies' Relaxing of Ratings Criteria Led to
Artificially High Ratings for the Certificates**

162.    In addition to using flawed models to generate ratings, Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  This easing of ratings standards was due in large part to the fact that rating agencies like Moody's and S&P were compensated by the very entities that they provided ratings to, and the fact that those entities were free to shop around for the rating agency that would provide them with the highest ratings.  As former S&P Managing Director – Richard Gugliada – explained, the easing of standards as a "***market-share war where criteria were relaxed***" and admitted "***I knew it was wrong at the time . . . [i]t was either that or skip the business***.  That wasn't my mandate.  My mandate was to find a way.  Find the way."  According to Gugliada, when the subject of tightening S&P's rating criteria came up, the co-director of CDO ratings, David Tesher, said "Don't kill the golden goose."  This comment reflected Tesher's belief that if S&P implemented more stringent rating criteria than its competitors (and thereby began assigning lower ratings to investments that it rated), entities that needed their investments rated – such as the defendants herein – would avoid S&P.  Instead, these entities would seek ratings from S&P's competitors who, because they had weaker rating criteria, would assign a higher rating to the investment.

- 59 -

163.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney") – two S&P analysts describing S&P's rating of an investment similar to the Trusts:

Shah:  btw – that deal is ridiculous

Mooney:  i know right . . . **[model def does not capture half of the rish [sic]]**

Mooney:  *risk*

Shah:  *we should not be rating it*

Mooney:  *we rate every deal*

Mooney:  *it could be structured by cows and we would rate it*

Shah:  but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

164.    In another e-mail, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters*."

165.    The loosening of ratings criteria due to market share considerations was evident at Moody's also.  Jerome Fons, a former Managing Director for Credit Quality at Moody's, indicated that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

166.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in

- 60 -

this [rating] shopping spree" and made it "relatively easy for the major banks to play the agencies off one another."  Fons said it was this business model that "***prevented analysts from putting investor interests first***."

167.   McDaniel of Moody's also acknowledged the degradation of ratings standards.  In a presentation to Moody's board of directors in October 2007, McDaniel told his board "The real problem is not that the market . . . underweight[s] ratings quality but rather that in some sectors, it actually penalizes quality . . . .  It turns out that ***ratings quality has surprisingly few friends***."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal* found that in at least one instance, Moody's increased the amount of a mortgage deal that was rated triple-A after its client complained and said it might go with a different rating firm.

168.   As McDaniel noted, this degradation of ratings quality was not limited to Moody's: "What happened in '04 and '05 with respect to subordinated tranches is that our competition, ***Fitch and S&P, went nuts.  Everything was investment grade.  It didn't really matter***."

**Due to Defects in the Underwriting Process, Inaccurate Data**
**was Entered into the Ratings Models Thereby Yielding Inaccurate Ratings**

169.   In addition to the eroding rating standards and the flawed rating models alleged above, Moody's and S&P's ratings were also based on inaccurate information.  The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that Citigroup Mortgage provided to them – including appraisal values, LTV ratios, and borrower credit-worthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As alleged above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation and falsification, and the other facets of defective

- 61 -

underwriting alleged herein.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence was performed.  During a "Town Hall Meeting" hosted by Moody's McDaniel, executives at Moody's acknowledged that the Rating Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true . . . [W]e relied on reps and warrantees that no loans were originated in violation of any state or federal law.  We know that's a lie.

> \*       \*       \*

> There's a lot of fraud that's involved there, things that we didn't see . . .  We're sort of retooling those to make sure that we capture a lot of the things that we relied on in the past that we can't rely on, on a going forward basis.

> \*       \*       \*

> [W]e're being asked to figure out how much everyone lied. . . .  [If] all of the information was truthful and comprehensive and complete, we wouldn't have an issue here.

> \*       \*       \*

> What we're really being asked to do is figure out how much lying is going on and bake that into a credit [rating] . . . which is a pretty challenging thing to do.  I'm not sure how you tackle that from a modeling standpoint.

170.    In response to the "Town Hall Meeting," a Moody's employee noted:

[W]hat really went wrong with Moody's subprime ratings leading to massive downgrades and potential more downgrades to come?  We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets.  As for #1, it seems to me that *we had blinders on and never questioned the information we were given*.  Specifically, why would a rational borrower with full information sign up for a floating rate loan that they couldn't possibly repay, and why would an ethical and responsible lender offer such a loan?  As for #2, *it is our job to think of the worst case scenarios and model for them*. . . . *Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both*.  [Emphasis added.]

- 62 -

171. Because Moody's and S&P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk. Certificates were given investment grade ratings when in reality they were not of investment grade quality. As such, the statements regarding the ratings of the Certificates were false and misleading.

172. The problems identified above were not disclosed to the public and resulted in artificially high ratings for the Certificates. These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

### DISCLOSURES EMERGE ABOUT PROBLEMS WITH
### LOANS UNDERLYING THE CERTIFICATES

173. After the sale of the Certificates, the rating on Certificates within each of the Trusts have been downgraded. In some instances, Certificates that received the highest rating of AAA at issuance have fallen many notches and are now rated CCC – a rating many levels below the threshold for "junk status."

174. These downgrades have occurred because the original ratings did not accurately reflect the risk associated with the assets underlying the Certificates.

### COUNT I

### Violations of §11 of the 1933 Act Against
### All Defendants

175. Plaintiffs repeat and re-allege the allegations set forth above as if set forth fully herein. For purposes of this cause of action, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act. This cause of

action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

176.    The Registration Statement for the Certificate offerings was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

177.    Each of the Defendant Issuers are strictly liable to plaintiffs and the Class for the misstatements and omissions complained of herein.

178.    The Individual Defendants signed the Registration Statement which was false due to the misstatements described above.

179.    Defendant Citigroup Global was an underwriter of the Certificates and sold and marketed these investments to members of the Class.

180.    None of these defendants made a reasonable investigation to ensure that the statements contained in the Registration Statement were true and not misleading.  Nor did they possess reasonable grounds to represent that these statements were true and not misleading.

181.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

182.    Citigroup Global was the underwriter for the following issuances:

> Citigroup Mortgage Loan Trust 2007-AR5
> Citigroup Mortgage Loan Trust 2007-WFHE2

183.    Plaintiffs acquired the Certificates pursuant and/or traceable to the Registration Statement.

184.    Plaintiffs and the Class have sustained damages as the value of the Certificates has declined substantially subsequent to the disclosures of defendants' misconduct.

- 64 -

521318_1

185.    At the time of their purchases of the Certificates, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to early January 2008.  Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint was based to the time that plaintiffs filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiffs filed the initial complaint.

## COUNT II

### Violations of §12(a)(2) of the 1933 Act
### Against All Defendants

186.    Plaintiffs repeat and re-allege the allegations above as if set forth fully herein.  For purposes of this cause of action, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this cause of action is based solely on claims of strict liability and/or negligence under the 1933 Act.

187.    By means of the defective Prospectus Supplements, defendants promoted and sold the Certificates to plaintiffs and other members of the Class.

188.    The Prospectus Supplements contained untrue statements of material fact, and concealed and failed to disclose material facts, as alleged above.  Defendants owed plaintiffs and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus Supplements to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus Supplements as set forth above.

- 65 -

521318_1

189.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the Prospectus Supplements at the time they acquired the Certificates.

190.    By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the Certificates pursuant to the Prospectus Supplements sustained substantial damages in connection with their purchases of the Certificates.  Accordingly, plaintiffs and the other members of the Class who hold the Certificates issued pursuant to the Prospectus Supplements have the right to rescind and recover the consideration paid for their shares, and hereby tender their Certificates to the Defendants sued herein.  Class members who have sold their Certificates seek damages to the extent permitted by law.

## COUNT III

### Violations of §15 of the 1933 Act
### Against the Individual Defendants and Citigroup Mortgage

191.    Plaintiffs repeat and re-allege each and every allegation contained above.

192.    This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and Citigroup Mortgage.

193.    Each of the Individual Defendants was a control person of Citigroup Mortgage and of the Trusts by virtue of his or her position as a director and/or senior officer of Citigroup Mortgage. The Individual Defendants were responsible for the preparation of the contents of the Registration Statement which incorporated by reference the statements in the Prospectus Supplements.

194.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statement and having otherwise participated in the consummation of the offerings detailed herein.

- 66 -

195.    Citigroup Mortgage was the Depositor and an Issuer for the offerings.    The defendants named herein were responsible for overseeing the formation of the Defendant Issuers as well as the operations of the Defendant Issuers, including routing payments from the borrowers to investors.

196.    Citigroup Mortgage and the Individual Defendants prepared, reviewed and/or caused the Registration Statement and Prospectus Supplements to be filed and disseminated.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiffs as Class representatives;

B.      Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable/injunctive or other relief as deemed appropriate

by the Court.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury.

DATED:  May 24, 2010                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        ARTHUR C. LEAHY
                                        THOMAS E. EGLER
                                        SCOTT H. SAHAM
                                        SUSAN G. TAYLOR
                                        MATTHEW I. ALPERT
                                        NATHAN R. LINDELL


                                            s/ THOMAS E. EGLER
                                        THOMAS E. EGLER

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        DAVID A. ROSENFELD
                                        CAROLINA C. TORRES
                                        JARRETT S. CHARO
                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        Lead Counsel for Plaintiff

- 68 -

VANOVERBEKE MICHAUD &
   TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

521318_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 24, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 24, 2010.

s/ THOMAS E. EGLER
THOMAS E. EGLER

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  tome@rgrdlaw.com

521318_1

# Mailing Information for a Case 2:08-cv-01418-LDW-ETB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  malpert@rgrdlaw.com,hectorm@rgrdlaw.com

- **Jarrett S Charo**
  jcharo@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas E. Egler**
  tome@rgrdlaw.com,nlindell@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Lawrence B. Friedman**
  lfriedman@cgsh.com,tgeiger@cgsh.com,maofiling@cgsh.com,kspiering@cgsh.com,jkpark@cgsh.com,lvitale@c

- **Shawn Hynes**
  shynes@cgsh.com

- **Arthur C. Leahy**
  artl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Nathan R Lindell**
  nlindell@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David A. Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com,e_file_ny@csgrr.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan G. Taylor**
  susant@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)